**FILED**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAR 2 3 2004

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

SIGNATOR INVESTORS, INC., SIGNATOR )
INSURANCE AGENCY, INC., individually and )
as wholly-owned subsidiaries of JOHN )
HANCOCK FINANCIAL SERVICES, INC., )
)
Plaintiffs, )
)
v. )
)
ROBERT LYMAN, MARK BERNHAGEN, )
KEITH MOONEY and THOMAS KOCHAN, )
)
Defendants. )

**04C 2149**

**DOCKETED**

MAR 2 4 2004

**JUDGE JOAN H. LEFKOW**

**MAGISTRATE JUDGE LEVIN**

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

### Introduction

Plaintiffs seek, in aid of arbitration, temporary and permanent injunctive relief as well as money damages against defendants, a group of former managers, employees, agents and representatives who unlawfully conspired to raid the plaintiffs' business and deliver it to a competitor of plaintiffs for which they are now working. Consequently, plaintiffs seek relief arising out of defendants': (a) misappropriation and conversion of plaintiffs' confidential customer and business information and trade secrets; (b) wrongful solicitation of plaintiffs' clients and personnel; (c) breaches of the fiduciary duties and the contractual obligations owed plaintiffs; and (d) violations of Illinois statutory law governing trade secrets and fair business practices.

## THE PARTIES

### The Signator Entities

1.  John Hancock Financial Services, Inc. ("JH Services") is a financial services holding company organized and existing under the law of Delaware with a principal place of business in Boston, Suffolk County, Massachusetts. JH Services and its subsidiary and affiliated companies offer a broad array of investment and insurance products to individual and institutional customers.

2.  Plaintiff Signator Investors, Inc. ("Signator Investors") is a Delaware corporation with a principal place of business in Boston, Suffolk County, Massachusetts, and is a wholly owned subsidiary of JH Services. Signator Investors is a securities broker/dealer registered with the Securities and Exchange Commission ("SEC") and a member firm of the National Association of Securities Dealers, Inc. ("NASD"). It sells investment products and services directly to retail customers through registered representatives who are licensed by, among others, the NASD to sell on behalf of Signator Services.

3.  Plaintiff Signator Insurance Agency, Inc. ("Signator Insurance") is a Massachusetts corporation with a principal place of business in Boston, Suffolk County, Massachusetts, and is a wholly owned subsidiary of JH Services. Signator Insurance offers insurance, investment and advisory products and services directly to retail customers through agents and brokers who are licensed and registered to sell John Hancock and Signator products. (JH Services, Signator Investors and Signator Insurance shall be referred to collectively as "Signator" or "Plaintiffs.")

4.  At all relevant times, Plaintiffs maintained a branch office located at 1901 N. Roselle Road, Suite 620, Schaumburg, Illinois (the "Chicago North Branch Office").

### The Former Signator Managers and Registered Representatives

### Kochan – Plaintiffs' Former Regional Vice President

5.  Defendant Thomas Kochan ("Kochan") is an individual who resides, upon information and belief, at 1175 Radford Drive, Aurora, Illinois 60504. From 1974 until January 2002, Kochan was a registered representative of Plaintiffs.

6.  From 1990 until January 2002, Kochan was employed by Plaintiffs in various executive level positions, including: Director of Agencies in the Great Lakes Region (February 1990 through June 1992); Regional Vice President of the Great Lakes Region (June 1992 through January 2000); head of the Field Implementation Unit (January 2000 through December 2000); and Regional Vice President of the Transition Region (formerly known as the Great Lakes Region) (December 2000 through January 2002).

7.  While Regional Vice President, Kochan was responsible for, among other things, supervising the operations of the Signator offices and personnel within the Great Lakes/Transition Region, including the Chicago North Branch Office.

8.  Solely by virtue of his management position, Kochan gained access to Plaintiffs' most highly confidential information, including extensive data about Plaintiffs' clients and the producers and registered representatives that reported directly and indirectly to Kochan.

9.  Kochan is now a registered representative of Associated Securities Corp ("ASC"), a securities broker-dealer. See Exhibit A. ASC is a member of the NASD and is registered and licensed with both the NASD and the State of Illinois to conduct

business within Illinois. Upon information and belief, Kochan is the Branch Manager or, as the position is defined formally in the securities industry, the Office of Supervisory Jurisdiction ("OSJ") for the ASC office located at 1901 N. Roselle Road, Suite 834, Schaumburg, Illinois 60195. The ASC office is thus located in the same building in which the Plaintiffs' Chicago North Branch Office is located.

### Lyman – Plaintiffs' Former Branch Manager and General Agent

10. Defendant Robert Lyman ("Lyman") is an individual who resides at 792 Wortham Drive, Mundelein, Illinois 60060. From January 1996 until his abrupt resignation on March 8, 2004, Lyman served as the General Agent, Branch Manager and OSJ of Plaintiffs' Chicago North Branch Office.

11. As Plaintiffs' Branch Manager, OSJ and General Agent, Lyman directly supervised all of Plaintiffs' employees, agents and registered representatives in the Chicago North Branch Office. He was also in charge of insuring that all personnel in the Office acted solely in furtherance of Plaintiffs' interests and that Plaintiffs' valuable customer and sales information was kept confidential.

12. Solely by virtue of his management position, Lyman gained access to Plaintiffs' most highly confidential information, including extensive data about Plaintiffs' clients and the producers and registered representatives that reported directly and indirectly to Lyman.

13. Upon information and belief, Lyman is now working with or on behalf of Kochan and/or ASC.

### Bernhagen and Mooney -- Plaintiffs' Former Branch Manager, Agency Compliance Specialist and Producers

14. Defendant Mark Bernhagen ("Bernhagen") is an individual who resides at

23801 Douglas Drive, Plainfield, Illinois 60544.

15.  Before March 8, 2004, Bernhagen was a registered representative and agent of Plaintiffs and worked out of the Chicago North Branch Office under Lyman's supervision. From 1999 until October 2003, Bernhagen served as the Agency Compliance Specialist in the Chicago North Branch Office.

16.  Prior to 1999, Bernhagen was employed by Plaintiffs as the Branch Manger and General Agent of their Naperville, Illinois office. Bernhagen worked for Plaintiffs continuously in excess of ten years.

17.  Solely by virtue of his management positions, Bernhagen gained access to Plaintiffs' most highly confidential information, including extensive data about Plaintiffs' clients and the producers and registered representatives that reported directly and indirectly to Bernhagen. He was also intimately familiar with and responsible for enforcing and monitoring compliance with, among other things, Plaintiffs' rules and regulations governing use and disclosure of customer and sales information.

18.  Upon information and belief, Bernhagen is now working with or on behalf of Kochan and/or ASC.

19.  Defendant Keith B. Mooney ("Mooney") is an individual who resides at 843 Tipperary Gilberts, Illinois. For seven years, or from 1997 until March 8, 2004, Mooney worked out of the Chicago North Branch Office under Lyman's supervision. Before his sudden resignation, Mooney was the largest and most successful producer in the Chicago North Branch Office.

20.  On March 17, 2004, Mooney transferred his securities registration to ASC. Mooney now works out of the new ASC branch office located at 5 Executive Court,

South Barrington, Illinois.

## JURISDICTION AND VENUE

21.    This Court, pursuant to 28 U.S.C. §1332, has jurisdiction over this matter based upon diversity of citizenship.  The controversy is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

22.    Venue is proper in the Northern District of Illinois because the claims for relief asserted in this Complaint arose in this District.

## STATEMENT OF FACTS

### Background

**Signator Provides its Managers and Producers the Means to Acquire and Service Customers**

23.    Each Signator office is managed by a Branch Manager and a Managing Director or General Agent (in many instances the same person) (referred to herein as a "Manager") who is trained, selected and works for Signator.  The Manager directs and supervises the activities of the producers, registered representatives and employees working at the Signator office for which he or she is responsible.

24.    Signator furnishes all financial and other resources necessary to enable its Managers to:  establish and maintain a branch office; recruit, hire and train individuals to staff the office and sell Signator products; and maintain and enhance Signator's business.

25.    Managers are provided a generous compensation package and receive commission payments that are based upon the profitability of the branch office for which they are responsible.  Additionally, Managers are eligible for stock grants and to participate in Signator's group benefit plans which are maintained and administered at Signator's expense, including the Signator Employees' 401(k) Matched Savings Plan.

26.    Signator provides extensive and ongoing professional support to all of its agents and registered representatives, producers and Managers.  Such support includes the provision of marketing materials, a comprehensive training program, broker-dealer support services and compliance training and assistance.

27.    Managers and producers also derive substantial benefit from Signator's investments in advertising, promotional marketing and sales support, and from the considerable goodwill and recognition associated with the Signator/John Hancock name.

28.    The primary responsibilities and obligations of a Manager are to manage and supervise the registered representatives and agents of the office and to ensure that accurate and complete books and records are maintained for the benefit and as the exclusive property of Signator.

29.    Signator's registered representatives, producers and agents also have the responsibility and obligation to ensure that accurate and complete books and records are maintained for the benefit and as the exclusive property of Signator.

30.    Such records include confidential, proprietary and competitively sensitive information about Signator's customers and policyholders including, but not limited to, the customer's name, address, social security number, account number, telephone number, financial statements, medical information, insurance goals, investment objectives, investment activities, net worth, and/or information regarding the insurance policies and securities purchased and held by customers.

31.    Much of this information is stored on a proprietary electronic recordkeeping computer system created and maintained at Signator's corporate headquarters and at Signator's expense.  The computer system is password protected so that only authorized

Signator employees and representatives may access the system.

32.   Via this computer system, Signator provides Managers with the means to assess and monitor the ongoing operations of the office they manage. The Manager and the Office Manager assigned to each office are the only office personnel authorized to access office-wide information on the computer system. As a further security measure, authorized users are required to establish new passwords every sixty (60) days so that Signator may ensure that only authorized users are accessing the computer records.

33.   Using Signator's systems and software, Managers are able to generate reports showing, among other things, the amount of business being conducted by producers, each producer's product mix, and the overall type and extent of business being generated in a particular office. Included within these reports are the names and other identifying information of the Signator customers and policyholders purchasing investment products.

34.   The producers supervised by the Managers are provided limited access to the information stored on the computer system. Specifically, producers are authorized and permitted to access only the information contained on the computer system that pertains to the customers and clients whom they service on behalf of Signator. In other words, a producer may review the electronic files relating to clients he or she is servicing, but not the electronic files of clients serviced by other producers. Moreover, in order to gain even this limited access to the computer system, the producer must enter a password and, like the management-level password system, the producers must re-enter a new password every sixty (60) days.

35.   Given the highly competitive nature of the financial services industry, the

identity and profiles of Signator's customers and policyholders and their financial and personal information are invaluable assets of Signator, and of extreme interest to Signator's competitors.

<u>**Defendants' Affiliation with Plaintiffs and Their Obligations**</u>

**Lyman**

36.    At all times relevant hereto, Lyman was the Manager of the Chicago North Branch Office.

37.    Lyman was paid a bonus based on the Office's production, compensation based on his own production and a percentage of the production of some of the producers in the Office.

38.    In connection therewith, Lyman signed, among other things, a General Agent's Agreement (the "Lyman General Agent Agreement"). <u>See</u> Exhibit B.

39.    In the General Agent's Agreement, Lyman agreed specifically that, for a period of two years following his termination, he would not "directly or indirectly...aid or abet others" to:

> . . . do anything to cause, persuade, encourage or assist any policyholder or annuity contract holder of [Signator] within the confines of [the counties specified in the General Agent's Agreement] to reduce, cancel, lapse or fail to renew their policy(ies) or contract(s) with [Signator].

<u>See</u> Exhibit B, ¶48B.

40.    Lyman agreed also that all records pertaining to Signator's business are the property of Signator and to return such records to Signator upon termination of his relationship with the Company.  <u>See</u> Exhibit B at ¶¶26 and 48A; <u>see</u> <u>also</u>, Exhibit C, Management Agreement, at ¶7.

41.    The Lyman General Agent Agreement and the Management Agreement are valid and binding contracts supported by consideration.

42.    In addition, Lyman agreed, in writing, to abide by the policies, procedures and requirements set forth in the Plaintiffs' Market Conduct Manual (the "Compliance Manual"). See Exhibit C, §2, ¶3.

43.    Lyman read the Compliance Manual and separately signed a written Acknowledgement agreeing to abide by its terms. See Exhibit D.

44.    The Compliance Manual confirms that all client information is "confidential" and must not be divulged to anyone "except as absolutely necessary to complete the transaction or perform a service" for the customer. See Exhibit E, p. 13.5 §M. Indeed, similar to the language in the General Agent and Management Agreements, the Compliance Manual includes a provision reinforcing that: "Client Files belong to the Company and must be returned" to Plaintiffs upon termination. Exhibit E, ¶ 7.1.

45.    Lyman had access to extensive confidential customer information and records containing, among other things: production and product mix records relating to the personnel he supervised; customer names and investment histories; the dates of renewal and expiration for products sold to customers; customer addresses and contact information; and customer investment profiles.

46.    Those records concerned *thousands* of Signator clients and *millions* of dollars in investments.

47.    Lyman, by virtue of his position and his Agreements with Plaintiffs, owed Plaintiffs a fiduciary duty to remain loyal to Plaintiffs and to refrain from, among other things, conspiring with persons he supervised and with a competitor of Signator to

misappropriate and bring to a competitor Plaintiffs' confidential information, clients, employees, agents and registered representatives.

**Bernhagen & Mooney's History and Agreements with Signator**

48. Before working under Lyman's supervision in the Chicago North Branch Office, Bernhagen served as a General Agent and Branch Manager of a Signator Office in Naperville, Illinois. From 1999 to October 2003, Bernhagen worked as the Agency Compliance Specialist in the Chicago North Branch Office. As such, Bernhagen was intimately familiar with Signator's policies and practices concerning retention and confidentiality of books and records and customer and sales information.

49. When Bernhagen was transferred to the Chicago North Branch Office in 1999, he executed a written Special Agent's Agreement (the "Bernhagen Special Agent Agreement").

50. In the Bernhagen Special Agent Agreement, Bernhagen specifically promised that, for a period of two years following his termination, he would not "directly or indirectly":

> contact any policyholder(s) or contractholder(s) who
> purchased their policy(ies) or contract(s) through
> [Bernhagen], for the purpose of inducing or attempting to
> induce such policyholder(s) or contractholder(s) to cancel,
> lapse, or fail to renew such policyholder's or
> contractholder's policy(ies) or contract(s) with [Signator].

See Exhibit F, ¶17.

51. Bernhagen also agreed that all records pertaining to Signator's business are the property of Signator and to return such records to Signator upon termination of his relationship with the Company. See Exhibit F, ¶14, and the Bernhagen Sales Representative's Agreement, attached hereto as Exhibit G, ¶6.

52.     Mooney also had an extended tenure with Signator, having worked for Signator as a registered representative, agent and financial advisor for the last seven years.

53.     Mooney also executed written agreements with Signator.  Among others, Mooney executed a Signator-Select Commission Agreement (the "Mooney Agreement") requiring that he refrain, for a period of two years following the termination of the Agreement, from:

> contact[ing] any policyholder(s) or contractholder(s) who purchased their policy(ies) or contract(s) through [Mooney], for the purpose of inducing or attempting to induce such policyholder(s) or contractholder(s) to cancel, lapse, or fail to renew such policyholder's or contractholder's policy(ies) or contract(s) with [Signator].

See Exhibit H, at ¶17.

54.     Mooney agreed also that all records pertaining to Signator's business are the property of Signator and to return such records to Signator upon termination of his relationship with the Company.  See Mooney Agent Agreement, Exhibit H, ¶14 and Mooney Sales Representative's Agreement, attached as Exhibit I, ¶6.

55.     In addition, Bernhagen and Mooney agreed, in writing, to abide by the policies, procedures and requirements set forth in the Plaintiffs' Compliance Manual, including the requirement that defendants keep Signator client information confidential and return all client files and information to Plaintiffs upon termination of their relationship with Plaintiffs.  See Exhibits F, ¶21, G, ¶2, H, ¶19 and I, ¶2; see also, Exhibit E.  In addition, Bernhagen and Mooney, upon information and belief, executed written Acknowledgments, similar if not identical to Exhibit D, agreeing to comply with the Compliance Manual.

- 12 -

56. In addition to their written contractual obligations, Mooney and Bernhagen, by virtue of their positions and relationships with Plaintiffs, owed Plaintiffs a fiduciary duty to remain loyal to Plaintiffs and to refrain from, among other things, conspiring to misappropriate Plaintiffs' personnel, business, confidential records, clients and producers.

<u>**Kochan's Knowledge of the Agreements**</u>
<u>**and Defendants' Obligations**</u>

57. As noted, Kochan was the former Regional Vice President of the territory that included the Chicago North Branch Office. In that position, Kochan hired and supervised Lyman. Kochan had knowledge of the restrictions and obligations contained in Lyman's, Bernhagen's and Mooney's written Agreements with Plaintiffs. Indeed, he was ultimately responsible for insuring that those Agreements were executed.

58. Kochan is now a manager, an employee, a representative and/or an agent of ASC. <u>See</u> Exhibit A.

59. Kochan, in his capacity as a Manager and employee of ASC participated in and induced the unlawful activities described herein despite his knowledge of Lyman, Bernhagen and Mooney's contractual and fiduciary obligations to Plaintiffs.

<u>**The Departures and Related Unlawful Actions**</u>

**Lyman and Mooney Abscond with Signator Information and Property before They Resign**

60. On March 8, 2004, Lyman abruptly resigned. Lyman notified Signator of his resignation in a letter faxed to his supervisor.

61. That same day, Lyman told personnel in the Chicago North Branch Office that he was leaving to work for an undisclosed competitor of Signator.

62. On the day he resigned, March 8, Lyman told Signator, for the first time,

that *Bernhagen* had resigned as well. Specifically, Lyman gave Signator what he represented as being Bernhagen's letter of resignation; however, Bernhagen's resignation letter stated that Bernhagen's resignation was *effective March 1, 2004, or seven days before Lyman actually told Signator that Bernhagen had resigned*.

63. Lyman's delay in reporting Bernhagen's resignation was unquestionably purposeful.

64. Lyman and Bernhagen knew, based upon their experience as Branch Managers and General Agents, that it was imperative for Signator to receive immediate notice of any resignation in order to, among other things: disable the representative's access to the password-protected computer system; obtain the representative's keys to the Office; inventory client files; and take all additional steps necessary to safeguard Signator's confidential and proprietary information and client relations.

65. In waiting a week to advise Signator that Bernhagen had resigned, Lyman thus violated his fiduciary duties to Signator, and ignored Signator's policies, practices and requirements governing personnel departures. Lyman also improperly allowed Bernhagen to continue reporting to the Office and accessing information, in hard copy and electronic format, for at least a week after Bernhagen had supposedly resigned.

66. In fact, Bernhagen was seen in the Chicago North Branch Office on several occasions after his purported resignation and continued to access email and the computer system. However, because Signator did not know that he had resigned to go work for a competitor, no one knew to keep Bernhagen off the premises and/or to deny him computer access.

67. On the day Lyman resigned, it was also discovered that Lyman and

- 14 -

Bernhagen had entered the Chicago North Branch Office during the weekend before March 8, and removed: (1) the contents of their internal offices; (2) the contents of the locked Office Manager's internal office; and (3) furniture and furnishings. All of this was done before Lyman resigned and relinquished his office keys.

68. Significantly, while all of this was ongoing, Kochan moved his ASC office, which had been located on a separate floor in the same building as Plaintiffs' Chicago North Branch Office, to a new location.

69. Lyman never informed anyone from Signator of his intention to resign, let alone his plan to enter the Chicago North Branch Office over a weekend in order to remove files, commission, production and payroll reports, and furniture and furnishings.

70. Lyman and Bernhagen removed, among other things, *original* client files containing customer names and addresses as well as client investment profiles and confidential agent production and commission reports in breach of: their written Agreements with Signator; Plaintiffs' Market Conduct Manual; and applicable securities regulations and their common law and statutory obligations to Plaintiffs.

71. Given this conduct, Plaintiffs believe also that Lyman and Bernhagen took electronically-maintained client information.

72. After a written demand, Lyman and Bernhagen purportedly returned certain records. However, upon information and belief, Lyman and Bernhagen continue to retain possession of Signator property including, without limitation: production reports; policyholder and customer files; customer names, addresses and telephone numbers; and investment information and other confidential, proprietary and trade secret information of Plaintiffs. Lyman and Bernhagen also have retained possession of

furniture and furnishings which they are now attempting to "purchase" from Signator.

### Mooney's Misrepresentations, the Change of Address Card and Mooney's Solicitation of Clients While Still Working for Signator

73.    During the weekend that Lyman and Bernhagen secretly removed client files and Office information and the furniture in their offices, Mooney also changed office locations. At the time, though, he represented specifically that the move had nothing to do with the resignations and that he had no plans to join the other defendants. It was soon discovered that Mooney too was involved in the conspiracy. Indeed, Mooney's actions were perhaps the most wrongful of any of the Defendants.

### The Change of Address Card

74.    During the weekend of March 6 and 7, Mooney relocated his team to another office.

75.    In connection therewith, Mooney represented to Plaintiffs that the move was solely to allow him and his team to have more office space, and that it was in no way connected to any decision by either himself or Lyman or Bernhagen to leave Signator.

76.    As part of the relocation, Mooney requested that Signator change his *Signator* office address with the NASD to: 1 Executive Court, Suite 5, South Barrington, Illinois. (Unbeknownst to Signator, this was ultimately to become his *ASC* address.)

77.    *Before* the move over the March 6 weekend, Mooney also secretly prepared and mailed a change of address card (the "Change of Address Card") to hundreds of Signator clients notifying them that he had moved, but purposefully failing to advise the clients -- as he was required by law to so do -- that, despite the move, he was and remained a registered representative of Signator.

78.   The Card read:

We're Moving
March 9th, 2004
**Keith B. Mooney & Associates**
1 Executive Court
Suite 5
South Barrington, IL 60010

**Phone:  847-382-2600**
Fax:  847-382-4143
**Email:  kmooney@kbmooney.com**

See Exhibit J (emphasis supplied).

79.   Mooney was obligated under applicable securities rules and regulations to obtain Signator's approval before sending the card out to Signator clients, and it was Lyman's responsibility, as the Branch Manager and General Agent of the Chicago North Office, to make certain that occurred.

80.   Had a sample of the Change of Address Card, as was required, been provided to Signator's Compliance Department, it never would have been approved for mailing.  The Compliance Department, among other things, would have required that the Card include a statement disclosing Mooney's status as a registered representative of Signator.  Signator also would not have allowed Mooney to use his personal email address instead of the Signator address that allows Signator, as it must, to monitor each registered representative's email.

81.   When it discovered that Mooney emptied out his office at the same time as Bernhagen and Lyman had secretly emptied out their offices, Signator questioned Mooney about his intentions (still not knowing of the Change of Address Card).  Mooney said he was surprised to hear about Bernhagen's recent resignation and confirmed that he was not leaving Signator.

82. As later became clear, Mooney intentionally misrepresented his plans and purposefully withheld the Change of Address Card from Signator's Compliance Department in order to covertly further the Defendants' illicit scheme.

83. Upon information and belief, Lyman knew of the contents of the Change of Address Card and/or of Mooney's plan to mail the Cards before they were mailed. However, Lyman withheld that information in order to further the Defendants' wrongful scheme.

### Before Leaving Signator, Mooney and Kochan Solicited Signator Clients Via a Deceptive and Misleading Solicitation Letter

84. Signator discovered recently that, *before* Mooney resigned on March 16, *ASC* sent a solicitation mailing, signed by Kochan, to clients served by Mooney at Signator (the "Solicitation Letter"). See Exhibit K (redacted to protect the client's privacy interests).

85. Signator is certain that the Solicitation Letter was mailed to Signator clients before March 15, 2004, and while Mooney was a registered representative and agent of Signator. Moreover, when the Solicitation Letter was sent, Mooney was not a registered representative of ASC.

86. Signator first learned of the Solicitation Letter on March 16, 2004, the day Mooney resigned, when confused and concerned clients began calling Signator's 1-800 Customer Service Line asking questions about the Letter. Obviously, clients calling about the letter on March 16, 2004, had to have been mailed the Solicitation Letter before March 16, or before Mooney resigned from Signator.

87. The clients' confusion and concern was understandable. First, the Solicitation Letter is printed on letterhead with the *ASC* logo. Second, defendant "Tom

Kochan," who had no relationship whatsoever with the targeted clients, was the supposed author of the Letter.

88.　Third, the Letter was mailed to clients serviced by *Mooney* at Signator. Even more confusing and misleading was the "substance" of what Kochan wrote. To clients with whom he never worked, Kochan discussed, in the second paragraph of the Letter, "the qualities *I* have focused on throughout *my working relationship with you*, while developing investment strategies tailored to meet your specific needs." He then (mis)represented that he was "taking a career step which I am convinced will allow me to *continue serving* you in the best manner possible." See Exhibit K (emphasis added).

89.　The Letter also states that, "*[m]y* 7-year association with (Signator Investors) has been [*sic*] very pleasant one." See Exhibit K.

90.　The Solicitation Letter closed by asking the targeted Signator client to contact **Kochan** at (847)-382-2600: (a) if he/she should have any questions; and (b) to discuss the "new affiliation and the reasons it will be advantageous to [the client]."

91.　Enclosed with the Letter were the forms necessary to effect wholesale client account transfers. The enclosed pre-prepared forms were completed with the information needed, such as account numbers, to transfer customer accounts to ASC.

92.　Kochan and ASC had no access to the client information needed to send out the Solicitation Letter. Kochan never had a relationship with the targeted clients. Kochan never developed any investment strategies for the targeted clients. Kochan took no career step in March of 2004. Kochan worked at Signator for twenty, not seven years.

93.　The Solicitation Letter was written and prepared by Mooney or, at minimum, was solely about Mooney. **Mooney** was affiliated with Signator for seven

years. **Mooney** serviced the targeted clients. **Mooney** helped develop investment strategies.

94.   Mooney was also Signator's registered representative at the time the Letter was sent.

95.   The address under Kochan's name, 1 Executive Court, Unit #5, South Barrington, Illinois, is the same address Mooney used in the Change of Address Card. Compare Exhibits J and K. It is the same location he asked Signator to register with the NASD. It is now registered as an ASC Office.

96.   The telephone number in the Solicitation Letter is the same number Mooney used in the Change of Address Card. Compare Exhibits J and K.

97.   It thus became clear that Mooney and Kochan crafted the Change of Address Card and the Solicitation Letter in tandem, so that the targeted Signator clients, upon receipt of the two, would not contact Plaintiffs. Specifically, Mooney and Kochan knew that the targeted clients would be very confused by a letter sent to them by a stranger, Kochan, purporting to have all of their Signator financial information and telling them to execute account transfer forms. To insure that the clients did not contact Signator, Mooney and Kochan had Mooney (a) change locations, and (b) sent out new contact information that, if used, would ensure that Mooney, not Signator, was contacted when the inevitable confusion and concern occurred.

98.   The confusion and consternation caused by Defendants' wrongdoing was nevertheless so great that some clients contacted Signator directly about the false and misleading Solicitation Letter, and that is how Signator discovered it had been sent. Most Signator clients, however, likely did exactly what Defendants hoped: contacted only

Mooney and ASC.

99.   Kochan and ASC did not have access to the confidential and proprietary information (e.g., client names, addresses, account/policy and contract numbers and investment profiles) needed to prepare the Solicitation Letter.  Mooney, either acting on his own or with the assistance of others, provided Kochan and ASC with that information.  The information was provided while Mooney -- and perhaps Lyman and Bernhagen -- was still an agent, registered representative and financial advisor of Plaintiffs.

100.   Upon information and belief, Lyman knew of and/or participated in said conduct to further ASC's and Kochan's interests even though, at the time, he was a Branch Manager and General Agent of Plaintiffs.

**Mooney Participates in Securities Transactions for ASC
before Resigning and Becoming Registered with ASC.**

101.   Mooney went beyond pre-soliciting clients.  Incredibly, Mooney orchestrated the move of Signator *business* to ASC *before* he became registered and licensed with ASC.

102.   Signator has learned that, on March 6, 2004, or *ten days* before Mooney resigned, a Signator account assigned to Mooney was transferred to ASC.  Signator learned of the transfer on March 16, 2004, when a Signator client -- who perhaps forgot to use Mooney's "new" email address -- sent an email to Signator asking how and why it was that the Signator account was no longer at Signator:  "[m]y question is where did it go?  I didn't fill out any papers or sign anything!"  (The full email is not attached hereto in order to protect client confidentiality.)

103.   As part of its investigation of that client's concerns, Signator has learned

that a large portion of the client's mutual funds in the transferred account were redeemed (sold), and that the broker-dealer of record for the account was changed from Signator to ASC, **all before Mooney resigned and was registered to solicit on behalf of ASC**.

104. To the contrary, Mooney, at the time, was licensed and registered with the Plaintiffs.

105. Mooney's actions thus violate: his written agreements with Signator; his common law and statutory obligations to Signator; and applicable NASD and NYSE rules and regulations.

## Mooney and the Signator Producers in his Office Resign after a Compliance Inquiry

106. On March 16, 2004, after learning of the Solicitation Letter through communications with concerned and confused Signator clients, Signator's Chief Compliance Officer, Lawrence Niland, attempted to contact Mooney by telephone. Mooney's assistant informed Mr. Niland that Mooney was unavailable. Mr. Niland left a message for Mooney to contact him immediately.

107. Mooney never returned the call. Instead, later that same day, Mooney had his assistant deliver four resignation letters to the Chicago North Branch Office. Mooney and the three producers who moved with him to the new office in South Barrington terminated their relationship with Plaintiffs on March 16 to work for a new (undisclosed) broker-dealer.

108. On March 17, 2004, Mooney's brokerage license was transferred from Signator to ASC. See Exhibit L.

109. After Mooney left, Signator examined the client files Mooney purported to leave upon his resignation and found, among other things, that: (a) the records are

incomplete; (b) the records contain photocopies, not originals; and (c) most notably, the client investment profiles -- which describe the manner in which the clients wished to invest -- are missing.

## Defendants have Caused and will Cause Irreparable Harm to Plaintiffs

110. Without an injunction, the existence of irreparable harm is beyond doubt. Defendants' improper recruitment and solicitation of Signator's personnel and clients threatens the Office's stability and its longstanding relationships with its personnel and clientele.

111. In sum, while acting in their capacities as either Manager, agent and/or financial advisors of Signator, and thereafter, Defendants engaged in, and continue to engage in, the following unlawful acts in violation of their fiduciary duties, the Agreements, Signator's policies and procedures and applicable regulatory, common and statutory law:

(a)    Soliciting securities business and engaging in securities transactions on behalf of ASC while registered and licensed and affiliated with Signator;

(b)    Soliciting Signator's clients, customers, agents, representatives and employees for the benefit of ASC while registered and affiliated with Signator;

(c)    Preparing and mailing deceptive and misleading communications to Signator clients in order to divert business from Signator to ASC;

(d)    Using, removing, receiving, retaining, disclosing and converting for their own use or ASC's use, original and/or copies of Signator's business information, including without limitation agent and financial advisor identity, production and client information, applications for insurance, client investment profile forms, customer names, investment history, account numbers, investment activity and insurance holdings (collectively, the "Information"); and

(e)    Using the Information both pre- and post-resignation to solicit, induce and/or persuade clients and/or customers of Signator to terminate and transfer their accounts, policies, contracts and/or business to ASC.

112. All of this was done despite the Defendants' having specific knowledge about Lyman's, Bernhagen's and Mooney's fiduciary and contractual obligations to Signator.

113. Unless Defendants are temporarily and preliminarily enjoined from the foregoing conduct, Signator will be irreparably harmed by, among other things:

(a)     the disclosure to ASC, a Signator competitor, of highly confidential information regarding the business operations of Signator and Signator's agents, brokers, policyholders and clients;

(b)     the ongoing threat to Signator's contractual and business relationships with its personnel and clients causing damage to the stability and viability of the Plaintiffs' Offices, and the possibility that additional agents, financial advisors, brokers and employees will, in concert with Defendants, continue to undermine the goodwill and agent and customer relationships of Signator;

(c)     continuing illegal and unfair competition;

(d)     the loss of Signator's express contractual right to prevent the solicitation of clients in violation of Lyman's, Bernhagen's and Mooney's Agreements with Signator; and

(e)     the loss of a full and fair opportunity to compete with Defendants for the patronage of clients, in view of the Defendants' wrongful recruitment of the agents, brokers and employees of Signator, the pre-departure solicitation of Plaintiffs' clients and the sudden and coordinated departures of Lyman, Bernhagen, Mooney and the three producers who worked with Mooney.

114. Consequently, Signator has no adequate remedy at law.

115. The injunctive relief Signator seeks will do no more than require Defendants to comply with the Agreements and their legal obligations and prevent them from reaping the benefit of their unlawful conduct.

116. Permitting Defendants to continue on with their misdeeds would encourage other agents, financial advisors, and employees bound by fiduciary obligations and agreements substantially identical to those signed by Defendants to violate those

- 24 -

obligations and agreements with impunity. Such a result undermines Signator's

relationship with its employees and agents and leaves Signator vulnerable to further

raiding and poaching by its competitors.

### Count 1 – Injunctive Relief
### (All Defendants)

117. Signator repeats and realleges the allegations contained in each and every

Paragraph above, as if fully set forth here.

118. Signator is likely to succeed on the merits of its claims against Defendants.

119. Signator will be irreparably harmed without the issuance of an injunction.

120. Signator has no adequate remedy at law; thus, injunctive relief is

appropriate.

121. The balance of harms tips in favor of issuing an injunction for Plaintiffs'

benefit.

122. The public interest is served in this case by the issuance of an injunction.

### Count II -Breach of Contract
### (Lyman, Bernhagen and Mooney)

123. Signator repeats and realleges the allegations contained in each and every

Paragraph above, as if fully set forth here.

124. The Agreements with Lyman, Bernhagen and Mooney are valid and binding

contracts.

125. By virtue of the foregoing, Lyman, Bernhagen and Mooney breached and

continue to be in breach of the Agreements.

126. As a direct and proximate result of Lyman's, Bernhagen's and Mooney's

wrongful conduct, Signator has suffered and will continue to suffer damages.

127. Consequently, Plaintiffs are entitled to damages in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law.

### Count III –Breach of Fiduciary Duty
### (Lyman, Bernhagen and Mooney)

128. Signator repeats and realleges the allegations contained in each and every Paragraph above, as if fully set forth here.

129. Lyman, Bernhagen and Mooney each owed a fiduciary duty to Signator.

130. By virtue of the foregoing, Lyman, Bernhagen and Mooney breached their fiduciary duties to Signator.

131. As a direct and proximate result of Lyman's, Bernhagen's and Mooney's wrongful conduct, Signator has suffered and will continue to suffer damages.

132. Consequently, Plaintiffs are entitled to damages in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law.

### Count IV – Inducement of Breach of Fiduciary Duty
### (Kochan)

133. Signator repeats and realleges the allegations contained in each and every Paragraph above, as if fully set forth here.

134. As described in detail above, Kochan obtained and knowingly accepted the benefits resulting from other Defendants' breaches of fiduciary duties.

135. As a direct and proximate result of Kochan's wrongful conduct, Signator has suffered and will continue to suffer damages.

136. Consequently, Plaintiffs are entitled to damages in an amount to be

determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law.

### Count V - Tortious Interference with Contractual and Business Relations
### (All Defendants)

137. Signator repeats and realleges the allegations contained in each and every Paragraph above, as if fully set forth here.

138. As described in detail above, Signator has contractual and/or business relationships with its policyholders and customers, its Managers, agents, financial advisors and representatives.

139. Defendants were and are aware of these contractual and business relationships.

140. Defendants intentionally, with improper motive and without justification or excuse, interfered or are planning or attempting to interfere with those relationships.

141. Defendants' actions were with malice and/or improper motive or means.

142. As a direct and proximate result of Defendants' wrongful conduct, Signator has suffered and will continue to suffer damages.

143. Consequently, Plaintiffs are entitled to damages in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law.

### Count VI – Actual or Threatened Misappropriation of Trade Secrets
### in Violation of 765 ILCS 1065/1 et seq.
### (All Defendants)

144. Signator repeats and realleges the allegations contained in each and every Paragraph above, as if fully set forth here.

145. Signator's lists and records, and the confidential information contained

therein, including the identity of agents and registered representatives, their production figures, their product mixes and customer names, addresses, investment profiles, trading histories, assets and financial worth, constitute trade secrets entitled to protection under the Illinois Trade Secrets Act, 765 ILCS 1065, and common law.

146. This information provides actual and/or potential economic value to Plaintiffs.

147. This information was kept secret by Plaintiffs and was not generally known or available to other persons to whom it would provide actual or potential economic value.

148. This information was subject to reasonable security measures to maintain secrecy or confidentiality.

149. Defendants threaten to and/or actually have misappropriated Plaintiffs' trade secrets and have used and/or are planning to use them in Defendants' competing business by taking and converting said information to Kochan and ASC for the purpose of soliciting clients and representatives and agents of Signator.

150. As a direct and proximate result of Defendants' wrongful conduct, Signator has suffered and will continue to suffer damages in an amount to be determined by the Court.

151. Consequently, Plaintiffs are entitled to damages in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law.

### Count VII - Conversion
### (All Defendants)

152. Signator repeats and realleges the allegations contained in each and every

Paragraph above, as if fully set forth here.

153. As more fully described above, Defendants exercised unauthorized dominion and control over Signator's property, including the business records and confidential and trade secret information of Signator, and have thereby converted Signator's property to their own use.

154. Signator has an immediate right to possession of such property.

155. As a direct and proximate result of Defendants' wrongful conduct, Signator has suffered and will continue to suffer damages in an amount to be determined by the Court.

156. Consequently, Plaintiffs are entitled to damages in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law.

### Count VIII- Civil Conspiracy
### (All Defendants)

157. Signator repeats and realleges the allegations contained in each and every Paragraph above, as if fully set forth here.

158. As described above, Defendants knowingly and intentionally agreed to act in concert to commit an unlawful act, to wit: misappropriating Signator's trade secrets; soliciting and hiring Signator' representatives, agents and/or employees in breach of one or more of the Defendants' fiduciary and contractual duties; soliciting Signator's customers and clients using Signator's trade secrets in breach of one or more of the Defendants' fiduciary and contractual duties; and usurping Signator business opportunities in breach of one or more of the Defendants' fiduciary and contractual duties.

159. Defendants knowingly and intentionally agreed to so act in concert and, therefore, to commit a lawful act in an unlawful manner; to wit, unfairly competing with Signator by misappropriating Plaintiffs' trade secrets and soliciting and hiring Signator's personnel in breach of one or more of the Defendants' fiduciary and contractual duties.

160. One or more of the Defendants committed overt, tortious and unlawful acts in furtherance of the Defendants' agreements by, among other things, misappropriating Signator's confidential information and trade secrets and soliciting Signator's personnel and clients in breach of one or more of the Defendants' fiduciary and contractual duties.

161. By virtue of Defendants' unlawful conduct, Plaintiffs were and continue to be harmed.

162. Consequently, Plaintiffs are entitled to damages in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law.

### Count IX- Violation of Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq., and Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq. (Kochan and Mooney)

163. Signator repeats and realleges the allegations contained in each and every Paragraph above, as if fully set forth here.

164. Kochan and Mooney sent the Solicitation Letter to Signator's clients and the Letter contained deceptive and misleading information about, among other things, who was and had been servicing their accounts, and who they should contact if they had any questions about their securities accounts.

165. Defendants also sent the misleading and deceptive Change of Address Card to Signator's clients. The Card did not inform the recipients that Mooney was registered

with Signator and/or that it was sent in connection with Mooney's plans to terminate his affiliation with Plaintiffs. The Card did not inform the recipients that the phone number on the card was not Plaintiffs' number. The Card included Mooney's personal, as opposed to Signator-sanctioned, email address.

166. Defendants intended and hoped that the clients to whom they sent the letters and the Cards would rely upon the misinformation contained therein and transfer their accounts from Signator to ASC.

167. Defendants' deceptive acts occurred in a course of conduct involving trade or commerce.

168. Defendants' deceptive conduct implicates consumer protection concerns because the misleading information was sent to consumers, and Defendants intended those consumers to rely on the misleading information. Such misconduct injures or threatens to injure consumers, who may be or were already led to take action in reliance on the misleading information.

169. Consumers' interests in receiving truthful information would be advanced by the relief requested.

170. The foregoing conduct constitutes a deceptive business practice in violation of 815 ILCS 505/2 and 815 ILCS 510/2.

171. By the foregoing conduct, Defendants created and caused a likelihood of confusion or misunderstanding as to the source, sponsorship, approval and/or certification of their services.

172. By the foregoing conduct, Defendants are also causing a likelihood of confusion or misunderstanding as to affiliation, connection or association with Plaintiffs.

173. By virtue of the foregoing, Signator has been damaged.

174.     Consequently, Plaintiffs are entitled to damages in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law.

### Count X – Misrepresentation
### (Kochan and Mooney)

175. Signator repeats and realleges the allegations contained in each and every Paragraph above, as if fully set forth here.

176. Defendants Mooney and Kochan misrepresented to clients of Signator that: (a) **Kochan** had a "working relationship" with the clients while at Signator; (b) **Kochan** "develop[ed] investment strategies tailored to meet [the clients'] specific needs"; (c) **Kochan** properly had their Signator account information; and (d) the clients should transfer their accounts to ASC because **Kochan** made a change to ASC.

177. Those representations were knowingly false and/or reckless and/or negligent and Kochan and Mooney knew, or should have so known.

178. The misrepresentations were material and were made in the hope that Signator clients would rely thereon.

179. Signator clients did in fact rely on the misrepresentations.

180. By virtue of the foregoing, Signator has been damaged.

181. Consequently, Plaintiffs are entitled to damages in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law.

## Count XI – Fraud
### (Kochan and Mooney)

182. Signator repeats and realleges the allegations contained in each and every Paragraph above, as if fully set forth here.

183. Defendants Mooney and Kochan misrepresented to clients of Signator that: (a) **Kochan** had a "working relationship" with the clients while at Signator; (b) **Kochan** "develop[ed] investment strategies tailored to meet [the clients'] specific needs"; (c) **Kochan** properly had their Signator account information; and (d) the clients should transfer their accounts to ASC because **Kochan** made a change to ASC.

184. These representations were material and false.

185. Kochan and Mooney knew, or should have so known that the representations were false, or were ignorant of the truth of the representations.

186. Defendants made these representations in the hope that Signator clients would rely thereon by, among other things, contacting or communicating only with Defendants and by transferring their business to ASC.

187. Clients of Signator did not understand that the representations were not true and they had the right to, and in fa ct did, rely on the alleged truth of the statements.

188. Plaintiffs were proximately injured by Mooney's and Kochan's conduct.

189. By virtue of the foregoing, the Defendants are jointly and severally liable to Signator in an amount to be determined by the Court including, but not limited to, Signator's attorneys' fees relating to this action and punitive damages.

## <u>REQUESTS FOR RELIEF</u>

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1.     Declare that the Agreements have been violated by Defendants' conduct

described herein;

2.  Enter a temporary restraining order, followed by a preliminary and then a

permanent injunction immediately restraining and enjoining Defendants, whether directly

or indirectly, alone or in concert with other persons or corporate entities until further

Order of this Court from doing any of the following:

(a)  using, disclosing, or transmitting for any purpose, including the
solicitation of clients served by or personnel registered or licensed with Signator,
the information contained in the books and records of Signator; and

(b)  doing anything to cause, persuade, encourage or assist any client of
Signator to reduce, cancel, lapse or fail to renew any policy or contract with
Signator.

3.  Enter a temporary restraining order, followed by a preliminary and then a

permanent injunction immediately requiring Defendants to return to Signator all records

and information, however stored or formatted, removed from Signator within twenty-four

hours of service upon Defendants of the Court's Order, and to purge from all electronic

recordkeeping systems of the Defendants and/or any persons or corporate entities to

whom Defendants gave that information (e.g., palm pilots and computers), all such

information and to certify to the Court, under oath, that these steps have been taken.

4.  Enter judgment on all counts in favor of Plaintiffs and against Defendants,

and order Defendants to pay damages to Plaintiffs, including multiple or punitive

damages (where appropriate), and all costs, interest and attorneys' fees; and

5.  Grant Signator such other and further relief as the Court deems just and

equitable.

SIGNATOR INVESTORS, INC. and SIGNATOR
INSURANCE AGENCY, INC., as wholly-owned
subsidiaries of SIGNATOR FINANCIAL
SERVICES, INC.,

By their attorneys,

Michael J. Sheehan
Brian E. Spang
CONNELLY, SHEEHAN, AND MORAN
150 S. Wacker Dr., Suite 1600
Chicago, IL 60606
Telephone: (312) 372-1969
Facsimile: (312) 372-1968

OF COUNSEL:
Steven L. Manchel (MA BBO #551066)
Heather A. Lacy (MA BBO #638299)
MANCHEL & BRENNAN, P.C.
199 Wells Avenue, Suite 301
Newton, MA 02459-3345
Telephone: (617) 796-8920
Facsimile: (617) 796-8921

## VERIFICATION

I, Larry J. McGrory, as acting Managing Director of the Chicago North Branch Office in Schaumburg, Illinois, hereby state that I have read the foregoing Verified Complaint, and that I know the allegations set forth therein to be true, except those made on information and belief, as to which I believe them to be true to the best of my knowledge, information and belief.

Signed under the pains and penalties of perjury this 23rdday of March, 2004.

Larry J. McGrory

36

EX. A

File for:

Data Current as of: 03/16/2004

CRD# 820463
THOMAS MICHAEL KOCHAN

# ALL CURRENT EMPLOYMENTS

This section provides all current employments (investment-related and non-investment related) as reported on the individual broker's Form U-4. It displays the name of the employing brokerage firm that employs this individual broker, the brokerage firm's CRD number (if applicable), the location of the office where the individual broker is employed, and the individual broker's start date.

To view information on NASD registered firms, you can click on the brokerage firm name hyperlink.

If the individual broker is currently employed with an investment adviser, the investment adviser's name and CRD number will display. However, additional information is not available on investment advisers through NASD BrokerCheck as they are not NASD registered brokerage firms.

If the individual broker is currently employed with a brokerage firm registered with any self-regulatory organization other than NASD (e.g., the NYSE), either the brokerage firm's name or "Other Business" will display as the Employing Firm. To obtain the brokerage firm's name when "Other Business" displays as the Employing Firm, please call the NASD BrokerCheck Hotline number, 1-800-289-9999.

A Brokerage Firm CRD Number will display for NASD registered brokerage firms the individual broker is currently associated with. A Brokerage Firm CRD Number will not display for NASD registered firms the individual broker was formerly associated with.

In addition, a Brokerage Firm CRD Number will not display for employing brokerage firms that are not NASD registered firms. Information on these employing brokerage firms is not available through NASD BrokerCheck.

**Employing Brokerage Firm:** ASSOCIATED SECURITIES CORP.
**Brokerage Firm CRD Number:** 12969
**Office of Employment Address:** 1901 N. ROSELLE RD. STE. 834
SCHAUMBURG, IL 60195
USA
**Start Date:** 02/17/2004
**End Date:** to present

**Other Business**

SEQUOIA PREMIER PARTNERS; INSURANCE/ANNUITY BROKERAGE FIRM; PRESIDENT; 910 HRS/MONTH; NON-SECURITY INVESTMENT RELATED STRATEGIC ALLIANCE GROUP; INSURANCE/ANNUITY BROKERAGE FIRM;

VICE PRESIDENT; 10HRS/MONTH; NON-SECURITY INVESTMENT
RELATED

Ex. B

THIS CONTRACT, made in duplicate, the _____ 20th _____ day of _____ April _____ 1999, by and between the SIGNATOR INSURANCE AGENCY, INC., of Boston, Massachusetts, hereinafter called the Company or Signator, and Robert D. Lyman, hereinafter called the General Agent, of Schaumburg in the County of Du Page, in the State of Illinois.

SIGNATOR INSURANCE AGENCY, INC. is a wholly owned indirect subsidiary of John Hancock Mutual Life Insurance Company. Signator is an insurance agency licensed and/or appointed to sell insurance and annuity products issued by John Hancock Mutual Life Insurance Company and its affiliates and other Company approved unaffiliated companies, hereinafter called the Providers.

WITNESSETH:

That in consideration of the mutual covenants herein contained the said parties do hereby agree as follows:

**B**

Territory    1. On a non-exclusive basis the General Agent is hereby vested with the authority and powers, and is subject to the terms, conditions and limitations herein set forth, within and for the following territory, to wit:

> The counties of Cook, Du Page, Kane, De Kalb, Lee, Whiteside, Carroll, Ogle, Lake, McHenry, Boone, Winnebago, Stephenson and Jo Daviess in the State of Illinois. Those counties north of and including Benton, White, Carroll, Cass, Miami, Grant, Blackford and Jay in the State of Indiana. The counties of New York and Queens in the State of New York. Middlesex County in the State of New Jersey.

Relationship   2. Nothing contained herein shall be construed to create the relation of employer and employee between the Company and the General Agent. Within the territory above described, the General Agent shall be free to exercise judgment as to the persons from whom applications will be solicited for insurance and the time, place and manner of solicitation, but the Company or the Providers may from time to time prescribe rules and regulations respecting the business covered hereby, not interfering with such freedom of action of the General Agent, which rules and regulations shall be observed and conformed to by the General Agent.

      3. The Providers may prescribe the form, plan and character of policies or contracts for which applications may be solicited, and may from time to time change or discontinue any form, plan or character of policy or contract now or hereafter in use.

General    4. The General Agent shall endeavor to promote the interests of the Company and the Providers as
Powers and  contemplated by this contract, and shall so conduct the affairs of the General Agent as not to affect adversely the
Duties    business, good standing or reputation of the General Agent, the Company or the Providers.

      5. The General Agent shall have no power or authority other than herein expressly granted, and no other or greater power or authority shall be implied by the grant or denial of power or authority specifically mentioned herein.

      6. The General Agent shall do no business for any life insurance company other than the Providers, except in connection with insurance upon the lives of persons who are then not acceptable to the Company or the Providers for new or additional insurance.

      7. The General Agent shall not engage in any business other than that covered by this contract during its continuance, unless expressly authorized by the Company to do so.

      8. The General Agent shall have no power or authority on behalf of the Company or the Providers: to issue, make or discharge any policy or contract of any kind, or to alter, modify or waive any of the terms or conditions thereof, or of any premium or other notice or any receipt or other instrument issued or made by the Company or the Providers; or to waive any breach on any such terms or conditions, or any forfeiture; or to extend any credit at any time in respect to, or to take a note as or for, or to extend the time for the payment of, any premium or any indebtedness due the Company or the Providers, or to bind any of them or to waive any of their rights by making any statement or by receiving at any time any notice or information.

| | |
|---|---|
| Management Agreement, Licenses and Medical Examinations | 9. The General Agent shall enter into a Management Agreement with SIGNATOR INVESTORS. INC., an an affiliate of the Company, which management agreement will describe the duties and responsibilities of a Branch Manager of Signator Financial Network, Inc. |

The General Agent must be properly licensed for the John Hancock Mutual Life Insurance Company, the John Hancock Variable Life Insurance Company and for each of the Providers whose products are solicited through the agency of the General Agent as well as being appropriately registered with the National Association of Securities Dealers, Inc.

The General Agent shall pay the fee for state licenses of the General Agent and Agents duly appointed by the General Agent, all of which licenses shall be procured through the Company. The Company or the Providers shall pay generally for medical examinations except in such cases as, under its rules made from time to time by the Company or the Providers, the General Agent or the insured shall be required to pay them.

**Solicitation of Business**

10. The General Agent shall have authority within said territory to solicit applications for all types of insurance and annuities offered by the Providers through the Company.

11. The General Agent shall thoroughly and to the satisfaction of the Company, personally and by Agents, canvass and develop all the said territory.

12. The General Agent shall in each full calendar year ending December thirty-first, during the continuance of this contract, procure insurance in an amount and on a number of lives satisfactory to the Company.

13. The General Agent shall immediately deliver to the Company all applications procured hereunder whether recommended by the local medical examiner or not, with the Agent's part of such applications properly filled out and signed.

**Extra-Territorial Business**

14. The General Agent shall not personally, by Agent, by correspondence, or in any other manner, solicit applications for insurance outside said territory until the written consent of the General Agent in whose territory said solicitation is to be made has been obtained, and has secured through the Company an Agent's license or appointment from the proper state authority; nor shall the General Agent in any manner solicit applications for insurance in any territory in which the Company or the Provider is not licensed to do business.

15. The General Agent shall have no commission interest whatever in any policy or contract issued upon the life of a resident of the territory covered by this contract when the application for such policy or contract shall have been secured by the General Agent of another territory, provided such application shall have been secured and an examination made outside the territory covered by this contract, but nothing herein shall be construed or held to authorize any General Agent to solicit application in the territory of another General Agent.

16. The General Agent shall pay no commission to any person before an Agent's or Broker's agreement shall have been entered into with such person and the necessary Agent's or Broker's license duly secured. The General Agent shall execute in triplicate, and shall forward to the Company for the Company's records, a duly executed copy of all agreements which provide for the payment of commissions.

**Anti-Rebate**

17. The General Agent shall not, as to any insurance issued by, or under consideration with, any Provider, or with any other company, directly or indirectly, pay, allow or give, or offer or agree to pay, allow or give, any rebate of premium or any part of the General Agent's commission, or any special favor or advantage in the dividends or other benefits to accrue, or any valuable consideration or inducement whatever not specified in in the policy or contract. The General Agent shall comply with all applicable laws.

**Collection of Premium**

18. The General Agent shall be entitled to collect, and shall collect, when required by the Company or any Provider to do so, without expense thereto other than contract commission thereon, the premiums on all policies or contracts in which the General Agent has a commission interest under this, or any previous general agency contract with the John Hancock Mutual Life Insurance Company or the Company for said territory, except such premiums as are paid by persons who have moved from the territory, and who elect to pay them to another General Agent or directly to the Home Office of a Provider. When requested by the Company or a Provider, the General Agent shall collect renewal premiums in which the General Agent has no commission interest.

**Remittances**

19. The General Agent shall be responsible to the Company for all monies received on its account by the General Agent or the General Agent's employees, or by Agents appointed by the General Agent, and shall hold such monies in trust for the Company and the Providers. The General Agent shall deposit all such monies, properly segregated from all other funds, in an account in the Company's name or in the name of John Hancock Mutual Life Insurance Company in a bank approved in writing by the Company. At such time as the Company or a Provider may require, the General Agent shall remit to it all such monies not previously remitted. The Company or a Provider may at any time and from time to time, by notice in writing, or through written operating policies and procedures require the General Agent to remit promptly to the Home Office or other designated location of the Company or a Provider, any specified part or parts of the whole of such monies without any deductions whatever and thereafter remittances shall be in compliance with such written notice or notices.

**Appointment of Agents and Brokers**

20. The General Agent, individually and for and on the General Agent's own behalf, may appoint and contract with Agents and Brokers to carry out the purposes of this contract but they shall be compensated by the General Agent at the General Agent's own cost and charge and they shall not be deemed Agents under contract with the Company or the Providers.

21. The General Agent shall in contracting with Agents and Brokers use a form of agreement approved by the Company which shall be executed in triplicate. The General Agent hereby waives claim to renewal commissions payable under any and all agreements made by the General Agent with Agents and Brokers, and hereby authorizes and directs the Company to pay such renewal commissions to such Agents and Brokers when they become due after the termination of this contract, and to deduct the amount so paid from any sum due to the General Agent hereunder.

22. The General Agent shall be responsible to the Company and the Providers for all business done by or entrusted to Agents or others appointed or employed by the General Agent, and no such appointee or employee shall have any claim against the Company or the Providers for commissions or otherwise.

23. The General Agent shall indemnify and save the Company and the Providers harmless from all losses, expenses, costs, including reasonable attorney's fees, damages and liability resulting from negligent acts by the General Agent or employees or Agents appointed by the General Agent, and from acts or transactions by any of them not authorized by the Company or the Providers.

**Office, Records, Books and Accounts**

24. The General Agent shall, at his own expense, except as otherwise specifically compensated therefore, maintain in the city designated by the Company an office suitable for the transaction of the business of the General Agency created by this contract.

25. The General Agent shall keep, in manner and form prescribed or approved by the Company, true and correct records and books of account of all transactions under this and all previous contracts with the John Hancock Mutual Life Insurance Company or the Company and shall cooperate with the Company or the Providers in periodic audits of such records and books of account. The General Agent shall from time to time as required by the Company furnish to the Company statements concerning the finances of the General Agency created by this contract.

26. The General Agent shall hold and preserve as the property of the Company all papers, books, files, correspondence and records of all kinds which at any time shall come into the General Agent's possession or control relating to transactions by or for the Company or the Providers, and shall surrender them to the Company upon termination of this contract or upon prior request.

27. The General Agent shall, as often as requested, submit to a representative of the Company appointed in writing all such books and records for such examination as said representative may desire to make and shall in all things cooperate and render friendly assistance in such examination.

28. The General Agent shall make such reports of all transactions under this and all previous contracts as may be required by the Company or the Providers.

29. The General Agent shall submit to the Company and make available to it for examination any records necessary to the Company or the Providers to enable them to comply with the laws or regulations of any jurisdiction.

30. The Company or the Providers will furnish to the General Agent such books, stationery and canvassing material as they deem proper, and the General Agent shall not use, or permit to be used, in the General Agent's business hereunder, any books, blanks, stationery or canvassing material, or any advertising not so furnished or approved by the Company or the Providers.



Expenses,
Commissions,
Fees, Bonuses,
Awards and
Allowances
During
Continuance
of Contract

31. The General Agent shall pay all expenses incurred by the General Agent in the performance of this contract and, except as herein otherwise provided in the Allowance Amendment provisions, shall be entitled to receive commissions on first year and renewal premiums on policies or contracts issued upon applications procured by the General Agent or Agents of the General Agent under this contract. Commissions will be due and payable at such times as the premiums have been collected and paid over to the Company or the Providers and the commissions have been authorized according to their respective normal accounting procedure. The General Agent shall be entitled to such commissions, fees, bonuses and allowances during the continuance of and in accordance with the terms of this contract, and as provided for and subject to the conditions stated in the Schedule of Payments thereto, which schedule, including any amendments which, from time to time may be made, is incorporated into and made a part of this contract.

Productivity Increase Awards and Quality Performance Bonuses shall be paid to the General Agent during the continuance of this contract, for the sole purpose of paying them over to such of the Agents who qualify for such payments under a form of commission agreement approved by the Company.

Payments to the General Agent under this section shall be in the amounts equal to the obligation of the General Agent for payments of such bonuses under such agreements.

Agent
Financing
Programs

32. The General Agent agrees to conform with the regulations adopted by the Company governing Company provided Agent financing programs.

The General Agent hereby assigns, sets over and transfers to the Company the commissions assigned or hereafter assigned to the General Agent under the provisions of financing amendments entered into with the Agents, which commission agreements terminate before the successful completion of the Program.

The General Agent hereby warrants that there is no prior assignment in effect of the commissions assigned to the General Agent under the aforementioned programs.

This assignment is to take precedence over any claims the General Agent or, executors, administrators or assigns thereof, have to such commissions because of any indebtedness of any such Agent to the General Agent.

Supervisory
Programs

33. The General Agent agrees to conform with the regulations, and related policies and procedures adopted from time to time by the Company governing Company provided supervisory programs.

Changes in
Commissions,
Awards and
Bonus Programs

34. The Company may, upon written notice to the General Agent, change the rates of any or all commissions allowed by this contract thereafter, and may fix rates of first and renewal commissions upon any new plan, type or form of insurance policies or annuity contracts adopted by the Company or the Provider subsequent to the date hereof. The Company may, upon written notice to the General Agent, change the provisions under this contract for payment of bonuses with respect to any bonus year commencing after the date of said change.

35. Commissions, if any, on conversions except as provided herein, on exchanges to other forms of policies which in the judgment of the Company or the Providers take or are to take the place of other insurance; on policies changed by means of a rider on business secured on special rate quotations and on forms of policies not mentioned herein shall be determined by the Company or the Providers.

36. If the Company or a Provider shall for any reason refund any premium, the General Agent shall lose all right to commissions on such premium, and shall pay the Company the full amount received on account thereof. If the Company or a Provider for any reason, pays to the General Agent a commission in advance of the payment of the premium and the premium is not subsequently collected from the policyowner, the General Agent shall repay such commission to the Company.

Indebtedness
the Company

37. The Company may at any time offset against any commissions or other remuneration due or to become due to the General Agent, or anyone claiming through or under the General Agent, any debt or debts due or to become due from the General Agent to the Company and any loss or losses incurred by the Company for which the General Agent is responsible under this contract. The Company in its discretion may pay to any Agent any commissions due from the General Agent and offset such payment or payments against any commissions or other remuneration due or to become due to the General Agent.

**Waiver**

38. No forbearance or neglect on the part of the Company or Provider to enforce or insist upon any of the provisions of this contract shall be construed as a waiver of any of its rights and privileges hereunder, nor shall any alteration or modification be valid, unless in each instance a written memorandum specifically expressing such waiver, alteration or modification be made and subscribed by the President or a Senior Vice President or a Vice President or a Second Vice President of the Company. No waiver of the rights of the Company or a Provider arising from any default or failure of performance by the General Agent shall modify this contract, or extend to or affect the rights of the Company or a Provider arising from any subsequent default or failure of performance.

**Assignment**

39. This contract is not transferable. Any assignment by the General Agent of commissions, other than personal commissions, due or to become due under this contract without prior written consent of the Company shall automatically annul this contract.

40. The Company reserves to itself the absolute control in interest and management of all policies and contracts issued through its Managerial Agency Offices, whether or not hereafter established within said Agency territory.

41. The provisions of this contract shall apply to all policies and contracts issued through the General Agency after the effective date of this contract, including policies and contracts not specifically mentioned herein, except that commission rates and other conditions specifically applicable to Employee Insurance,Group Life, Group Accident and Health Insurance, Group Annuities and any other forms of Group or Employee Insurance will be governed by such agreement supplementary hereto or in addition hereto as may be made between the General Agent and the Company.

**Termination**

42. Fraud, misappropriation or withholding of funds by the General Agent shall automatically terminate this contract, and thereafter no payments of any kind shall be payable to the General Agent. This provision is not intended to, and shall not limit or restrict the right of either party to terminate the contract pursuant to the provisions of Section 44.

43. This contract cancels and supersedes all contracts and agreements whether oral or in writing, as to matters herein referred to heretofore existing between the Company, or John Hancock Mutual Life Insurance Company, and the General Agent, if any, except for any Mutual Agreement to Arbitrate Claims which may exist, and all rights conferred thereby or arising therefrom shall forthwith cease and terminate, unless otherwise expressly provided herein. The General Agent affirms that no other promises or agreements of any kind have been made to or with him/her to sign this contract, and that he/she fully understands the meaning and intent of this contract.

44. This contract and the rights of the General Agent hereunder, except as shall by express provision survive termination, shall be terminated automatically by the death of the General Agent.

This contract and the rights of the General Agent hereunder, except as shall by express provision survive termination, may be terminated for any reason at the option of either of the parties hereto immediately upon written notice. In the event that the contract is terminated by such notice by the Company and immediately prior to the time of termination there had been an Allowance Amendment (Formula) in effect between the parties, then the Company shall pay to the General Agent, subject to the provisions of Sections 37 and 42, an amount equal to one-third (1/3) of the agency net income under this contract in the most recent six calendar months prior to the termination, with respect to which Confidential Financial Statements submitted by the General Agent are on file in the home office of the Company at the time of termination. Any such payment to the General Agent shall be based upon the agency net income as reported in such statements. In the event that the contract is so terminated by the Company and immediately prior to the time of termination there had been an Allowance Agreement (Development) in effect between the parties, then the Company shall pay to the General Agent, subject to the provisions of Sections 37 and 42, an amount equal to one-third (1/3) of compensation paid to the General Agent under the provisions of Part A of the Allowance Amendment (Development) in the six calendar months immediately prior to termination. The parties understand and agree that any such payment pursuant to the termination under either Allowance Agreement shall constitute full, fair and complete compensation for all right, title and interest the General Agent may have in the General Agency.

A written notice shall be effective for such purposes as follows: (a) if given by the Company to the General Agent, by delivery thereof to the General Agent, or by mailing thereof addressed to the General Agent at the last known office address; (b) if given by the General Agent to the Company, by delivery thereof at the home office of the Company in Boston or by mailing thereof addressed to the Company at its said home office.

**Agency Equity Sale/Purchase Program**

45. Upon termination of the General Agent's contract, subject to the provisions of Sections 37 and 42, the General Agent will be eligible to participate in the Agency Equity Sale/Purchase Program, the provisions of which are contained in the General Agent's Compensation Manual, which are incorporated herein by reference.

46. The invalidity or unenforceability of any provision of this contract shall not affect the validity or enforceability of any other provision of this contract.

47. This contract shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts.

**Competition**

48. The General Agent agrees that following the termination of this Agreement, the General Agent will not directly or indirectly engage in any of the following conduct nor aid or abet others to do so:

A. Retain in his/her possession any Company or Provider records, forms, files, manuals, supplies or policyholder or production information of any kind, whether furnished by the Company or Provider or prepared by the General Agent, in any form whatsoever nor photostat or otherwise copy same:

B. For a period of two years immediately following the termination of this Agreement, do anything to cause, persuade, encourage or assist any policyholder or annuity contract holder of any Provider within the confines of the territory covered by this Agreement to reduce, cancel, lapse or fail to renew their policy(ies) or contract(s) with any Provider.

Violation of any of the above shall subject the General Agent to damages and may be enjoined by any legal means available to the Company and if it prevails in such litigation the Company shall be entitled to recover all costs and expenses incurred in connection with such litigation including all attorneys fees.

For purposes of this paragraph the term Company shall include the John Hancock Mutual Life Insurance Company and its subsidiary companies or any Provider whether currently in existence or subsequently established or acquired after the effective date of this agreement, or any Provider.

49. Unless terminated earlier under any other of its provisions, this contract shall terminate without notice on the final day of the month immediately prior to the month in which the General Agent attains the age of sixty-five (65) years.

**Effective Date**

50. This contract shall take effect as of January 1, 1999.

IN WITNESS WHEREOF, the Company has caused this instrument to be signed by its President, and the General Agent has signed this instrument, the date and year first above written.

SIGNATOR INSURANCE AGENCY, INC.

By: _____
                    President

GENERAL AGENT

_____
Robert D. Lyman

## SCHEDULE OF PAYMENTS

**Commissions**    1.   Commissions payable in accordance with the terms of the contract of which this schedule is a part shall apply to all business written under this or under any prior General Agent's agreement at the rates provided for in this schedule and shall be subject to the following conditions:

**Conversions**    A.   On conversion of a Group Certificate or an Employee Insurance policy to a permanent form of life insurance, the first year commission on the converted policy will be 10% of the premium. except that on those forms of policies where the first year commission is at the rate of 10% or less. the first year commission will be one half of the rate otherwise applicable to such issue. No renewal commission will be allowed on a policy converted from a Group Certificate or Employee Insurance policy. On conversion of a Group Certificate to a Disability Income no commission will be payable.

**Policy Ratings**    B.   Commissions on Ratings and Sub-Standard Premiums:

       1)   Life Insurance:

| | Through Class "C" | Above Class "C" | Permanent Dollar | Temporary Dollar |
|---|---|---|---|---|
| Traditional | Full Rate | None | Full Rate | None |
| Estate Protection | Full Rate | Full Rate | None | None |
| Flexible Variable and Universal Life | Paid at MCRP Rate | Paid at Excess Rate | Paid at MCRP Rate | Paid at Excess Rate |

Variable Estate Protection      Full rate is paid up to Target Premium

Medallion Variable Life      Full commission is paid up to the Commissionable Premium Target 'CPT' and High Band Universal Life

       2)   Long Term Care Substandard: Substandard commissions on Long Term Care Policies will be paid at regular rates. in accordance with the Schedule of Payments, on premiums up to and including 130% of standard (no commission will be paid on premiums in excess of the standard premium).

**Modified**    C.   Upon payment of premiums on Mod Plus Policies no additional first year commissions will be paid on the increase in premium if any for the sixth policy year. Renewal commissions will be paid on the original premium for the second through the fifth policy years at the regular rate when collected and paid over to the Company.

**Waived Premiums**    D.   No commissions will be allowed on premium waived under the waiver of premium clause for Long Term Care, Medallion Variable Life, Universal Life or High Band Universal Life. Full commissions (less commission on waiver of premium riders) will be allowed on premiums waived under the waiver of premium clause for Traditional Life, Estate Protection and Flexible Variable Life.

**Commission Chargebacks**    E.   There will be a chargeback of both earned and unearned first year commissions for certain policies procured through this contract which lapse or are surrendered in their first, second or third policy year. The chargeback will be in accordance with the Commission Chargeback section under Special Commission Provisions contained in this contract.

**Replacements**    F.   Policies and contracts procured through this contract which replace existing policies and contracts will result in reduced commissions or a chargeback of commissions in accordance with the rules specified in the Special Commission Provisions section of this contract.



SCHEDULE OF PAYMENTS (Continued):

Supplemental
Benefit
Provisions

G.   Children's Insurance Benefit Provision, Initial Term:

When any such provision is attached to a policy, a first year commission will be paid on the premium applicable to such a provision at the same rate as is applicable to the regular premium on the policy.

Renewal commissions on renewal premiums paid under any of the above provisions will be paid for the full renewal commission period at the same rates as are payable to Special Agent under the regular premiums of the policy to which it is attached or at the rates that would be payable to Special Agent had Special Agent procured the application upon which said policy was issued.

H.   Disability Benefit Provision, Accidental Death Benefit Provision, Applicant Waiver of Premium Benefit, or Insurance of Insurability Benefit Provision:

When any such provision is attached to a policy at issue or added thereto during the first policy year, a first year commission will be payable to Special Agent at the same rate as the regular premium of the policy to which it is attached. When any such benefit provision is added to a policy after the first policy year, no first year commission will be paid; but renewal commissions on such provision will be at the same rates as are payable to Special Agent under the provisions of this contract on premiums on policies of the type to which the benefit provision is attached. Renewal commissions will be paid to the end of the regular renewal commission period provided for such policies under the provisions of this contract. Commissions, but not service fees, will be paid on any premium waived by the Company under a disability benefit provision unless excluded by Paragraph 1, Section D "Waived".

I.   Paid Up Insurance (PUI) Benefit Provision:

When any such provision is attached to a policy at issue or added thereto during the first policy year, a first year commission will be payable. Renewal commissions will be paid to the end of the regular renewal commission period provided for such policies.

Lump sum payments will generate commissions at first year rates for payments made during the first policy year. Lump sum payments will be considered as renewal commissions if paid beyond the first policy year.

J.   Additional Insurance Protection Rider:

When any such provision is attached to a policy at issue, a first year commission will be payable.

Lump sum payments will generate commissions at first year rates for payments made during the first policy year. Lump sum payments will be considered as renewal commissions if paid beyond the first policy year.

K.   Inflation option Rider and Shared Care election on Long Term Care:

First year commissions are paid on resulting increase in policy premium, in the year benefit is added. Renewal commissions on renewal premiums will be paid for the balance of the base policy renewal commission period at the same rates and for the same duration as are payable under the regular premiums of the policy to which it is attached. If the base policy commission paying period has ended then no renewal commission will be paid.

L.   Term Riders

First year and renewal commissions are paid in accordance with rates shown the the Table, Schedule of Commission Rates.

Service Fees

2.   Non-vested, non-transferable service fees shall be paid to the General Agent, unless priorly discontinued by the Company, during the continuance of this contract, for the sole purpose of paying them over to such of the Agents and Brokers who qualify for such payments under a form of commission agreement approved by the Company.

Payments to the General Agent under this section shall be in amounts equal to the obligation of the General Agent for payments of service fees under such agreements. No service fees will be payable to the General Agent subsequent to the termination of this Contract.

SCHEDULE OF PAYMENTS (Continued):

In addition, service fees shall be paid to the General Agent, according to the rules of the Company, in each calendar year, unless priorly discontinued by the Company, on business personally produced, provided the General Agent had in force at all times during the full calendar year immediately preceding that in which any such service fees are payable, a General Agent's contract with the Company or a Special Agent's Commission Agreement with another General Agent of the Company.

The service fees shall be paid at the following rates:

| | |
|---|---|
| Traditional Life, Estate Protection, Long Term Care, and Provident Individual Disability Income policies obtained through John Hancock Networking Insurance Agency | 2% of premium |
| Flexible Variable Life, Variable Estate Protection, Medallion Variable Life and High Band Universal Life | 3% of premium |

If the General Agent has been credited with at least eleven (11) years of continuous service and has qualified for the payment of service fees, then service fees payable on Traditional Life, Estate Protection, Long Term Care, and Provident Individual Disability Income policies obtained through John Hancock Networking Insurance Agency personally produced shall be payable at the rates provided in the following table:

| Years of Continuous Service At Least | Service Fee Rate |
|---|---|
| 11 | 2.1% |
| 12 | 2.2 |
| 13 | 2.3 |
| 14 | 2.4 |
| 15 | 2.5 |
| 16 | 2.6 |
| 17 | 2.7 |
| 18 | 2.8 |
| 19 | 2.9 |
| 20 | 3.0 |

Years of continuous service shall include the combined total of all such years as an Agent under a Whole-Time Commission Agreement with a General Agent of the Company or as a General Agent.

Forfeiture of Commissions and Service Fees

3. In the event of a forfeiture by a Special Agent of commissions or service fees, under the provisions of a Special Agent's Commission Agreement (Whole-Time) Plan H-Standard, Special Agent's Commission Agreement (Whole-Time) Plan R-Standard, or a Forfeiture by a Broker under the provisions of the Independent Producers or Surplus Line Commission Agreement, such commissions shall be retained by the Company. Any such commissions or service fees received by the General Agent shall be paid to the Company.



### SCHEDULE OF REPLACEMENTS

## A. DEFINITIONS

The following definitions will determine whether or not a policy or contract transaction qualifies as a replacement:

1. Termination Date:
   a. Lapse: Due date of unpaid premium.
   b. Surrender: Date of surrender check.
   c. Transfer of all values to new product: Date the Company processes transfer.

2. Replacement Period:

   a. Basic Replacement Period for Life Insurance policies and Annuity contracts: Period commencing 180 days prior and ending 360 days after date of new policy; which date will be established as follows:

   Date of New Policy

   | | |
   |---|---|
   | Life Insurance Policy | Date written (date application is approved for issue). |
   | Annuity Contract | Date initial premium is received and processed in accordance with normal accounting procedures of the Company. |

   b. Extended Replacement Period for Life Insurance policies and Annuity contracts: Period extending from 361 days to 720 days after the date of new policy. This period is an expansion of the basic replacement period and is activated when a loan is taken on the replaced policy during the basic replacement period.

3. Long Term Care Replacement Period: Period commencing 180 days prior to and ending 180 days after the issue date of the new Individual Disability & Health or Long Term Care policy.

4. Replaced Premium:

   a. When a Life Insurance policy replaces a Life Insurance policy, or a Long Term Care policy replaces a Long Term Care policy the replaced premium will be the amount of the annual premium of the policy replaced.

   b. When an Annuity contract is replaced by a Life Insurance policy the replaced premium will be the total of all withdrawals, surrenders and loans, from the replaced contract during the replacement period.

   c. When an Annuity contract is replaced by an Annuity contract the replaced premium will be the total of all withdrawals, surrenders and loans from the replaced contract.

   d. When a Life Insurance policy is replaced by an Annuity contract the replaced premium will be the cash value and loans taken during the replacement period from the Life Insurance policy which terminate during the replacement period.

5. Admitted Replacement: Policy will be considered an admitted replacement if application for new insurance or contract indicates that it is intended to replace an existing John Hancock policy or contract and any State required replacement forms accompany new application.

## B. COMMISSIONS ON LIFE INSURANCE AND ANNUITY REPLACEMENTS

If the termination date of a replaced policy or contract falls within the Basic or Extended Replacement Period, a commission on new policy or contract on the same life, will be paid as follows:

1. Admitted Replacements:

   a. First Year Commission:

      1) Life replacing Life or Annuity replacing Life:

         a) If a replaced policy has been in-force three years or longer, one-half (1/2) of the first year commission, as specified in the Schedule of Payment, will be paid on replaced premium.

         b) If a replaced policy has been in-force less three years or longer, one-quarter (1/4) of the first year commission, as specified in the Schedule of Payment, will be paid on replaced premium.

         First year commission will be paid at the rate specified in the Schedule of Payment on any premium amount for the replacing policy or contract in excess of the replaced premium.

Ed. 01/99

SCHEDULE OF REPLACEMENTS (Continued)

2) Life replacing Annuity contract:

Commissions will be paid on the replaced Annuity premium at the rate of 3% less than the rate specified in the Schedule of payments on the base life policy premium.

3) Annuity replacing Annuity:

One-half the first year commission, as specified in the Schedule of Payments, will be paid on the replaced premium.

b. Renewal Commissions:

Full renewal rates will be paid on all renewal premiums paid on Life Insurance policies made subsequent to the first policy anniversary as provided for in the Schedule of Payment.

2. Non Admitted Replacements:

a. First Year Commissions:

1) If a Replaced policy terminates during the basic replacement period, no first year commission will be paid on replaced premium.
2) If a Replaced policy terminates during the extended replacement period, one-half (1/2) first year commission, as specified in the Schedule of Payments, will be paid on replaced premium.

First year commission will be paid at the rate specified in the Schedule of Payments on any premium amount for the replacing policy or contract over the replaced premium.

b. Renewal Commissions:

Full renewal commissions will be paid on all renewal premiums paid on Life Insurance policies and on all payments to Annuity contracts made subsequent to the first policy anniversary as provided for in the Schedule of Payments.

C. COMMISSIONS ON LONG TERM CARE REPLACEMENTS

1. New policy Premium Greater than Replaced policy Premium:

First year and renewal commissions on the increase in premium over the replaced premium will be paid to the Special Agent responsible for the replacing policy.

First year and renewal commissions up to the replaced premium will be paid to the Special Agent responsible for the replaced policy for the balance of the commission paying period on the replaced policy.

2. New policy Premium Equal to or Less than Replaced policy Premium:

No commissions will be paid on the replacing policy.

First year and renewal commissions will be paid on the replaced policy to the Special Agent responsible for the replaced policy for the balance of the commission paying period on the replaced policy in accordance with the Schedule of Payments.

D. EXCEPTIONS

The following transactions are not considered replacements when:

1. A "Permanent" insurance policy or Annuity contract replaces term insurance.

2. A policy replaces a fully paid-up policy or Immediate Annuity contract.

3. A policy replaces an endowment policy within five years of maturity.

4. A policy replaces a spouse's coverage under a family policy or under a family rider.

5. A policy results from an original date conversion for at least the same sum insured.

6. The owner of an existing policy loses eligibility for special tax sheltered treatment, provided the original policy continues on a reduced paid-up basis.

## COMMISSION CHARGEBACKS

A. TRADITIONAL LIFE , TERM, ESTATE PROTECTION, MEDALLION GOLD UNIVERSAL LIFE, UNIVERSAL LIFE ESTATE PROTECTION AND LONG TERM CARE INSURANCE



There will be a chargeback of earned first year commission on any policy procured under this contract which is lapsed or are surrendered according to the following:

| The Due Date of Unpaid Premium At the Time of Lapse/Surrender | First Year Earned Commission Chargeback |
|---|---|
| 1 month after issue | 100% |
| 2 months after issue | 100% |
| 3 months after issue | 100% |
| 4 months after issue | 75% |
| 5 months after issue | 60% |
| 6 months after issue | 50% |
| 7 months after issue | 42.85% |
| 8 months after issue | 37.50% |
| 9 months after issue | 33.33% |
| 10 months after issue | 30% |
| 11 months after issue | 27.27% |
| 12 months after issue | 25% |
| 13 months after issue | 0% |

If the General Agent, Special Agent or Broker meets the annually announced first year commission, lapse rate and years under contract requirements established by the Company, the effect of the chargeback provisions of this section will be waived...Individuals holding Independent Producers Agreements will be excluded from the effect of this chargeback provision on Long Term Care Policies.

B. FLEXIBLE VARIABLE LIFE, MEDALLION VARIABLE LIFE, MEDALLION EXECUTIVE VARIABLE LIFE, HIGH BAND UNIVERSAL LIFE AND VARIABLE ESTATE PROTECTION

If a policy lapses or is surrendered with a premium due date or effective date within the first 36 months, a chargeback will be made equal to the lessor of the total of all commissions paid in the first year up to the MCRP or the amount computed from the following table:

| Paid-To-Date at the Time of Lapse (Month after issue) | Commission Chargeback (First year commissions) |
|---|---|
| 1 through 12 | 100 % |
| 13 | 91.66% |
| 14 | 83.33% |
| 15 | 75% |
| 16 | 66.66% |
| 17 | 58.33% |
| 18 through 24 | 50% |

If the General Agent, Special Agent or Broker meets the annually announced first year commission, lapse rate and years under contract requirements established by the Company, the effect of the chargeback provisions of this section will be waived.

Chargebacks will apply to face amounts surrendered under a full or partial surrender.

C. ADDITIONAL INSURANCE PROTECTION RIDER (AIP)

If during the first three policy years an Additional Insurance Protection (AIP) rider premium, which had been compensated at a rate greater than 3% in the first year, is reduced, the commission paid in the first year will be redetermined as if the reduced portion had been an AIP lump sum payment. Any commission paid in excess of this redetermined commission will be charged back.

D. ANNUITIES

For Allegiance Preferred and Independence Preferred, full commissions will be chargedback on any amount withdrawn, including the 10% free withdrawal, if the amount has been held on deposit less than six months. For amounts held on deposit over six months, but less than thirteen months, 50% of commissions will be charged back.

## SCHEDULE OF OVERRIDE RATES

| | Year 1 % | Year 2 % | Year 3 % | Year 4 % | Year 5 | Year 6 |
|---|---|---|---|---|---|---|
| **Traditional Life Policies:** | | | | | | |
| Level Premium/Mod Plus Preferred | 5 | 5.5 | 5.5 | 5.5 | | |
| Level Premium Mod Plus Standard | 5 | 7 | 7 | 7 | | |
| Additional Insurance Protection Rider (AIP) | 2.5 | 2.5 | 2.5 | 2.5 | | |
| Lump Sum | 1% in any duration | | | | | |
| Excess Premium | 1% in any duration | | | | | |
| Paid Up Insurance Rider (PUI) | .5 | .5 | .5 | .5 | | |
| LP100 Simplified Issue | | | | | | |
| To Age 70 | 5 | 4.5 | 2 | 2 | 2 | 2 |
| Age 71 and over | 5 | 2 | 2 | 2 | 2 | 2 |
| Vested to Age 70 | | 3.5 | 1 | 1 | 1 | 1 |
| Vested Age 71 and over | | 1 | 1 | 1 | 1 | 1 |
| Yearly Renewable Term & 10, 15, 20, 25 & 30 Year Level Premium Term Policies | | | | | | |
| Standard | 5 | 5.5 | 5.5 | 5.5 | | |
| Preferred | 5 | 5 | 5 | 5 | | |
| Yearly Renewable Term Rider (Insured & Spouse) | | | | | | |
| Standard | 5 | 5.5 | 5.5 | 5.5 | | |
| Preferred | 5 | 5 | 5 | 5 | | |
| **Estate Protection Policies:** | | | | | | |
| Survivorship Base | 5 | 5 | 5 | 5 | | |
| Additional Insurance Protection Rider (AIP) | 2.5 | 2.5 | 2.5 | 2.5 | | |
| Lump Sum | 1% in any duration | | | | | |
| Excess Premium | 1 | 1 | 1 | 1 | | |
| Paid-Up Insurance Rider (PUI) | 1 | 1 | 1 | 1 | | |
| Lump Sum | 1% in any duration | | | | | |
| **Flexible Premium Adjustable Life Policies (Universal Life):** | | | | | | |
| Payable on maximum commission rate premium: | 5 | 5 | 5 | 5 | | |
| Yearly Renewable Term Rider | 5 | 5 | 5 | 5 | | |
| Add-Ons (Increases) | 4.5 | | | | | |
| Excess Premium, and Premium for ratings greater than Class C, and temporary dollar amount ratings (Option 1 & 2) | .75 in any duration | | | | | |
| **Medallion Variable Life Policies:** | | | | | | |
| Medallion Variable Life | | | | | | |
| Standard & Preferred | 5 | 5 | 5 | 5 | | |
| Yearly Renewable Term Rider | | | | | | |
| Standard & Preferred | 5 | 5 | 5 | 5 | | |
| Optional Group Sales Provision | | | | | | |
| Standard & Preferred | 5 | 5 | 5 | 5 | | |
| Excess | .75 in any duration | | | | | |
| **Variable Estate Protection Policies:** | | | | | | |
| Variable Estate Protection | 5 | 5 | 5 | 5 | | |
| Excess | .75 in any duration | | | | | |
| **Flexible Variable Life Policies:** | | | | | | |
| Standard & Preferred | 5 | 5 | 5 | 5 | | |
| Yearly Renewable Term Rider (YRT) | 5 | 5 | 5 | 5 | | |
| Standard & Preferred | 5 | 5 | 5 | 5 | | |
| Optional Group Sales Provision | | | | | | |
| Standard & Preferred | 5 | 5 | 5 | 5 | | |
| Excess | .75 in any duration | | | | | |

## SCHEDULE OF OVERRIDE RATES

|  | Year 1 % | Year 2 % | Year 3 % | Year 4 % |
|---|---|---|---|---|
| **Long Term Care Policies:** | | | | |
| Gold and Classic | 5 | 7 | 7 | 7 |
| | | | | |
| **Annuities:** | | | | |
| Regular Annuities | 5 | 5 | 5 | 5 |
| FPA Annuities | | | | |
| Allegiance Preferred | .19 Each payment in any duration | | | |
| All Others | .25 Each payment in any duration | | | |
| IVA Annuities | .25 Each payment in any duration | | | |
| | | | | |
| **High Band Universal Life:** | | | | |
| HB – 1 & HB - 2 | 5 | 4 | 4 | 2 |
| Excess | .75 in any duration | | | |
| | | | | |
| **Medallion Executive Variable Life Policies:** | 5 | 5 | 5 | 5 |
| Excess | .75 in any duration | | | |
| | | | | |
| **Medallion Gold Universal Life Policies (Low Target UL):** | 5 | 5 | 5 | 5 |
| Excess | .75 in any duration | | | |
| | | | | |
| **Universal Life Estate Protection Policies:** | 5 | 5 | 5 | 5 |
| Excess | .75 in any duration | | | |
| | | | | |
| **Payroll Benefit Line UL:** | 5 | 4 | 4 | 4 |
| Excess | .75 in any duration | | | |

SCHEDULE OF COMMISSION RATES
STANDARD & PREFERRED STYLE AGENT RATES




| Traditional Life Policies: | First Policy Year % | Renewal Commissions % | Policy Years |
|---|---|---|---|
| **Level Plus 100** | | | |
| Standard & Preferred | | | |
|   Issue ages 65 and under | 45 | 8 | 2-6 |
|   Issue ages 66 to 70 | 35 | 8 | 2-6 |
|   Issue ages 71 and over | 25 | 8 | 2-6 |
| Additional Insurance Protection Rider (AIP)* | | | |
|   Target Premium Issue Age: | 25 | 4 | 2-6 |
|   Issue ages 65 and under | 20 | 4 | 2-6 |
|   Issue ages 66 and over | 3 | 3 | 2-10 |
|   Excess Premium | 3 | 3 | 2-10 |
|   Lump Sum | | | |
| **Mod Plus** | | | |
| Band 2 ($50,000 - $99,999) | | | |
| Band 3 ($100,000 - $249,999) | | | |
| Band 4 ($250,000 - $999,999) | | | |
| Band 5 ($1,000,000 and above) | 50 | 8 | 2-6 |
|   Issue ages 65 and under | 40 | 8 | 2-6 |
|   Issue ages 66 - 85 | | | |
| **Additional Insurance Protection Rider (AIP)"** | | | |
|   Target Premium Issue Age: | 25 | 4 | 2-5 |
|   20 - 65 | 20 | 4 | 2-5 |
|   66 and over | 3 | | |
|   Lump Sum | 3 | 3 | 2-5 |
|   Excess Premium | | | |
| **Paid Up Insurance Rider (PUI)** | 3 | 3 | 2-6 |
|   Reoccurring Scheduled Payments | 3 | 3 | 2-10 |
|   Lump Sum Payments | | | |
| **LP100** | | | |
| Simplified Issue | 40 | 8 | 2-5 |
|   Issue ages 50 and under | 37.5 | 8 | 2-5 |
|   Issue ages 51 to 60 | 35 | 8 | 2-5 |
|   Issue ages 61 to 65 | 30 | 8 | 2-5 |
|   Issue ages 66 to 67 | 25 | 8 | 2-5 |
|   Issue ages 68 to 70 | 20 | 5.5 | 2-5 |
|   Issue ages 71 and over | | | |

*   For compensation purposes, the AIP Rider Target Premium is one-half of the base policy premium rate, not including the policy fee, times the initial AIP coverage amount in thousands.  No commission is payable on the base policy premium increase in the 11th year.

| | First Policy Year % | Renewal Commissions % | Policy Years |
|---|---|---|---|
| **Yearly Renewable Term & 10, 15, 20, 25 & 30 Year Level Premium Term** | | | |
| Band 1 - 5 | 55 * | 3 | 2-5 |
|   Issue ages 65 and under | 47.5 | 3 | 2-5 |
|   Issue ages 66 to 70 | 40 | 3 | 2-5 |
|   Issue ages 71 and over | 55 * | 3 | 2-5 |
| Preferred Band 3 -5 | 47.5 | 3 | 2-5 |
|   Issue ages 66 to 70 | 40 | | |
|   Issue ages 71 and over | | | |
| * Rate for General Agent is 50% | | | |
| **Yearly Renewal Term 3** | 2 | 2 | 2-3 |

| | First Policy Year % | Renewal Commissions for Policy Years | | | |
|---|---|---|---|---|---|
| | | 2 % | 3 % | 4 % | 5 % |
| **Yearly Renewable Term Rider (Insured & Spouse)** | | | | | |
| Standard Bands 1-4 | | | | | |
|   Ratable ages 65 and under | 35 | 7 | 5 | 5 | 4 |
|   Ratable ages 66 to 70, incl. | 27.5 | 7 | 5 | 5 | 4 |
|   Ratable ages 71 and over | 20 | 7 | 5 | 5 | 4 |
| | | | | | |
| Preferred Bands 3–4 | | | | | |
|   Ratable ages 65 and under | 30 | 7 | 5 | 5 | 4 |
|   Ratable ages 66 to 70, incl. | 22.5 | 7 | 5 | 5 | 4 |
|   Ratable ages 71 and over | 15 | 7 | 5 | 5 | 4 |

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

**Long Term Care Policies:**

Following rates are payable modified by subsequent State regulations establishing a different commission schedule. In that event, the commission rates required by the respective State will be paid.

POLICY YEARS

| | 1 % | 2 % | 3 % | 4 % | 5 % | 6 % |
|---|---|---|---|---|---|---|
| **All States except Michigan (ages 65 and above), New York, New Jersey, Indiana, Maine, Delaware, Pennsylvania and Gold and Classic for Wisconsin only** | | | | | | |
| Non EC | 40 | 12.5 | 12.5 | 12.5 | 12.5 | |
| 3 - 49 Lives EC | 40 | 10 | 10 | 10 | 10 | |
| 50 - 100 Lives EC | 35 | 8 | 4 | 4 | 2 | |
| 100 + Lives EC (Ohio only) | 32 | 6 | 4 | 4 | 2 | |
| | | | | | | |
| Gold and Classic - Sponsored Group | 35 | 5 | 5 | 5 | 5 | |
|     - Non Sponsored Group | 40 | 12.5 | 12.5 | 12.5 | 12.5 | |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **Michigan** | | | | | | |
| Long Term Care Advantage Ages 64 - 84: | | | | | | |
| Non EC | 23 | 23 | 23 | 12.5 | 12.5 | |
| 3 - 49 Lives EC | 22 | 22 | 22 | 10 | 10 | |
| 50 + Lives EC | 18 | 18 | 18 | 4 | 2 | |
| | | | | | | |
| Gold and Classic - Sponsored Group | 18 | 18 | 18 | 3 | 3 | |
|     - Non Sponsored Group | 23 | 23 | 23 | 12.5 | 12.5 | |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **New York and Maine** | | | | | | |
| Long Term Care Advantage Ages 18 - 65: | | | | | | |
| Non Ec | 40 | 12.5 | 12.5 | 12.5 | 12.5 | |
| 3 - 49 Lives EC | 40 | 10 | 10 | 10 | 10 | |
| 50 + Lives EC | 35 | 5 | 5 | 5 | 5 | |
| | | | | | | |
| Gold and Classic - Sponsored Group | 35 | 5 | 5 | 5 | 5 | |
|     - Non Sponsored Group | 40 | 12.5 | 12.5 | 12.5 | 12.5 | |
| | | | | | | |
| Long Term Care Advantage Ages 66 - 84: | | | | | | |
| Non EC | 35 | 12.5 | 12.5 | 12.5 | 12.5 | |
| 3 - 49 Lives EC | 35 | 10 | 10 | 10 | 10 | |
| 50 + Lives EC | 30 | 5 | 5 | 5 | 5 | |
| | | | | | | |
| Gold and Classic - Sponsored Group | 30 | 5 | 5 | 5 | 5 | |
|     - Non Sponsored Group | 35 | 12.5 | 12.5 | 12.5 | 12.5 | |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **New Jersey** | | | | | | |
| Non EC | | | | | | |
| Long Term Care Advantage Ages 18 - 65: | 40 | 12.5 | 12.5 | 12.5 | 12.5 | |
| Long Term Care Advantage Ages 66+ | 35 | 12.5 | 12.5 | 12.5 | 12.5 | |
| | | | | | | |
| Gold and Classic - Sponsored Group | 30 | 5 | 5 | 5 | 5 | |
|     - Non Sponsored Group | 35 | 12.5 | 12.5 | 12.5 | 12.5 | |

Indexed Inflation Option 25%

(H-STANDARD & PROSPECTIVE AGENT RATES)

Long Term Care Policies (Continued):

| | POLICY YEARS | | | | | |
|---|---|---|---|---|---|---|
| | 1 % | 2 % | 3 % | 4 % | 5 % | 6 % |
| **Indiana** | | | | | | |
| Long Term Care Advantage Ages 18 - 84: | | | | | | |
| Non EC | 28 | 14 | 14 | 14 | 14 | 14 |
| 3 - 49 Lives EC | 26 | 13 | 13 | 13 | 13 | 13 |
| 50 + Lives EC | 20 | 10 | 10 | 10 | 10 | 10 |
| | | | | | | |
| Gold and Classic - Sponsored Group | 20 | 10 | 10 | 10 | 10 | 10 |
|      - Non Sponsored Group | 28 | 14 | 14 | 14 | 14 | 14 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **Delaware:** | | | | | | |
| Long Term Care Advantage Ages 18 - 84: | | | | | | |
| Non EC | 25 | 25 | 20 | 12.5 | 12.5 | |
| 3 - 49 Lives EC | 25 | 20 | 20 | 10 | 10 | |
| 50 + Lives EC | 20 | 15 | 15 | 5 | 5 | |
| | | | | | | |
| Gold and Classic - Sponsored Group | 18 | 11 | 11 | 11 | 11 | 11 |
|      - Non Sponsored Group | 18 | 18 | 18 | 18 | 18 | 18 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **Pennsylvania:** | | | | | | |
| Advantage Non EC and Gold and Classic | 40 | 10 | 10 | 10 | 10 | 10 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **Wisconsin:** | | | | | | |
| Gold and Classic - Sponsored Group | 28 | 7 | 7 | 7 | 7 | 7 |
|      - Non Sponsored Group | 40 | 10 | 10 | 10 | 10 | 10 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

### High Band Universal Life

HB-1

| | First Policy Year | | Policy Years 2-5 | |
|---|---|---|---|---|
| | Target % | Excess % | Target % | Excess % |
| | 35 | 3 | 3 | 3 |

HB-2

| | First Policy Year | | Policy Years 2-4 | | Policy Year 5 | |
|---|---|---|---|---|---|---|
| | Target % | Excess % | Target % | Excess % | Target % | Excess % |
| | 20 | 3 | 8 | 3 | 3 | 3 |

Special Agents entitled to receive annualized commissions according to the rules of the "Company will be entitled to receive such annualization only on High Band Universal Life pemiums paid during the first policy year up to the lesser of the Target or twelve times the special modal premium.

Target Premium for High Band Universal Life is the amount of premium that is fully commissionable.
Excess is any premium payment in a given year that exceeds the policy target for that same policy year.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

### Medallion Gold Universal Life Policies (Low Target UL):

| | First Policy Year | | Policy Years 2 - 5 | |
|---|---|---|---|---|
| | CPT % | Excess % | CPT % | Excess % |
| | 45 | 3 | 5 | 3 |

Commissionable Premium Target (CPT) is the amount of premium which is fully commissionable.

Excess premium is any premium payment in a given policy year that exceeds the policy CPT for that same policy year. The date of the receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in default will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice, for a premium due the following year, will receive the rate for the following year.

Special Agents entitled to receive annualized commissions according tho the rules of the Company will be entitled to receive such annualization only on Medallion Gold Universal Life premiums paid during the first policy year up to the lesser of the primary no lapse guarantee premium or the annualized special modal premium.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

(R-STANDARD INDEPENDENT PRODUCER'S & SURPLUS LINE BROKERS RATES)

| Traditional Life Policies: | First Policy Year % | Renewal Commissions for Policy Years 2 - 10 % |
|---|---|---|
| Level Premium 100 | | |
|     Issue ages 65 and under | 45 | 5 |
|     Issue ages 66 -85 | 35 | 5 |
|     Issue ages 86 and over | 25 | 5 |
| Additional Insurance Protection Rider (AIP)* | | |
|     Target Premium Issue Age: | | |
|       Issue ages 65 and under | 25 | 3 |
|       Issue ages 66 and over | 20 | 3 |
|     Excess Premium | 3 | 3 |
|     Lump Sum | 3 | 3 |
| Paid Up Insurance Rider (PUI) | | |
|     Schedule Premium | 3 | 3 |
|     Lump Sum | 3 | 3 |
| Mod Plus | | |
|     Band 2 ($50,000 - $99,999) | | |
|     Band 3 ($100,000 - $249,999) | | |
|     Band 4 ($250,000 - $999,999) | | |
|     Band 5 ($1,000,000 and above) | | |
|       Issue ages 65 and under | 50 | 5 |
|       Issue ages 66 - 85 | 40 | 5 |
| Additional Insurance Protection Rider (AIP)* | | |
|     Target Premium Issue Age: | | |
|       20 - 65 | 25 | 3 |
|       66 and over | 20 | 3 |
|     Lump Sum | 3 | - |
|     Excess Premium | 3 | 3 |
| Paid Up Insurance Rider (PUI) | | |
|     Reoccurring Scheduled Payments | 3 | 2 |
|     Lump Sum Payments | 3 | 3 |
| LP100 | | |
| Simplified Issue | | |
|     Issue Ages 50 and under | 40 | 4 |
|     Issue ages 51 to 60 | 37.5 | 4 |
|     Issue ages 61 to 65 | 35 | 4 |
|     Issue ages 66 to 67 | 30 | 4 |
|     Issue ages 68 to 70 | 25 | 4 |
|     Issue ages 71 and over | 20 | 3 |
| Yearly Renewable Term & 10, 15, 20, 25 & 30 Year Level Premium Term | | |
|     Band 1 - 5 | | |
|       Issue ages 65 and under | 55 * | 3 |
|       Issue ages 66 to 70 | 47.5 | 3 |
|       Issue ages 71 and over | 40 | 3 |
|     Preferred Band 3 -5 | | |
|       Issue ages 65 and under | 55 * | 3 |
|       Issue ages 66 to 70 | 47.5 | 3 |
|       Issue ages 71 and over | 40 | 3 |
|     * Rate for General Agent is 50% | | |

| | First Policy Year % | Ren'l Comm for Pol Yrs 2 & 3 % |
|---|---|---|
| Yearly Renewal Term 3 | 2 | 2 |

| Yearly Renewable Term Rider (Insured & Spouse) | First Policy Year % | Ren'l Comm for Policy Years | | | |
|---|---|---|---|---|---|
| | | 2 % | 3 % | 4 % | 5-10 % |
| Standard Bands 1-4 | | | | | |
|     Ratable ages 65 and under | 35 | 5 | 5 | 5 | 5 |
|     Ratable ages 66 to 70, incl. | 27.5 | 5 | 5 | 5 | 5 |
|     Ratable ages 71 and over | 20 | 5 | 5 | 5 | 5 |
| Preferred Bands 3-4 | | | | | |
|     Ratable ages 65 and under | 30 | 5 | 5 | 5 | 5 |
|     Ratable ages 66 to 70, incl. | 22.5 | 5 | 5 | 5 | 5 |
|     Ratable ages 71 and over | 15 | 5 | 5 | 5 | 5 |

* For compensation purposes, the AIP Rider Target Premium is one-half of the base policy premium rate, not including the policy fee, times the initial AIP coverage amount in thousands. No commission is payable on the base policy premium increase in the 11th year.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

# SCHEDULE OF COMMISSION RATES
## (R-STANDARD INDEPENDENT PRODUCER'S & SURPLUS LINE BROKERS RATES)

**Long Term Care Policies:**

Following rates are payable unless modified by subsequent State regulations establishing a different commission schedule. In that event, the commission rates required by the respective State will be paid.

POLICY YEARS

| | 1 % | 2 % | 3 % | 4 % | 5 % | 6 % |
|---|---|---|---|---|---|---|
| **All States except-Michigan (ages 65 and above),** | | | | | | |
| **New York, New Jersey. Indiana. Maine. Delaware** | | | | | | |
| **Pennsylvania and Gold and Classic for Wisconsin only** | | | | | | |
| Non EC | 40 | 15 | 10 | 5 | 5 | |
| 3 - 49 Lives EC | 40 | 12 | 8 | 3 | 3 | |
| 50 - 100 Lives EC | 35 | 5 | 5 | 5 | 5 | |
| 100 + Lives EC (Ohio only) | 32 | 5 | 5 | 5 | 5 | |
| | | | | | | |
| Gold and Classic – Sponsored Group | 35 | 5 | 5 | 5 | 5 | |
|     – Non-Sponsored Group | 40 | 15 | 10 | 5 | 5 | |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **Michigan** | | | | | | |
| **Long Term Care Advantage Ages 65 - 84:** | | | | | | |
| Non EC | 23 | 23 | 23 | 12.5 | 12.5 | |
| 3 - 49 Lives EC | 22 | 22 | 22 | 10 | 10 | |
| 50+ Lives EC | 18 | 18 | 18 | 4 | 2 | |
| | | | | | | |
| Gold and Classic - Sponsored Group | 18 | 18 | 18 | 3 | 3 | |
|     – Non-Sponsored Group | 23 | 23 | 23 | 12.5 | 12.5 | |
| | | | | | | |
| Indexed Inflation option only 25% | | | | | | |
| | | | | | | |
| **New York and Maine** | | | | | | |
| **Long Term Care Advantage Ages 18 - 65:** | | | | | | |
| Non EC | 40 | 10 | 10 | 10 | 10 | |
| 3 - 49 Lives | 40 | 8 | 8 | 8 | 8 | |
| 50 + Lives | 35 | 5 | 5 | 5 | 5 | |
| | | | | | | |
| Gold and Classic - Sponsored Group | 35 | 5 | 5 | 5 | 5 | |
|     – Non-Sponsored Group | 40 | 10 | 10 | 10 | 10 | |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **Long Term Care Advantage Ages 66 - 84:** | | | | | | |
| Non EC | 35 | 10 | 10 | 10 | 10 | |
| 3 - 49 Lives EC | 35 | 8 | 8 | 8 | 8 | |
| 50 + Lives EC | 30 | 5 | 5 | 5 | 5 | |
| | | | | | | |
| Gold and Classic - Sponsored Group | 30 | 5 | 5 | 5 | 5 | |
|     – Non-Sponsored Group | 35 | 10 | 10 | 10 | 10 | |
| | | | | | | |
| **Indiana** | | | | | | |
| **Long Term Care Advantage Ages 18 - 84:** | | | | | | |
| Non EC | 28 | 14 | 14 | 14 | 14 | 14 |
| 3 - 49 Lives EC | 26 | 13 | 13 | 13 | 13 | 13 |
| 50 + Lives EC | 20 | 10 | 10 | 10 | 10 | 10 |
| | | | | | | |
| Gold and Classic   – Sponsored Group | 20 | 10 | 10 | 10 | 10 | 10 |
|     – Non-Sponsored Group | 28 | 14 | 14 | 14 | 14 | 14 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **New Jersey:** | | | | | | |
| **Long Term Care Advantage** | | | | | | |
| Non EC Ages 18-65 | 40 | 10 | 10 | 10 | 10 | |
| Ages 66 and over | 35 | 10 | 10 | 10 | 10 | |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| Gold and Classic – Sponsored Group | 35 | 5 | 5 | 5 | 5 | |
|     – Non Sponsored Group | 40 | 10 | 10 | 10 | 10 | |

Indexed Inflation Option 25%

SCHEDULE OF COMMISSION RATES
(R-STANDARD INDEPENDENT PRODUCER'S & SURPLUS UT-BROKER'S RATES)

Long Term Care Policies (Continued):

|  | POLICY YEARS | | | | | |
|---|---|---|---|---|---|---|
|  | 1 % | 2 % | 3 % | 4 % | 5 % | 6 % |
| **Delaware:** | | | | | | |
| Long Term Care Advantage Ages 18 - 84: | | | | | | |
| Non EC | 25 | 25 | 20 | 12.5 | 12.5 | |
| 3 - 49 Lives EC | 25 | 20 | 20 | 10 | 10 | |
| 50 – Lives EC | 20 | 15 | 15 | 5 | 5 | |
| | | | | | | |
| Gold and Classic  - Sponsored Group | 18 | 11 | 11 | 11 | 11 | 11 |
| - Non-Sponsored Group | 20.5 | 20.5 | 20.5 | 20.5 | 20.5 | 20.5 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **Pennsylvania:** | | | | | | |
| Advantage Non EC and Gold and Classic | 40 | 10 | 10 | 10 | 10 | 10 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **Wisconsin:** | | | | | | |
| Gold and Classic - Sponsored Group | 28 | 7 | 7 | 7 | 7 | 7 |
| - Non-Sponsored Group | 40 | 10 | 10 | 10 | 10 | 10 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS



## High Band Universal Life Policies

### HB-1

| High Band Universal Life | First Policy Year | | Policy Years 2-10 | |
| No reduction for Higher Ages | Target | Excess | Target | Excess |
| | % | % | % | % |
| | 35 | 3 | 3 | 3 |

### HB-2

| | First Policy Year | | Policy Years 2-10 | | Policy Years 5-10 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Target | Excess | Target | Excess | Target | Excess |
| | % | % | % | % | % | % |
| | 20 | 3 | 3 | 3 | 3 | 3 |

Special Agents entitled to receive annualized commissions according to the rules of the "Company will be entitled to receive such annualization only on High Band Universal Life premiums paid during the first policy year up to the lesser of the Target or twelve times the special modal premium.

Target Premium for High Band Universal Life is the amount of premium that is fully commissionable.
Excess is any premium payment in a given year that exceeds the policy target for that same policy year.

## Medallion Gold Universal Life Policies ( Low Target UL)

| Medallion Gold Universal Life | First Policy Year | | Policy Years 2-5 | | Policy Years 6-10 | |
| --- | --- | --- | --- | --- | --- | --- |
| No Reduction for Higher Ages | CPT* | Excess | CPT | Excess | CPT | Excess |
| | % | % | % | % | % | % |
| | 45 | 3 | 5 | 3 | 3 | 3 |

Commissionable Premium Target (CPT) is the amount of premium which is fully commissionable.

Excess premium is any premium payment in a given policy year that exceeds the policy CPT for that same policy year. The date of the receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in default will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice, for a premium due the following year, will receive the rate for the following year.

Special Agents entitled to receive annualized commissions according tho the rules of the Company will be entitled to receive such annualization only on Medallion Gold Universal Life premiums paid during the first policy year up to the lesser of the primary no lapse guarantee premium or the annualized special modal premium.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

**Traditional Estate Protection Policies:**

|  | First Policy Year<br>% | Renewal Commissions for<br>Policy Years 2 - 10<br>% |
|---|---|---|
| Modified Premium Policy<br>Base<br>Issue ages*: |  |  |
| 20 - 70 | 50 | 5 |
| 71 - 75 | 45 | 5 |
| 76 - 80 | 40 | 5 |
| Additional Insurance Protection Rider (AIP)**<br>Target Premium Issue ages*: |  |  |
| 20 - 70 | 25 | 3 |
| 71 - 75 | 22.5 | 3 |
| 76 - 85 | 20 | 3 |
| Lump Sum | 3 |  |
| Excess Premium | 3 | 3 |
| Paid-Up Insurance Rider (PUI)<br>Reoccurring Scheduled Payments | 3 | 2 |
| Lump Sum Payments | 3 |  |

\*    Ages based on younger insured.

\*\* For compensation purposes, AIP Rider Target Premium is one-half of the base policy premium rate, not including the policy fee, times the initial AIP coverage amount in thousands. No commission is payable on the base policy premium increase in the 11th year. Base policy compensation is payable when premiums are being vanished. AIP compensation is paid only on premiums that are actually received in cash.

**Level Premium Estate Protection**

|  | First Policy Year<br>% | Renewal Commissions for<br>Policy Years 2 - 10<br>% |
|---|---|---|
| Base<br>Issue Ages: |  |  |
| 20 – 70 | 45 | 5 |
| 71 – 75 | 40 | 5 |
| 76 – 80 | 35 | 5 |
| 81 – 85 | 30 | 5 |
| Additional Insurance Protection Rider (AIP)<br>Target Premium Issue ages: |  |  |
| 20 – 70 | 25 | 3 |
| 71 – 75 | 22.5 | 3 |
| 76 – 80 | 20 | 3 |
| 81 – 85 | 17.5 | 3 |
| Excess Premium | 3 | 3 |
| Lump Sum | 3 |  |
| Paid-Up Insurance (PUI)<br>Scheduled Premium | 3 | 3 |
| Lump Sum | 3 | 3 |

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS



**SCHEDULE OF COMMISSION RATES**
**(R-STANDARD & PROSPECTIVE AGENT RATES)**
**(R-STANDARD, INDEPENDENT PRODUCER'S & SURPLUS LINE BROKERS RATES)**

<u>Flexible Premium Adjustable Life Policies</u> (Universal Life):

| | First Policy Year % | Policy Years 2-5 Option 1* % | Policy Years 2-5 Option 2* % | Policy Years 6 - Beyond* % |
|---|---|---|---|---|
| Payable on maximum commission rate premium: | | | | |
| **Policy Base less than $250,000** | | | | |
| Issue ages 65 and under | 50 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 45 | 4 | 6 | 3 |
| Issue ages 71 to 75 | 40 | 4 | 6 | 3 |
| Issue ages 76 and over | 35 | 4 | 6 | 3 |
| **Policy Base $250,000 and over** | | | | |
| Issue ages 65 and under | 45 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 40 | 4 | 6 | 3 |
| Issue ages 71 to 75 | 35 | 4 | 6 | 3 |
| Issue ages 76 and over | 30 | 4 | 6 | 3 |
| **Yearly Renewable Term Rider** | | | | |
| Standard | | | | |
| Issue ages 65 and under | 35 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 27.5 | 4 | 6 | 3 |
| Issue ages 71 and over | 20 | 4 | 6 | 3 |
| Preferred | | | | |
| Issue ages 65 and under | 30 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 22.5 | 4 | 6 | 3 |
| Issue ages 71 and over | 15 | 4 | 6 | 3 |
| **Add-Ons (Increases)** | | | | |
| Policy Base $249,999 and under | 47 | - | - | - |
| Policy Base $250,000 and over | 42 | - | - | - |
| Excess Premium, and Premium for ratings greater than Class C, and temporary dollar amount ratings (Option 1 & 2) | 3 | 3.5 | 3.5 | 3 |

\* The date of receipt of premium payments will determine the policy year for the commission on Flexible Premium Adjustable Life.

MCRP (Maximum Commission Rate Premium) for Flexible Premium Adjustable Life equals 12 times the minimum monthly premium for Option 1, plus the premium on all riders and substandard extra premiums, excluding temporary dollar ratings or premiums in excess of Class C.

Special Agents entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization on Universal Life only on premiums paid during first policy year up to the MCRP (no annualization will be paid after first policy year on any premiums).

Universal Life commissions are not payable after the termination of this agreement.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

**Medallion Variable Life Policies:**

| | First Policy Year | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|
| | CPT % | Excess % | CPT % | Excess % | CPT % | Excess % |
| **Medallion Variable Life** | | | | | | |
| Standard & Preferred | | | | | | |
| Less than $250,000 | | | | | | |
| Issue ages 65 and under | 50 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 45 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 40 | 3 | 6 | 3 | 3 | 3 |
| | | | | | | |
| $250,000 and Over | | | | | | |
| Issue ages 65 and under | 45 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 40 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 35 | 3 | 6 | 3 | 3 | 3 |
| | | | | | | |
| **Yearly Renewable Term Rider** | | | | | | |
| Standard | | | | | | |
| Issue ages 65 and under | 35 | | 6 | | 3 | |
| Issue ages 66 - 70 | 27.5 | | 6 | | 3 | |
| Issue ages 71 and over | 20 | | 6 | | 3 | |
| | | | | | | |
| Preferred | | | | | | |
| Issue ages 65 and under | 30 | | 6 | | 3 | |
| Issue ages 66 - 70 | 22.5 | | 6 | | 3 | |
| Issue ages 71 and over | 15 | | 6 | | 3 | |

| | First Year Rates | | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|---|
| | Payable Policy Years 1 % | 2-4 % | Excess % | CPT % | Excess % | CPT % | Excess % |
| **Optional Group Sales Provision*** | | | | | | | |
| Standard & Preferred | | | | | | | |
| Less than $250,000 | | | | | | | |
| Issue ages 65 and under | 35 | 6 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 30 | 6 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 25 | 6 | 3 | 6 | 3 | 3 | 3 |
| $250,000 and Over | | | | | | | |
| Issue ages 65 and under | 30 | 6 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 25 | 6 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 20 | 6 | 3 | 6 | 3 | 3 | 3 |

*In order to meet higher early policy cash value needs, the optional Group Sales provision may be offered in employer-employee cases where at least 3 policies are to be paid by a payroll deduction method. Under this optional arrangement the payment of first year commissions will be spread out as set forth in the commission table.

**Deferred 6% first year commission will be paid at the start of month three in policy years 2-4. Commissions on excess premiums and renewal premiums are not impacted by this option and will be paid at the rates provided in the commission table.

Commissionable Premium Target (CPT) is equal to the sum of the base policy target and rider premiums (excluding YRT) as calculated at issue and at each anniversary.

The date of receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in arrears will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice for a premium due the following year will receive the rate for the following year.

Excess premiums is any premium in a given year that exceed the CPT

Special Agents entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization only on Medallion Variable Life premiums paid during the first policy year up to the CPT (no annualization will be paid after first policy year on any premiums or if paid monthly, the lessor of the CPT or 12 times the monthly premium).



ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

## SCHEDULE OF COMMISSION RATES
### (H-STANDARD & PROSPECTIVE AGENT RATES)
### (R-STANDARD, INDEPENDENT PRODUCER'S & SURPLUS LINE BROKERS RATES)

**Variable Estate Protection Policies:**

| | First Policy Year | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|
| | Target % | Excess % | Target % | Excess % | Target % | Excess % |
| Variable Estate Protection | | | | | | |
| Younger insured age 70 or younger | 45 | 3 | 5 | 3 | 3 | 3 |
| Younger insured age 71 or older | 40 | 3 | 5 | 3 | 3 | 3 |

Target premium for Variable Estate Protection is the amount of premium that is fully commissionable.

Excess premiums is any premium in a given year that exceed the Target.

Special Agents entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization only on Variable Estate Protection premiums paid during the first policy year up to the lesser of the target or twelve times the special modal premium (no annualization will be paid after first policy year on any premiums).

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

# SCHEDULE OF COMMISSION RATES
## (R-STANDARD & PROSPECTIVE AGENT RATES)
## (R-STANDARD, INDEPENDENT PRODUCER'S & SURPLUS LINE BROKERS RATES)

**Flexible Variable Life Policies:**

| | First Policy Year | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|
| | MCRP % | Excess % | MCRP % | Excess % | MCRP % | Excess % |
| **Flexible Variable Whole-Life** | | | | | | |
| Standard & Preferred | | | | | | |
| Less than $250,000 | | | | | | |
| Issue ages 65 and under | 50 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 45 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 71 and over | 40 | 3 | 8 | 3 | 3 | 3 |
| $250,000 and Over | | | | | | |
| Issue ages 65 and under | 45 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 40 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 71 and over | 35 | 3 | 8 | 3 | 3 | 3 |
| **Yearly Renewable Term Rider (YRT)** | | | | | | |
| Standard | | | | | | |
| Issue ages 65 and under | 35 | | 8 | | 3 | |
| Issue ages 66 - 70 | 27.5 | | 8 | | 3 | |
| Issue ages 71 and over | 20 | | 8 | | 3 | |
| Preferred | | | | | | |
| Issue ages 65 and under | 30 | | 8 | | 3 | |
| Issue ages 66 - 70 | 22.5 | | 8 | | 3 | |
| Issue ages 71 and over | 15 | | 8 | | 3 | |

| | First Year Rates | | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|---|
| | Payable Policy Years 1 % | 2-4** % | Excess % | CPT % | Excess % | CPT % | Excess % |
| **Optional Group Sales Provision*** | | | | | | | |
| Standard & Preferred | | | | | | | |
| Less than $250,000 | | | | | | | |
| Issue ages 65 and under | 35 | 6 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 30 | 6 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 71 and over | 25 | 6 | 3 | 8 | 3 | 3 | 3 |
| $250,000 and Over | | | | | | | |
| Issue ages 65 and under | 30 | 6 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 25 | 6 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 71 and over | 20 | 6 | 3 | 8 | 3 | 3 | 3 |

*In order to meet higher early policy cash value needs, the optional Group Sales provision may be offered in employer-employee cases where at least 5 policies are to be paid by a payroll deduction method. Under this optional arrangement the payment of first year commissions will be spread out as set forth in the commission table.

**Deferred 6% first year commission will be paid at the start of month three in policy years 2-4. Commissions on excess premiums and renewal premiums are not impacted by this option and will be paid at the rates provided in the commission table.

MCRP (Maximum Commission Rate Premium) equals sum of Modified Scheduled Premium plus the premium on all riders (excluding YRT) and substandard extra premiums, excluding temporary dollar ratings or premiums in excess of Class C rating.

Excess premium is any premium payment in a given policy year that exceeds the policy MCRP for that same policy year.

The date of receipt to premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in default will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice for a premium due the following year will receive the rate for the following year.

Special Agents entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization only on Flexible Variable Life premiums paid during the first policy year up to the MCRP (no annualization will be paid after first policy year on any premiums).



ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

# SCHEDULE OF COMMISSION RATES
## (H-STANDARD & PROSPECTIVE AGENT RATES)
### (R-STANDARD, INDEPENDENT PRODUCER'S & SURPLUS LINE BROKERS RATES)

**Annuities:**

Before engaging in the marketing of or servicing of an individual Variable Annuity product the Special Agent must be appropriately registered with the National Association of Securities Dealers (NASD) and meet all appropriate State licensing regulations for this product.

|  | Rates of Commission<br>All Policy Years<br>% |
|---|---|
| 1. Deferred Variable Annuities | |
|    Independence 2000 | 3 |
|    Issue Age 79 and under | 3 |
|    Issue Age 80 – 84 | 2 |
| 2. Deferred Fixed Annuities | |
|    Allegiance Preferred | 2.75 |
| 3. Immediate Variable Annuities | |
|    Accommodator | 3 |
| 4. Immediate Fixed Annuities | |
|    John Hancock Managed | 3 |

Annuity commissions are not payable after the termination of this agreement.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

SCHEDULE OF COMMISSION RATES
(R-STANDARD & PROSPECTIVE AGENT RATES)
(R-STANDARD, INDEPENDENT PRODUCER'S & SURPLUS LINE BROKERS RATES)

Medallion Executive Variable Life Policies:

|  | First Policy Year | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|
|  | CPT* % | Excess % | CPT % | Excess % | CPT % | Excess % |
| Issue ages 20 - 65 | 20 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 15 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 10 | 3 | 6 | 3 | 3 | 3 |

Commissionable Premium Target (CPT) is the amount of premium which is fully commissionable.

Excess premium is any premium payment in a given policy year that exceeds the policy CPT for that same policy year.

*An additional Deferred First Year Commission of 6% will be paid on the lesser of the First Year Aggregate or the first year CPT premium, on the Base Policy in years 2-4

Trail commissions of .2% will be paid starting at the end of the 5th policy year. Trail commissions are a percent of assets (less loans) at the end of the policy year.

Special Agents entitled to receive annualized commissions according tho the rules of the Company will be entitled to receive such annualization only on Medallion Executive Variable Life premiums paid during the first policy year up to the lesser of the CPT or the annualized special modal premium.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

Universal Life Estate Protection Policies:

|  | First Policy Year | | Policy Years 2 - 5 | | Policy Years 6 - 10 | |
|---|---|---|---|---|---|---|
|  | CPT % | Excess % | CPT % | Excess % | CPT % | Excess % |
| Issue ages 75 and under | 45 | 3 | 5 | 3 | 3 | 3 |
| Issue ages 76 and over | 40 | 3 | 5 | 3 | 3 | 3 |

Commissionable Premium Target (CPT) is the amount of premium which is fully commissionable.

Excess premium is any premium payment in a given policy year that exceeds the policy CPT for that same policy year. The date of the receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in default will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice, for a premium due the following year, will receive the rate for the following year.

Special Agents entitled to receive annualized commissions according tho the rules of the Company will be entitled to receive such annualization only on Universal Life Estate Protection premiums paid during the first policy year up to the lesser of the CPT or the annualized special modal premium.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

**SCHEDULE OF COMMISSION RATES**
**(H-STANDARD & PROSPECTIVE AGENT RATES)**
**(R-STANDARD INDEPENDENT PRODUCER'S & SURPLUS LINE BROKERS RATES)**

PAYROLL BENEFIT LINE (UL):

| No Reduction for Higher Ages | First Policy Year | | Years 2 and Beyond | |
|---|---|---|---|---|
| | Target | Excess | Target | Excess |
| | % | % | % | % |
| | 50 | 3 | 3 | 3 |

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

| | Tier I<br>Policy Years 1-5<br>% of prem. | Tier II<br>Policy Years 6 and beyond<br>% of prem. | Asset Fees |
|---|---|---|---|
| **Traditional Life Policies** | | | |
| | | | |
| **Level Plus** | | | |
| Band 1 ($25,000 - $49,999) | | | |
| Issue ages 65 and under | 12.0 | 6 | 16 Basis Points |
| Issue ages 66 and over | 12.0 | 6 | |
| | | | |
| Band 2 -5 | | | |
| Issue ages 65 and under | 12.0 | 6 | |
| Issue ages 66 and over | 11.5 | 6 | |
| | | | |
| **Mod Plus** | | | |
| Band 2 -5 | | | |
| Issue ages 65 and under | 12.0 | 8 | 16 Basis Points |
| Issue ages 66-85 | 11.5 | 6 | |
| | | | |
| **Yearly Renewable Term Rider** | 12.0 | 4.5 | |
| | | | |
| **Additional Insurance Protection Rider (AIP)*** | | | |
| Target Premium Issue Age: | | | |
| 20-65 | 5 | 2 | |
| 66 and over | 5 | 2 | |
| Lump Sum | 2 | 2 | |
| Excess Premium | 2 | 2 | |

\* For compensation purposes. AIP Rider Target Premium is one-half of the base policy premium rate, not including the policy fee, times the initial AIP coverage amount in thousands. No new commission is payable on the base policy premium increase in the 11th year. AIP compensation is paid only on premiums that are actually received in cash.

| | | | |
|---|---|---|---|
| **Paid Up Insurance Rider (PUI)** | | | |
| Recurring Scheduled Payments | 2 | 2 | |
| Lump Sum Payments | 2 | 2 | |

| Yearly Renewable Term Policies and 10, 15, 20, 25 and 30<br>Year Level Premium Term Policies | Policy Years 1 through 5 | Policy Years 6 and Beyond |
|---|---|---|
| Band 1-5 | | |
| Issue ages 65 and under | 20 | 2 |
| Issue ages 66 to 70 | 20 | 2 |
| Issue ages 71 and over | 20 | 2 |
| | | |
| Term Riders | 20 | 2 |

| | First Policy Years 1 through 3<br>% of prem. | |
|---|---|---|
| Yearly Renewal Term 3 | 2 | None |

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS



| | Tier I Policy Years 1-5 % of prem. | Tier II Policy Years 6 and Beyond % of prem. | Asset Fees |
|---|---|---|---|
| **Estate Protection Policies** | | | |
| Survivorship Base: | | | |
| Issue ages*: | | | |
| 20-70 | 10 | 4.5 | 16 Basic Points |
| 71-75 | 10 | 4.5 | |
| 76-80 | 10 | 4.5 | |
| Additional Insurance Protection Rider (AIP)** | | | |
| Target Premium Issue ages* : | | | |
| 20-70 | 5 | 2 | 16 Basic Points |
| 71-75 | 5 | 2 | |
| 76-85 | 5 | 2 | |
| Lump Sum | 2 | 2 | |
| Excess Premium | 2 | 2 | |
| Paid Insurance Rider (PUI) | | | |
| Recurring Scheduled Payments | 2 | 2 | 16 Basic Points |
| Lump Sum Payments | 2 | 2 | |

\*  Ages based on younger insured.

\*\* For compensation purposes, AIP Rider Target Premium is one-half of the base policy premium rate, not including the policy fee, times the initial API coverage amount in thousands. No new commission is payable on the base policy premium increase in the 11th year. AIP compensation is paid only on premiums that are actually received in cash.

**Flexible Premium Adjustable Life Policies (Universal Life)**

| | Tier I Policy Years 1-5 Opt. 1/Opt. 2 % of prem. | Tier II Policy Years 6 and beyond Opt. 1/Opt. 2 % of prem. | Asset Fees |
|---|---|---|---|
| Payable on maximum commission rate premium: | | | |
| Policy Base less than $250,000 | | | |
| Issue ages 65 and under | 12 | 4.5 | 16 Basis Points |
| Issue ages 66 to 70 | 11 | 4.5 | |
| Issue ages 71 to 75 | 11 | 4.5 | |
| Issue ages 76 and over | 10 | 4.5 | |
| Policy Base less than $250,000 and over | | | |
| Issue ages 65 and under | 11 | 4.5 | |
| Issue ages 66 to 70 | 11 | 4.5 | |
| Issue ages 71 to 75 | 10 | 4.5 | |
| Issue ages 76 and over | 10 | 4.5 | |
| Add-Ons (Increases) | | | |
| Policy Base $249,999 and under | 12 | 4.5 | |
| Policy Base $250,000 and over | 11 | 4.5 | |
| Excess Premium, and Premium for ratings greater than Class C, and temporary dollar amount ratings (Option 1 & 2) | 2 | 2 | |

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

SCHEDULE OF FEES & LEVELIZED COMMISSION RATES

| | Tier I<br>Policy Years 1-5<br>Opt. 1/Opt. 2<br>% of prem. | Tier II<br>Policy Years 6 and beyond<br>Opt. 1/Opt. 2<br>% of prem. | Asset Fees |
|---|---|---|---|
| **ULI 95 (High Band U.L.)** | | | |
| Payable on maximum commission rate premium | 10 | 4 | 16 Basis Points |
| Excess Premium | 2 | 2 | |

| Yearly Renewable Term Rider | Policy Year 1<br>% of prem. | Policy Years 2 and Beyond | |
|---|---|---|---|
| Standard and Preferred | 12 | See policy base rates above | None |

The date of receipt of premium payments will determine the policy year for the commission on Flexible Premium Adjustable Life.

Maximum Commission Rate Premium (MCRP) for Flexible Premium Adjustable Life equals 12 times the minimum monthly premium for Option 1, plus the premium on all riders and substandard extra premiums, excluding temporary dollar ratings or premiums in excess of Class C.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

## SCHEDULE OF FEES & LEVELIZED COMMISSION RATES

|  | Tier I Policy Years 1-5 % of prem. | | Tier II Policy Years 6 and Beyond % of prem. | | Asset Fees |
|---|---|---|---|---|---|

**Medallion Variable Life Policies:**

| Medallion Variable Life | CPT | Excess | CPT | Excess | |
|---|---|---|---|---|---|
| Standard & Preferred | | | | | |
| Less than $250,000 | | | | | |
| Issue ages 65 and under | 11 | 2 | 4.5 | 2 | |
| Issue ages 66 to 70 | 10 | 2 | 4.5 | 2 | |
| Issue ages 71 and over | 9 | 2 | 4.5 | 2 | |
| | | | | | |
| $250,000 and Over | | | | | |
| Issue ages 65 and under | 10 | 2 | 4.5 | 2 | |
| Issue ages 66 to 70 | 9 | 2 | 4.5 | 2 | |
| Issue ages 71 and over | 8 | 2 | 4.5 | 2 | |
| | | | | | |
| Optional Group Sales Provision | | | | | 16 Basis Points |
| Standard & Preferred | | | | | |
| Less than $250,000 | | | | | |
| Issue ages 65 and under | 10 | 2 | 4 | 2 | |
| Issue ages 66 to 70 | 10 | 2 | 4 | 2 | |
| Issue ages 71 and over | 10 | 2 | 4 | 2 | |
| | | | | | |
| $250,000 and Over | | | | | |
| Issue ages 65 and under | 10 | 2 | 4 | 2 | |
| Issue ages 66 to 70 | 10 | 2 | 4 | 2 | |
| Issue ages 71 and over | 10 | 2 | 4 | 2 | |

| Yearly Renewable Term Rider | Policy Years 1 % of prem. | Policy Years 2 and Beyond % of prem. | Asset Fees |
|---|---|---|---|
| Standard and Preferred | 12 | See policy base rates above | |

Commissionable Premium Target (CPT) is equal to the sum of the base policy target and rider premiums (excluding YRT) as calculated at issue and at each anniversary.

The date of receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in arrears will receive the commission rate in effect prior to the grace period. Premiums received at year and accompanied by a billing notice for a premium due to the following year will receive the rate for the following year.

Excess premiums is any premium in a given year that exceeds the CPT.

**Variable Estate Protection Policies:**

|  | Tier I Policy Years 1-5 % of prem. | | Tier II Policy Years 6 and beyond % of prem. | | Asset Fees |
|---|---|---|---|---|---|
| Variable Estate Protection | CPT | Excess | CPT | Excess | 16 Basis Points |
| Younger insured age 70 or younger | 9 | 2 | 3.5 | 2 | |
| Younger insured age 71 or older | 8 | 2 | 3.5 | 2 | |

Target premium for Variable Estate Protection equals the amount of premium that is fully commissionable at the target rate. Excess premiums is any premium in a given year that exceed the Target.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

# SCHEDULE OF FEES & LEVELIZED COMMISSION RATES

|  | Tier I Policy Years 1-5 % of prem. | | Tier II Policy Years 6 and beyond % of prem. | | Asset Fees |
|---|---|---|---|---|---|
| **Flexible Variable Life Policies:** | | | | | |
| Flexible Variable Life Whole-Life | MCRP | Excess | MCRP | Excess | 16 Basis Points |
| Standard and Preferred | | | | | |
| Less than $250,000 | | | | | |
| Issue ages 65 and under | 11.5 | 2 | 4 | 2 | |
| Issue ages 66 to 70 | 10.5 | 2 | 4 | 2 | |
| Issue ages 71 and over | 9.5 | 2 | 4 | 2 | |
| | | | | | |
| $250,000 and Over | | | | | |
| Issue ages 65 and under | 10.5 | 2 | 4 | 2 | |
| Issue ages 66 to 70 | 9.5 | 2 | 4 | 2 | |
| Issue ages 71 and over | 8.5 | 2 | 4 | 2 | |
| | | | | | |
| Optional Group Sales Provision | | | | | |
| Standard & Preferred | | | | | |
| Less than $250,000 | | | | | |
| Issue ages 65 and under | 10 | 2 | 4 | 2 | |
| Issue ages 66 to 70 | 10 | 2 | 4 | 2 | |
| Issue ages 71 and over | 10 | 2 | 4 | 2 | |
| | | | | | |
| $250,000 and Over | | | | | |
| Issue ages 65 and under | 10 | 2 | 4 | 2 | |
| Issue ages 66 to 70 | 10 | 2 | 4 | 2 | |
| Issue ages 71 and over | 10 | 2 | 4 | 2 | |

| Yearly Renewable Term Rider | Policy Years 1 % of prem. | Policy Years 2 and Beyond % of prem. |
|---|---|---|
| Standard and Preferred | 12 | See policy base rates above |

MCRP ( Maximum Commission Rate Premium) equals sum of Modified Scheduled Premium plus the premium on all riders (excluding YRT) and substandard extra premiums, excluding temporary dollar ratings or premiums in excess of Class C rating.

Excess premium: Amount of premium payment in a given policy year that exceeds the policy MCRP for that same policy year.

The date of receipt to premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in default will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice for a premium due the following year will receive the rate for the following year.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

| | Tier I Policy Years 1-5 % of prem. | Tier II Policy Years 6 and Beyond % of prem. | Asset Fees |
|---|---|---|---|
| **Long Term Care Policies:** | | | |
| Advantage 96 Gold & Classic | | | |
| Non EC ( Single Life Case) | 13 | 8 | |
| Sponsored Group | 9.5 | 6 | |
| Indexed Inflation Option | 7 | 4 | |
| | | | |
| Protectcare Advantage 91 & 94 | | | |
| Non EC (Single Life Case) | 13 | 8 | |
| EC (Multi Life Case) | | | |
| 3-49 Lives | 11.5 | 7 | |
| 50+ Lives (Non Ohio) | 9.5 | 6 | |
| 50-99 Lives (Ohio Only) | 9.5 | 6 | |
| 100+ Lives (Ohio Only) | 8 | 5 | |
| Indexed Inflation Option | 7 | 4 | |

A 7% First Year Commission will be paid on the Indexed Inflation Option premium in the year the Indexed Inflation Option is added. The following years, the Indexed Inflation Option premium will be compensated based on the commission rate specified for The Indexed Inflation Option in the table, and based on the duration of the base policy to which the Indexed Inflation Option is attached.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

SCHEDULE OF FEES & LEVELIZED COMMISSION RATES

Annuities:

Before engaging in the marketing of or servicing of an individual Variable Annuity product the Prospective Agent must be appropriately registered with the National Association of Securities Dealers (NASD) and meet all appropriate State licensing regulations for this product.

| | Rates of Commission All Policy Years % | Asset Fees |
|---|---|---|
| 1. Deferred Variable Annuities | | |
| Independence 2000 | | 16 Basis Points |
| Age 0–79 | 2 | |
| Age 80– | 1 | |
| 2. Deferred Fixed Annuities | | |
| Allegiance Preferred** | 1.75 | 16 Basis Points |
| 3. Immediate Variable Annuities | | |
| Accommodator | 3 | None |
| 4. Immediate Fixed Annuities | | |
| John Hancock Managed | 3 | None |

** For Allegiance Preferred, full commissions will be chargedback on any amounts withdrawn, including the 10% free withdrawal, if the amount has been held on deposit less than one year.

For all other annuity contracts there is no chargeback provision applicable.

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

## Medallion Executive Variable Life Policies:

| | First Policy Year | | Policy Years 2-4 | | Policy Years 5-10 | | Policy Years 5 + Beyond | **Asset Fees |
|---|---|---|---|---|---|---|---|---|
| | CPT* % | Excess % | CPT % | Excess % | CPT % | Excess % | | |
| Issue ages 20-65 | 20 | 3 | 6 | 3 | 3 | 3 | | 20 Basis Points |
| Issue ages 66-70 | 15 | 3 | 6 | 3 | 3 | 3 | | |
| Issue ages 71 and over | 10 | 3 | 6 | 3 | 3 | 3 | | |

Commissionable Premium Target (CPT) is the amount of premium which is fully commissionable.

Excess premium is any premium payment in a given policy year that exceeds the policy CPT for that same policy year.

*An additional Deferred First Year Commission of 6% will be paid on the lesser of the First Year Aggregate or the first year CPT premium, on the Base Policy in years 2-4. Payment will be made at the beginning of the 3rd month of each of these 3 policy years, providing the policy is not lapsed.

Trail commissions of .2% will be paid starting at the end of the 5th policy year. Trail commissions are a percent of assets (less loans) at the end of the policy year.

Special Agents entitled to receive annualized commissions according tho the rules of the Comapny will be entitled to receive such annualization only on Medallion Executive Variable Life premiums paid during the first policy year up to the lesser of the CPT or the annualized special modal premium.

**Asset fees are not generated in years 1 through 4.

## Universal Life Estate Protection:

| | Tier I Policy Years 1-5 % of prem. | | Tier II Policy Years 6 and Beyond % of prem. | | Asset Fees |
|---|---|---|---|---|---|
| | CPT 11 | Excess 2 | CPT 4.50 | Excess 2 | 16 Basis Points |

## Medallion Gold Universal Life:

| | Tier I Policy Years 1-5 % of prem. | | Tier II Policy Years 6 and Beyond % of prem. | | Asset Fees |
|---|---|---|---|---|---|
| | CPT 11 | Excess 2 | CPT 4.50 | Excess 2 | 16 Basis Points |

ALL COMMISSIONS ARE SUBJECT TO SCHEDULE OF REPLACEMENTS AND CHARGEBACKS

Ex. C



# SIGNATOR
## FINANCIAL NETWORK

Signator Investors, Inc.

Management Agreement

Name _Robert D. Lyman_____

Agency _Chicago_____  Ord. Code _500_____

Registered Rep. Number _14434_____

Managerial Department

# MANAGEMENT AGREEMENT
# SIGNATOR INVESTORS, INC.

Signator Investors, Inc., a Delaware corporation with its Home Office in Boston, Massachusetts, hereinafter called "Signator", and (Branch Manager name) _Robert D. Lyman_, currently of (home address) _92 Wortham_, hereinafter called "Branch Manager", in consideration of the terms and considerations set forth in this Management Agreement ("Agreement") or otherwise made a part hereof, do mutually agree as follows:

1.       **AUTHORIZATION.** Signator hereby appoints Branch Manager (he/she) as a management representative of Signator and an affiliated insurance agency, Signator Insurance Agency, Inc., authorized to function as part of its supervisory system exercising responsibility over its securities, investment advisor and insurance businesses. Signator authorizes Branch Manager to exercise designated supervisory functions as its management representative for the branch office noted at the end of this agreement. This responsibility to supervise extends to registered representatives physically working out of the branch office and to registered representatives assigned to the branch office but maintaining a work location elsewhere. This authorization to supervise is limited to only those securities, investment advisor or insurance products and services which Signator or its affiliated insurance agency are allowed to offer, including, but not limited to, mutual funds, variable life insurance, variable annuities, limited partnerships, unit investment trusts, general securities and investment advisor products and services, including fee-based financial plans and advice, wrap accounts and investment seminars for fees.

Signator also hereby authorizes Branch Manager, as an independent contractor and registered representative, to represent Signator in conducting its securities business and to offer for sale those products which Signator is authorized to offer. Signator reserves the right, from time to time at its discretion, to limit the offering and sale of certain securities to certain of its representatives. Solicitations shall be made only within the jurisdiction in which products are registered and/or qualified for sale and in which Signator and the Branch Manager are qualified to do business in accordance with licensing requirements and other applicable Federal and state laws, industry rules or regulations. Unless specifically authorized by Signator, Branch Manager is not authorized to act for Signator in the final acceptance of any application or transaction for purchase or sale of securities; rather, applications and transactions shall be accepted only by Signator at its Home Office and any other place it may designate for this responsibility.

The supervisory responsibilities assigned to the Branch Manager represent only those responsibilities appropriately assigned to the Branch Manager in a manner consistent with the Company's supervisory system designed to meet required standards outlined in federal and state laws and NASD rules. Branch Manager is also a duly authorized Agency Manager of John Hancock Mutual Life Insurance Company and must abide by all contract provisions and responsibilities he/she assumes as an Agency Manager.

2.       **RELATIONSHIP.** For employment purposes, the relationship of Branch Manager to Signator is that of an independent contractor and nothing contained herein shall be construed to create an employer and employee relationship between Branch Manager and Signator, nor between Branch Manager and any

issuer or sponsor of securities, investment advisor or insurance products/services. Branch Manager shall exercise his/her own judgment in carrying out his/her supervisory responsibilities as a management representative of Signator as long as minimum supervisory procedures outlined in the John Hancock/ Signator "Market Conduct Manual" and any updates to the "Market Conduct Manual" are followed. When permitted by Signator, certain supervisory tasks may be delegated to other persons in the office; however, final responsibility for supervision over branch office matters rests with the Branch Manager.

Branch Manager must notify Signator in writing in the event Branch Manager contemplates entering into a private securities transaction as defined in Rule 3040 of the Conduct Rules of the NASD. Signator will notify Branch Manager in writing that Signator approves or disapproves of the private securities transaction prior to Branch Manager's participation in such transaction. Furthermore, in the event Signator disapproves of the transaction, the Branch Manager shall not participate in the transaction in any manner, directly or indirectly.

Branch Manager must notify Signator in writing prior to engaging in any outside business activity as defined in Signator's "Market Conduct Manual". Signator reserves the right to restrict the Branch Manager's participation in any outside business activity. Branch Manager also agrees to comply with and be bound by the continuing education requirements established by Signator including, but not limited to, attendance at training and compliance-related seminars.

In addition to the foregoing, Branch Manager agrees to become thoroughly knowledgeable, and to comply in all aspects, with the provisions of the John Hancock/Signator "Market Conduct Manual", including the sections of the "Manual" devoted to supervisory responsibilities. Branch Manager agrees to promptly update this publication upon receipt of periodic updates from Signator.

3.      **LICENSING/REGISTRATION.** The Branch Manager shall be properly registered with Signator as a NASD General Securities Principal (Series 24) and have passed the Uniform Securities Agent State Law Examination (Series 63) within three months of appointment as an Agency Manager of John Hancock Mutual Life Insurance Company, and, after July 5, 1999, as a General Agent/Affiliated General Agent of Signator Insurance Agency, Inc., by passing the appropriate examinations.* The Branch Manager is also required to pass the Uniform Investment Advisor Law Examination (Series 65) or the Uniform Combined State Law Examination (Series 66) within four months of appointment as a Branch Manager.

* Agency Managers under contract with John Hancock Mutual Life Insurance Company prior to November, 1998 must be registered with Signator as a General Securities Principal (Series 24) prior to March 31, 1999.

4.      **GENERAL POWERS AND DUTIES.** The Branch Manager shall endeavor to promote the interests of Signator as contemplated by this contract, and shall carry out his/her duties and responsibilities so as not to affect adversely the business, good standing or reputation of Signator. The Branch Manager shall have no power or authority other than herein expressly granted, and no other or greater power or authority shall be implied by the grant or denial of power or authority specifically mentioned herein. The Branch Manager shall have no power or authority on behalf of Signator to issue, make or discharge any policy, contract, obligation or indebtedness whatsoever.

5.　　　　**SOLICITATION OF BUSINESS.** The Branch Manager shall have authority to solicit business for Signator personally and by registered representatives assigned to the branch office under the terms and conditions outlined in this agreement and policies and procedures detailed in the John Hancock Signator "Market Conduct Manual" and related publications. When acting as a registered representative personally soliciting clients for Signator, the Branch Manager agrees to the terms and conditions, including compensation schedules and commission forfeiture, outlined in the Signator Sales Representative's Agreement attached as an amendment to this agreement. Commissions and fees payable to Branch Manager as a registered representative shall be in accordance with the compensation schedule current at the time of purchase and in any event shall be payable only so long as Branch Manager is duly licensed as a representative of Signator and only to the extent the monies are available to Signator. Signator's commission schedule is subject to change by Signator at any time without notice.

6.　　　　**SELECTION OF REGISTERED REPRESENTATIVES.** The Branch Manager shall only recommend qualified persons as candidates for NASD registration with Signator. The Branch Manager shall complete the required background check procedures before presenting any individual's application for registration with Signator. All contracting guidelines included in the John Hancock/Signator "Market Conduct Manual" and related procedures shall be observed including, but not limited to, any restrictions imposed by the Violent Crime Control and Law Enforcement Act of 1994.

7.　　　　**OFFICE BOOKS AND RECORDS.** The Branch Manager shall keep, in manner or form prescribed or approved by Signator, required books and records, including proper signage at the branch office. Record retention requirements established by Signator will also be strictly observed. The books and records will be available for inspection by authorized representatives of Signator or its ultimate parent, John Hancock Mutual Life Insurance Company, who conduct periodic audits of such books and records. The Branch Manager shall submit to Signator and make available to it for examination any records necessary to enable Signator to comply with the laws, rules and regulations of any jurisdiction or self-regulatory body. All books and records required to be maintained at the Branch Manager's office shall be preserved as the property of Signator in accordance with Signator's standards and shall be surrendered to Signator upon termination of this agreement or upon prior request.

8.　　　　**SUPERVISORY RESPONSIBILITIES.** The Branch Manager accepts the responsibility to ensure that all persons subject to the Branch Manager's supervision conduct themselves in compliance with the policies and procedures set forth in John Hancock/Signator's "Market Conduct Manual" and in any updates to the Manual. This responsibility extends to whole-time and part-time producers, non-registered personnel, and any other persons who are under contract with the Branch Manager or who are subjected to the Branch Manager's direct or indirect control. Failure by the Branch Manager to fulfill his/ her responsibilities as a supervisor for Signator is cause for possible disciplinary action, including termination.

9.　　　　**TERMINATION.** This Agreement shall remain in full force and effect until terminated by written notice by the Branch Manager or Signator. This Agreement will be immediately terminated (unless Branch Manager is otherwise notified by Signator) in the event that the Branch Manager should cease to be associated as an Agency Manager with John Hancock Mutual Life Insurance Company, or, after July 5, 1999, as a General Agent or Affiliated General Agent with Signator Insurance Agency, Inc., or if the Branch Manager should breach any of the provisions of this Agreement (including, without

limitation, failure to comply with applicable laws or Signator's supervisory procedures), or in the event that his/her NASD registration with Signator or qualification under any state securities or insurance laws should be terminated. Any notice of termination by Signator to the Branch Manager shall be sent to the residence address designated in his/her NASD application, which shall be kept current at all times by the Branch Manager. If the Branch Manager terminates this Agreement by written notice to Signator Vice President, Managerial Agency Department (General Agency Department after July 5, 1999), Signator shall concurrently submit to the NASD a notice of termination. This Agreement shall automatically terminate upon the death of the Branch Manager

10.     **INDEMNIFICATION.** Branch Manager agrees to indemnify Signator in the event of any claim, suit, judgment or any liability whatsoever which may be imputed to Signator as a result of any act or omission by Branch Manager which may be construed or considered as negligent, willful, intentional, fraudulent, or criminal, or any violation of Federal and state securities laws, Conduct Rules of the NASD or policies of Signator including, but not limited to, provisions of the John Hancock/Signator "Market Conduct Manual", which may result from the Branch Manager's actions on behalf of Signator during the term of this Agreement or after termination. Branch Manager agrees to cooperate fully with Signator and not impede or hinder any of Signator's responsibilities to supervise Branch Manager, as mandated in Rule 3010 of the NASD Conduct Rules, including the investigation of customer complaints. Branch Manager may be liable for any losses incurred by Signator in connection with Branch Manager's failure to comply with any law, rule, industry regulation or Signator's policy. Furthermore, Branch Manager agrees not to conceal from Signator any securities sales activities, whether authorized by Signator or not.

11.     **MANDATORY ARBITRATION.** Signator and Branch Manager mutually consent to the resolution by arbitration of all claims or controversies ("claims"), whether or not arising out of the Branch Manager's status as a principal or representative of Signator (or Branch Manager's termination), that Signator may have against Branch Manager or that Branch Manager may have against Signator or against its officers, directors, employees or representatives in their capacity as such or otherwise. The claims covered by this consent to arbitration include all claims arising out of or in connection with the business of Signator, including but not limited to the following: claims for commissions or other compensation due; claims for breach of any contract or covenant (express or implied); tort claims; claims for discrimination (including, but not limited to, race, sex, religion, national origin, age, marital status or medical condition, handicap or disability); claims for benefits (except where a benefit or pension plan specifies that its claims procedure shall culminate in any arbitration procedure different from this one), and claims for violations of any Federal, state or other governmental law, statute, regulation, or ordinance.

12.     **MISCELLANEOUS.** This Agreement supersedes all previous agreements, oral or written, between the parties hereto regarding the subject matter hereof, and may be amended by written notice to Branch Manager by Signator at any time.

13.     This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

**IN WITNESS WHEREOF**, the parties hereto, on behalf of themselves, their heirs and assigns, have made and executed this Agreement in duplicate as a sealed instrument on April 13, 1999 .

SIGNATOR INVESTORS, INC.              BRANCH MANAGER

By: _____

Jason H. Diamond,                    Name: Robert D. Lyman

President and Chief Operating Officer    Branch Office: Chicago

Ord. Code: 500

Attachment:

Signator Sales Representative's Agreement

SII-MA-3/99

Ex. D

RETAIL TRAINING 16175725631                    NO. 0318   P. 2
                                               NO. 693   P02

**Signator**
**Market Conduct Manual**

I have read and understood all applicable sections of the Signator Market Conduct Manual. I understand the Manual covers the compliance obligations of all Company insurance agents, the additional NASD obligations of those agents and brokers who are registered representatives of Signator Investors, Inc., and the supervisory obligations of Agency Management over all registered and non-registered personnel. I further understand:

1. The Manual may be updated periodically and it is my responsibility to read and understand any updates;

2. It is my responsibility to conduct myself in compliance with all applicable policies and procedures set forth in the Manual and in any updates to the Manual;

3. To the extent I have supervisory responsibilities, it is my additional responsibility to ensure that all those subject to my supervision, including any brokers, enrollers, telephone solicitors and any other persons whom I have under contract or who are subject to my direct or indirect control, conduct themselves in compliance with the policies and procedures set forth in the Manual and in any updates to the Manual;

4. My compliance with all applicable policies and procedures set forth in the Manual and in any updates to the Manual, including any applicable supervisory procedures, will be subject to regular review by the Company; and

5. Any evidence of non-compliance may subject me to an array of sanctions, including termination.

_____                    _John Hancock_____
Signature                                  Company

_Robert D Lyman_____             _50D_____
Full Name (Print)                          Agency or Office

_12/9/02_____
Date

After signing and dating this Form, submit it no later than your contract date with the Agency/Company to your Managing Director for retention in the Agency's Supervisory Files. Keep a copy of the signed and dated Form in your personal files. Managing Directors and Affiliated Managing Directors registered with SII must send their own signed and dated Forms to Signator's Compliance Coordination Unit to be filed in their Supervisory File. A copy of the signed and dated Form needs to be kept in your personal file.

TABLE OF CONTENTS
INTRODUCTION
ACKNOWLEDGMENT FORM
TABLE OF CONTENTS _____1
POLICIES AND PROCEDURES

EX. E

# CHAPTER 7. | CLIENT FILES

A. HOW LONG MUST FILES BE RETAINED?

B. RETURN FILES TO AGENCY HEAD UPON RESIGNATION OR TERMINATION

C. FILE CONTENT REQUIREMENTS

D. DOCUMENTS YOU MUST NOT KEEP

> ▶ You must keep and maintain complete Client Files for each of your clients.
>
> ▶ These Files must be retained for at least six years if the product is purchased or the policy is issued and for two years if the policy is "not taken." Thereafter, if you do not wish to retain the Files in your personal possession, you must forward them to your Agency Head.
>
> ▶ Client Files belong to the Company and must be returned to your Agency Head upon your departure from the Company.
>
> ▶ You should not accept possession of, or keep in a Client File, original insurance policies or signed originals of wills, trusts, or codicils. Client files must not contain original stock or bond certificates or checks and must not contain any client medical records.

To protect yourself and the Company from liability, you must retain a complete file for each client who completes an application to purchase life insurance, long term care insurance, and an annuity or investment product, regardless of whether the sale is actually completed.

## A. HOW LONG MUST FILES BE RETAINED?

While there is good reason to retain Client Files indefinitely, you must retain them for a minimum of six years, if the product is purchased or the policy is issued and for a minimum of two years if the policy is "not taken." Thereafter, if you do not wish to retain the Files in your personal possession, you must give them to your Agency Head who will make arrangements to give them to the Home Office for safekeeping. Obtain a receipt for the Files from your Agency Head.

## B. RETURN FILES TO AGENCY HEAD UPON RESIGNATION OR TERMINATION

Client Files belong to the Company and must be returned to your Agency Head upon your resignation or termination.

## C. FILE CONTENT REQUIREMENTS

Each Client File must contain the following items. Refer to the section of the Manual listed next to each item for additional explanations.

The client file should represent, in writing, your entire relationship with the client.

Item:

1. Sales Presentation/Other Marketing Material. All sales presentation or other marketing material used by you or shown to the client. For Home Office created materials, documentation of the warehouse reference number and date of the document used or shown is sufficient in lieu of the actual document. This should be documented on the sales material provided/shown to client log.

2. Suitability Documentation/Factfinder. All documentation supporting the suitability of the products you sold.

3. Illustrations. Complete copies of all basic and supplemental illustrations shown to the client and, if required, a signed copy of the illustration of the policy delivered.

4. Correspondence. All client and agent correspondence.

5. Client Contact Log. A mandatory log of notes memorializing all contact with the client including dates and an adequate description of the occurrence.

6. Acknowledgment Receipt Form for Buyer's Guide and/or Policy/Contract Summary. A signed Acknowledgment Receipt Form, if state law requires delivery of Buyer's Guide, Preliminary Policy Summary Information and/or Contract Summary at time of application.

7. Replacement Forms. If replacement was involved: signed copies of all state replacement forms; the Policyowner Replacement Questionnaire, signed by the client; and the written justification, signed by you.

8. 1035 Exchange. Signed 1035 exchange forms, if applicable.

9. Application. Copies of all applications.

10. Account Statements. Copies of all annual statements, along with most recent quarterly statement.

11. Policy Acknowledgement Receipt.

12. Client's Check. A copy of the client's check, if applicable.

13. Complaints. A copy of any written complaints from or relating to the client.

14. Asset Transfer Form. Copies of all Asset Transfer Forms for Qualified Retirement Plans, statement of eligible IRAs and transaction related forms.

15. SII Client Profile Form. For products offered through SII.

16. Switch Form. If a known mutual fund switch was involved, this form must be signed by the client indicating consequences of switching. (A completed SII Client Profile Form with correct disclosures initialed by the client fulfills this requirement).

17. Switch Letter. If a switch was detected after the trade date, then a copy of the letter sent to the Client must be in the Client File. If the Client returns a signed copy of the Letter it must also be filed in the Client File.

18. For RIAs. Disclosure statement signed by the client and copy of written disclosure to client.

19. Securities Trading Program.

   **a. Discount Program Only**

   - Copy of the brokerage account application and any written instructions

   - Copies of client statements (most recent and all annual)

   - For Mutual Fund transaction, if facilitated by registered representative – copies of Mutual Fund Trade Logs with trade confirmations attached to show correct execution

   - Copies of checks

   - Client Trade Log (page of original entry record evidencing all transactions within the client account)

   **b. Broker Program**

   - Copy of the brokerage account application and any written instructions

   - Original trade ticket with date and time*

   - Confirmations (attached to trade ticket)

   - Copies of client statements (most recent and all annual statements)

   - Client Trade Log (page of original entry record evidencing all transactions within the client account)

   - Copies of checks and/or securities

**\* Trade tickets must contain the following information:**

| | |
|---|---|
| Date | Security |
| Time | Number of Shares or Dollar Amount |
| Client Name | Confirmation |
| Account Number | Time of Order Entry |
| Buy or Sell | |

20. Client File Checklist.

## D. DOCUMENTS YOU MUST NOT KEEP

You may not ask a client to sign a blank form. To further protect yourself, the Company and its affiliates, you must not accept possession or keep in any Client File:

- Original insurance policies, except on a temporary basis as necessary to review a client's existing coverage, in which case you must provide a receipt to the document's owner. You must comply with the "not taken" policy return procedures as documented by the company.

- Any "vault deposit box" documents such as signed originals of a will, codicil or trust.

- Original checks, post-dated checks, check books or wire transfers.

- Confidential copies of client medical information may not be maintained in the agency.

## J. CHECK PAYEE AND DEPOSIT POLICY

### 1. Mutual Fund and Other Purchases

When your client is purchasing mutual fund shares or a limited partnership interest or subscribing to a public or private offering, make sure that his or her check is made out to the custodian bank, underwriter, issuer or broker/dealer specified in the prospectus or private offering memorandum. Unless otherwise directed by SII, the payee for John Hancock mutual fund purchases is John Hancock Signature Services, Inc.

### 2. Insurance Purchases

When your client is purchasing insurance products, make sure that his or her check is made payable to the insurance company that is underwriting the product.

### 3. Segregation of Securities Purchases

Checks to purchase securities products, including variable life insurance and variable annuities, may not be deposited into the agency account.

## K. COMMISSION PAYMENT LIMITATIONS

If you alter Company books or records, improperly transfer or credit business or accounts, submit applications on behalf of yourself, family members or other customers knowing that they will be rescinded or lapsed after the qualification period or engage in any other unethical conduct for the purpose of qualifying for a prize, reward or other compensation of any kind, you may lose your right to solicit and sell JHFSI, SII and affiliate products and services.

## L. COMPANY BANK ACCOUNTS

You may not open or maintain any bank or other depository account in the name of JHFSI, SII or any other affiliate which has not been formally approved for corporate use by the Home Office.

## M. CONFIDENTIALITY

All your transactions with your customers and prospective customers must be held in strictest confidence. Except as absolutely necessary to complete the transaction or perform the service requested by the customer or prospective customer, under no circumstances are you to divulge any personal, medical or financial information on any customer or prospective customer to anyone.

## N. CUSTODY OF CLIENTS' SECURITIES

The Company strongly recommends you not take possession of customer securities certificates. If you must take possession during the course of your relationship with the customer, you must forward any certificate to the appropriate Home Office processing unit the same day or before 10 a.m. the following day. The security information must be logged on your branch office securities log (Chapter 26).

## O. FORGERY OR ALTERATION OF DOCUMENTS

Signing a client's or an agent's or registered representative's name to a check, an application, a suitability form, a loan request form, a policy receipt, an illustration acknowledgment receipt, or any other document is forgery and strictly prohibited. Nor may you alter any document under false pretenses or without specific prior approval from your client. Under no circumstances may you sign a client's or agent's or registered representative's name to a document for the sake of "convenience" or any other reason, even if the person consents. The penalties for forgery, signature of convenience or any other alteration to a document are severe and can include being barred from the securities industry and termination.

## P. FORWARDING CUSTOMER DOCUMENTS, REQUESTS AND FUNDS TO THE HOME OFFICE AND DELIVERING CONTRACTS/POLICIES

All applications and other customer documents as well as customer requests and funds must be forwarded to the Home Office the same day or before 10:00 a.m. the next business day. Depending on the circumstances, losses sustained as a result of unreasonable delays may be charged to you or your Agency Head. In addition, insurance policies and annuity contracts must be promptly delivered to the client upon your receipt of the documents.

## Q. GUARANTEES, WARRANTIES OR OTHER MISREPRESENTATION

Under no circumstances may you guarantee or warrant the future performance of any security or insurance products. Neither may you state or otherwise imply that any issuer or sponsor will unconditionally comply with its prospectus or policy representations. You may make no representations concerning a product, whether written or oral, other than those in current prospectuses, policies or approved sales materials.

## R. IMPROPER SOLICITATION AND COMPENSATION

You may not solicit an application from a prospect or client unless you are properly licensed to sell the contract or product. Similarly, you may not affix your signature to an application as the witnessing agent if someone else has completed the application for the contract or product. Whenever someone indicates an interest in a contract or product which you are not licensed to sell, you should refrain from further describing that contract or product and immediately refer the matter to an appropriately licensed colleague. You may not accept compensation for your referral.

## S. JH NETWORKING AND OTHER NON-HANCOCK PREMIUM PAYMENTS

Renewal premiums on any product underwritten by any company other than JHLICO or an affiliate must not be accepted. For example, you may not accept renewal premiums on any product offered through JH Networking. Acceptance of another company's renewal premium may expose you and JHLICO to liability not only for the improperly collected premium, but also for the full amount of the covered claim. The client should pay renewal premiums directly.

## T. LOANS FROM CLIENTS OR FROM CLIENT ACCOUNTS

You may never take loans against or borrow from a client or client's policy, fund or securities for any reason, including but not limited to, for example, the issuance of promissory notes. You may not use any funds other than those provided by the client to pay premiums or purchase securities for the client.

## U. MUTUAL FUND SWITCHING

In certain circumstances, due to changes in economic conditions, product availability, product performance, or a client's investment objectives or personal finances, shifts between various investments may be appropriate. However:

- Recommendations that a client switch mutual funds must never be based on sales commission considerations.
- The client must be notified in advance in writing of (i) any additional sales or surrender charges that would result from the switch, (ii) possible tax consequences, and (iii) any other possible consequences to the transaction(s). The client must demonstrate his or her knowledge of such consequences by signing the exchange portion of the Client Profile Form or Section D of the Client Acknowledgment Letter provided by you. The original of the form or letter must be forwarded to the appropriate Home Office processing unit. You must maintain a copy in your Client File.
- You must be able to demonstrate the benefit to the client that would result from the switch.

## V. OUTSIDE BUSINESS ACTIVITIES

If you are a registered representative of SII, you may not participate in any outside business activity until you have obtained approval from your Agency Head, CCU and the OBC. Without exception, NASD rules require you to make prompt written notification to the OBC's Compliance Enforcement Unit of any contemplated employment or business activity outside the scope of your association with SII and obtain the required approval. This rule applies to any money earned in connection with any activity, other than passive investment income such as that earned through dividends, interest, and so on. It is your responsibility to ensure that you have notified and obtained approval from all required parties before engaging in any outside business activity. Notification to the OBC of outside business activities must be in writing and, at a minimum, should identify the name of the outside business, the nature of the business and its activities, and the role that you would play in the organization. The OBC will review all outside business activities for potential conflicts of interest and compliance with all company policies. You may be restricted from engaging in any specific outside business activity.

\*The following OBAs are prohibited: those involving the sale or solicitation of any security or investment program, including but not limited to, for example, investments in certificates of deposit, rare stamps, gold coins, promissory notes, pay phone sales/leases, viatical settlements or equity indexed annuities (unless specifically approved by Signator).

## W. PRIVATE SECURITIES TRANSACTIONS/SELLING AWAY

You may not sell or solicit the sale of any security or investment program (including rare stamps, gold coins, certificates of deposit, etc.) or provide any service not specifically offered or otherwise authorized by your broker/dealer (SII). Participation in such unauthorized transactions, known as "Private Securities Transactions" or "selling away," is strictly prohibited, constitutes an extremely serious regulatory violation and can easily entrap the unwary representative.

Below are privacy requirements that stem from federal and state privacy laws and regulations adopted over the past few years. The first section applies with respect to all lines of business, while the second section applies only to long term care insurance, including long term care riders on life policies.

## A. Compliance with Privacy Laws and The Patriot Act

In accordance with the various privacy requirements under Title V of the Gramm-Leach-Bliley Act (15 U.S.C § 6081 et seq.) ("GLB") and other related regulations, you are required to respect the privacy of the non-public personal information of your clients.

John Hancock's customer privacy policy states that nonpublic personal information about the applicant and/or customer will not be shared with any nonaffiliated third parties for marketing purposes. Nonpublic personal information is broadly defined to include any identifying information, such as name and address, as well as information like Social Security numbers and medical data.

To comply with this policy it is important to remember that Client Data should not be disclosed to a service provider without a written agreement prohibiting the use and disclosure of the Client Data for any purpose other than to provide the service requested, nor should Client Data be used or disclosed for any purpose other than to perform a service requested by the Client. The standard should be to disclose only the minimum necessary Client Data.

In addition all agents and representatives should establish effective security measures to protect Client Data, and shall provide both assurances that measures are in place and access to audit such measures.

You must comply with all applicable anti-money laundering laws, regulations, rules and government guidance, including the reporting, recordkeeping and compliance requirements of the Bank Secrecy Act ("BSA"), as amended by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2002, Title III of the USA PATRIOT Act ("the Act"), its implementing regulations, and related SEC, SRO, and NASD rules. Further, you must comply with the economic sanctions programs administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

## B. Compliance with The Health Insurance Portability and Accountability Act (HIPAA)

One of the components of the Health Insurance Portability and Accountability Act, or HIPAA, is the requirement to protect individually identifiable health information. These privacy requirements are set forth in regulations promulgated by the Department of Health and Human Services at 45 CFR Parts 160 and 164, and they are in addition to any confidentiality provisions in your agreement.

These privacy requirements apply to protected health information that you collect, use or disclose in connection with John Hancock long term care insurance applications or policies, including long term care insurance riders with life insurance.

# CHAPTER 8. | MARKETING MATERIALS

A. SALES MATERIAL DEFINITIONS AND REVIEW REQUIREMENTS

B. WHAT ARE MARKETING MATERIALS?
   1. *Newspaper Clippings and Other Third-Party Material*
   2. *Seminars*
   3. *Electronic Communications (E-Mail, Internet Homepages)*
   4. *Agent and Agency Brochures*
   5. *Agent Written Articles*
   6. *Industry Material*
   7. *Newsletters*
   8. *Account Summaries/Consolidated Statements*

C. TRAINING AND RECRUITING MATERIAL
   1. *Training Material*
   2. *Recruiting Material*

D. STATIONERY AND BUSINESS CARDS

E. SIGNS

F. "FOR BROKER/DEALER USE ONLY," "FOR TRAINING PURPOSES ONLY" OR "FOR INTERNAL USE ONLY"

G. TITLES/DESIGNATIONS
   1. *Prohibited Titles*
   2. *Special Rules for Washington, Wisconsin and Maryland*

H. SPECIAL ADDITIONAL CONSIDERATIONS FOR SECURITIES ADVERTISING/SALES LITERATURE
   1. *Address Requirements for Securities Advertisements*

I. MODIFICATION OF APPROVED MATERIAL

J. RECORDS RETENTION REQUIREMENTS FOR MARKETING MATERIAL

K. APPROVAL PROCEDURES FOR NON-HOME OFFICE CREATED MATERIALS

L. NASD OR STATE FILING

M. QUESTIONS

- You may only use approved marketing material.

- Marketing materials include any material promoting or creating public interest in: a product or service you offer, an agent or an agency of Signator, John Hancock or a John Hancock affiliate. Training and recruiting materials constitute marketing materials. Even a letter or fax to a single client may constitute marketing materials.

- In general, you should use marketing materials prepared by the Home Office. You must be sure to use only the most current approved material. A list of current approved materials is available on OBC Online. Securities-related materials containing performance information are updated quarterly.

- You may submit for approval marketing materials prepared by or for yourself, but you may not use such materials until you have received approval from either the OBC's SMAR Unit (see the procedures set forth below) or the Agency Compliance Specialist if the material is approvable at the agency level.

- All approved marketing materials are given a reference number, which you must include on any materials given to the public. **Do not use materials that do not have a reference number.**

- Retain in your Client Files copies of all marketing materials shown to clients, or a note indicating number and edition date of Home Office material, complete copies of all illustrations and all correspondence.

- Home Office and field-created materials are approved for a three year period or until updated, if sooner. Any sales material and advertising that was approved on or after 9/20/00 is in compliance for 3 years from the date of approval. Any sales material and advertising that was approved before 9/20/00 will need to be resubmitted for continued use.

## A. SALES MATERIAL DEFINITIONS AND REVIEW REQUIREMENTS

### 1. Routine Correspondence

**a. Definition** – A letter that does not promote a product, agent, agency, or the Company. (Examples – thank you for meeting; confirmation of a meeting; review of meeting in which agent simply reports facts of meeting; some cover letters, for instance, "here is the copy of the statement you requested;" service report, for instance, "I forwarded your application, you will be receiving confirmation;" cover letter for approved enclosure to a single client).

### 2. Sales Correspondence

**a. Definition** – A letter sent to one person. Promotes a product, agent, agency, or the Company, but is unique to one prospect or client. Also includes material urging Policyholders to purchase, increase, modify, reinstate, or retain a policy. (Example – sales information to a single prospect or client).

**b. Review/Approval Requirement** – May be approved at agency level, provided agency compliance specialist and/or Managing Director has been approved by SMAR. ** Copy to agency file, client file, OBC Sales Material/Advertising Review Unit (SMAR) with log. See Sales Correspondence Approval Log on OBC Online at:
http://library.jhancock.com/livelink/livelink?func=ll&objId=1095554&objAction=browse&sort=name

** *Exceptions: If you are in a file state for long-term care insurance, variable or traditional life, or annuity products, even single customer correspondence may require filing. Agency Compliance Specialists in these states may not approve even single customer correspondence that may require filing. Submit material to SMAR for filing determinations.*

### 3. Mass Marketing Correspondence (Sales Literature)

**a. Definition** – A letter sent to more than one person. Audience is specific. Includes form letter, flyer, brochure, or cover letter with approved enclosure to more than one person.

**b. Review/Approval Requirement** – Must be approved by SMAR prior to use. Copy of approval maintained in the Agency Files.

**c.** Mass emails ("spamming") and faxing ("blast faxing") is not permitted.

### 4. Advertising

**a. Definition** – Any sales or marketing material that promotes a product, agent, registered representative, an agency, or the Company where the audience is not specific. Examples are radio/TV/newspaper ads, website, billboard, outside signs, recruiting materials, letterhead, business cards, phone messages, telephone scripts, etc.

**b. Review/Approval Requirement** – Must be approved by SMAR prior to use. Copy of approval maintained in the Agency Files.

## B. WHAT ARE MARKETING MATERIALS?

Marketing material is defined as: (i) any material designed to create a public interest in or to promote: a product or service you offer, an agent or an agency of the Company, a registered representative or branch office of SII, John Hancock or a John Hancock affiliate, or (ii) any material used to induce the public to purchase, increase, modify, reinstate or retain a policy or product.

Examples of marketing materials include, but are not limited to, the following: newspaper and other media advertisements, billboards, yellow page ads, flyers, prospecting letters and other direct mail, account summaries, product illustrations, software printouts, software or vendor presentations, brochures, newsletters, telephone greetings, pre-recorded telephone messages, e-mail, websites, telephone or sales scripts, prepared sales talks, seminar material, stationery and business cards, newspaper by-lines and third-party published articles.

Training materials and recruiting materials, including recruiting advertisements, also constitute materials that must be approved.

Material may appear in letter, print, radio/TV script or broadcast, seminar script, audio or videotape form.

### 1. Newspaper Clippings and Other Third-Party Materials

Any materials published by another source or photocopies of an article must be submitted to SMAR for approval. If the material is approved, you will need to obtain written reprint permission to copy the third party material or you may obtain reprints directly from the publisher. Copyright permission is needed to republish the material. The reprint permission, the receipt for the reprints, or the copyright permission needs to be maintained on file with the approval from OBC's SMAR Unit. If the publication appears on the Copyright Clearance Center (CCC) website (www.copyright.com) no reprint permission is required. Although SMAR approval is required in this situation, CCC will cover the reprint permission from the publication.

### 2. Seminars

All seminar presentation materials (overheads, written scripts, handouts and invitations) are considered to be sales material by both the state insurance regulators and the NASD and must be approved by the SMAR Unit prior to use. Seminar materials must be approved even if you do not mention specific products and even if you state that the seminar's purpose is educational rather than to sell products.

A seminar is any presentation sponsored by the company or any of its affiliates that is made to Individuals who are customers, prospects, or potential recruits that promotes the Company, an agent/registered representative or a product or service.

### a. Home Office Seminars

An approval list of third party seminar material can be found on www.sfnonline.com

### b. Emerald Seminars

Select Emerald seminars are approved for use, except where restricted in states requiring filing. Of these Emerald seminars, Signator has selected several Emerald seminars to customize. Any of these Company-customized modifications will be available with the purchase of the seminar package; therefore, *it is important to identify yourself as a Signator representative when ordering any Emerald seminar material*. Most Emerald materials are available at a discount for Signator representatives.

Any advertisements, invitations, and follow-up letters for any of the Emerald seminars must receive approval from OBC's SMAR Unit prior to use. If the material you have from one of the Emerald seminars does not contain a current OBC approval number, it must be submitted for approval to SMAR.

Whenever an Emerald Publication representative works directly with you to produce seminar sales material such as an overhead, invitation or handout, the material produced is considered agency-created sales material and must be approved by the OBC's SMAR Unit through the normal submission process. You will be responsible for all costs, if any, associated with Company-required modifications to field-created material.

### c. Successful Money Management Seminars

Successful Money Management Seminars (SMM) have been selected by Signator for use in the Corporate RIA program. The seminars currently approved are listed on SFN Online. Please note any state restriction on any seminar requiring state approval.

### d. Other Vendor Seminar Systems and Field-Created Seminars

Field-created and other vendor-created seminars should be submitted for review on a case-by-case basis. If the OBC's SMAR Unit approves the material, you will be responsible for keeping the material current, arranging for any Company-required modifications with the vendor and paying any associated costs. Check with the OBC's SMAR Unit before purchasing any other vendor seminar materials. The OBC's SMAR Unit may determine that it is not possible to modify a vendor's material to meet compliance standards, or the vendor may not permit modifications.

### e. No Seminar Fees Allowed

Due to regulatory prohibitions, you may not charge any seminar fee whatsoever, including a fee to recover expenses such as the cost of workbooks. See Chapter 12 for information concerning fees charged by a Registered Investment Adviser.

### f. Field Qualifications

Agency Management must ensure that all agency personnel conducting seminars are qualified and that they comply with Company policy regarding seminars.

### g. Guest Speakers

Any company-sponsored seminar requires SMAR approval, including those with guest speakers. Guest speakers should be limited to professionals with suitable expertise, such as an estate planning attorney or a tax accountant. Guest speakers may only appear at seminars for the purpose of sharing their specific expertise. You may not charge a fee to cover the cost of a guest speaker. You or your agency may pay a fee to the guest speaker as compensation for his or her participation in the seminar. If the guest speaker is compensated for his seminar presentation the following disclosure must appear on the seminar materials: "[Name of Guest Speaker] is a paid presenter. He is not affiliated with Signator Insurance Agency, Inc., an affiliate of John Hancock Life Insurance Company and Signator Investors, Inc., Member NASD, SIPC (add the OSJ address and telephone number). The information presented by [Name of Guest Speaker] is solely the responsibility of [Name of Guest Speaker] and comments made may not necessarily reflect the opinion of John Hancock Life Insurance Company, Signator Investors, Inc., or any of its affiliated companies.

Guest speakers may not deliver Signator/Hancock material or discuss Signator/Hancock products. You should not actively promote a guest speaker's service or business. The seminar materials must identify the guest speaker in the speaker's professional capacity and must clearly indicate that the guest speaker is not a representative of or affiliated with Signator. The seminar material should state that the information presented by the guest speaker is solely the responsibility of the guest speaker and may not necessarily represent the opinion of Signator or its affiliated companies.

### h. Additional Seminar Requirements

- You must identify yourself as an agent of Signator Insurance Agency, Inc., an affiliate of John Hancock Life Insurance Company.

- If registered products are mentioned, either generically or specifically, you must be licensed to sell such products and identify yourself as a registered representative of Signator Investors, Inc. If specific registered products are mentioned, current prospectuses must be available at the seminar. Any presentation must meet NASD/SEC guidelines.

- Taped SFN TV seminars on registered products approved for public use may include performance information. NASD/SEC regulations require that performance information be current as of the date of the most recent quarter end. Taped SFN TV presentations approved for public use continue to be approved only if all performance information is current or updated. It is your and your agency's responsibility to ensure this prior to the seminar date.

- You should not give legal, accounting, tax or other professional advice. While you may comment on issues that may have legal, tax or accounting aspects, specific recommendations or advice may not be given. All presentation materials and handouts should include or be accompanied by the following disclaimer: *This seminar is for informational purposes only and is not intended as legal, tax or accounting advice. Please consult your professional adviser on such matters.*

- Whenever a financial concept is being presented, it must be clear what type of product is being discussed. If specific products are discussed, they should be described accurately with reference to their limitations (charges, fees, and tax consequences) as well as their benefits. Overall, any product description, whether generic or Signator-specific, should be presented in a fair and balanced fashion. For example, investment features of life insurance should not be unduly emphasized over the protection feature.

- All vendor materials, including seminar publications, are copyrighted. Copyright violations are serious and may invite legal action by the publisher against the responsible individual. Copyright violations include but may not be limited to unauthorized/unlicensed use of material, modification of material without the publisher's permission and unauthorized reproduction of the material. You are responsible for maintaining a current license agreement with the approved vendor and for following all of the requirements of that agreement.

### 3. Electronic Communications (E-Mail)

The way in which marketing material is communicated does not change the fact that it is marketing material or your obligation to obtain approval before you use it. Prior approval is required from the OBC's SMAR Unit. Internet Homepages are treated like any other form of field-created advertising. Access to personal agent websites is available via SFN Online (www.SFNOnline.com).

E-mail is considered correspondence and requires the same review procedures. For communications with customers and business purposes, Agents and Registered Representatives can only use email through sfnonline.com. Use of any other mail provider for communication with customers and business purposes is prohibited. Unsolicited broadcast e-mails are prohibited. E-mails should not contain disparaging or negative statements about competitors or other products. The e-mail should also clearly indicate whom it is being mailed to and the states in which the agent is licensed. Agents cannot exchange confidential information with or about clients via e-mail. Use of personal email is prohibited without prior home office approval.

### 4. Agent and Agency Brochures

All agent/registered representative/agency brochures must be approved even if they do not mention specific products or mention the Company at all.

### 5. Agent Written Articles

All articles written by agents or Agency Heads that relate to insurance and investments must be approved prior to publication, whether or not the articles mention the Company or specific products. Articles such as these need to identify the Company and broker/dealer.

### 6. Industry Material

Do not assume materials that you received at an industry conference, (such as Million Dollar Round Table), or that were published by a well-known industry organization, (such as LIMRA and American Society of CLU and ChFC), have been approved. You must submit these materials for approval.

### 7. Newsletters

All newsletters must be approved, even if they do not describe particular products.

### a. Approved Newsletter Options

Newsletters are considered advertising by insurance and securities regulators and must conform to the same legal and compliance standards as direct mail letters or other sales materials. Signator recommends the following newsletter options that give you a range of choices in terms of style and target market. These newsletters are approved for use because they are of high quality in content and appearance and are submitted to the NASD by their publisher when necessary. Using an approved newsletter is in your best interest because it will enable you to comply with industry and sales practice standards. Newsletters created by field associates are not approved.

- **Primary Focus, Business Planning Solutions, Focus over fifty, In your Interest and 20/20,** published by Liberty Publishing. Call 1-800-722-7270 for more information.

- **Financial Ink, Golden Strategies, and Business Wise,** published by Emerald Publications. Call 1-800-233-2834 for more information.

- **Financial Monitor, Assets and Query,** published by the American Society of CLU and ChFC, are 2-color newsletters published bi-monthly. You must be a member of the Society to use any of the three. To use Financial Monitor and Assets you must be a CLU and ChFC. You can use Query if you are a student member having passed one CLU and CHFC course. Call 1-800-392-6900 for more information.

- **Personal Wealth Report, and Money at Work** published by WPI Communications, is a newsletter for the general consumer market and does not discuss securities products. It is the only approved newsletter that can be used by non-registered representatives. (See guidelines below). Call 1-800-323-4995 for more information.

- **Financial Success** published by Integrated Concepts. Call 1-800-338-4329 for more information.

### b. Guidelines for Use of Approved Newsletters

- It is not necessary to submit the approved newsletters listed above to SMAR.

- Because the approved newsletters, with the exception of Query and Personal Wealth Report, may describe securities products, you must be a registered representative (Series 6 or 7) to use the approved newsletters.

- When you order any approved newsletter, you must inform the publisher that you are a Signator representative. You must also instruct the publisher to add the required disclosures outlined in the *Approved Formats* section to the newsletter.

- No money can be charged for newsletters.

- In the front page imprint provided for inclusion of your name, you must follow one of the approved formats set out below.

### c. Approved Formats

i) Disclosures

*For agents in General Agencies, the disclosure is:* Insurance products offered Through Signator Insurance Agency, Inc., an affiliate of John Hancock Life Insurance Company, Boston, MA. Securities offered through Signator Investors, Inc., Member NASD, SIPC. The address and telephone number of the agent's Branch Office/OSJ or Registered Branch Office is also required.

*For agents in the Corporate RIA program, the disclosure is:* Insurance Products offered through Signator Insurance Agency, Inc., an affiliate of John Hancock Life Insurance Company, Boston, MA. Securities and investment advisory services are offered through Signator Investors Inc., Member NASD, SIPC, a Registered Investment Advisor. The address and phone number of the agent's Branch Office/OSJ or Registered Branch Office are also required.

ii) Format For Use With Any Newsletter Approved Herein:

a. Your name, approved designation(s) (if applicable)
  Office address
  Telephone

b. Your name, approved designation(s) (if applicable)
  . John Hancock or Signator
  Office address
  Telephone

If you are currently using any of the approved newsletters and your imprint information does not comply with the above guidelines, contact the publisher and request the necessary changes.

### 8. Account Summaries/Consolidated Statements

The format of a summary of all of a client's insurance policies and investments, including a summary of current account values, constitutes material that must be approved. A Home Office approved account summary/consolidated statement is available. If an agent opts to create his/her own account summary, the summary must contain specific disclaimers and the name of the company and broker/dealer and must be approved by SMAR prior to use.

## C. TRAINING AND RECRUITING MATERIAL

### 1. Training Material

All training material, whether created by an Agency Head or well known insurance industry publisher, must be approved by SMAR. The material should clearly state "For training purposes only, not for use with the public."

### 2. Recruiting Material

All recruiting material, including newspaper advertisements and handouts, must be approved by SMAR, even if the material does not refer to the Company. The material should clearly state "John Hancock is strongly committed to diversity and equal opportunity".

## D. STATIONERY AND BUSINESS CARDS

You must use Home Office approved stationery and business cards. Any stationery and business cards which are not standard, Home Office issued stationery and business cards, must be approved by SMAR prior to use.

SII-registered brokers may not use Home Office issued stationery and business cards and MUST have their stationery and business cards approved by SMAR prior to use.

The following disclosures must appear on your stationery and business cards as appropriate to your contract/registration status:

- **For non-NASD Registered Whole Time Agents:**

  Insurance products offered through Signator Insurance Agency, Inc.,
  An affiliate of John Hancock Life Insurance Company, Boston, MA 02117

- **For Signator (NASD) Registered Whole Time Agents:**

  Insurance products offered through Signator Insurance Agency, Inc.,
  An affiliate of John Hancock Life Insurance Company, Boston, MA 02117
  Registered Representative/Securities offered through Signator Investors, Inc.,
  Member NASD, SIPC
  [OSJ Address and Telephone]

- **For Signator (NASD) Registered Brokers:**

  Registered Representative/Securities offered through Signator Investors, Inc., Member NASD, SIPC
  [OSJ Address and Telephone]

## E. SIGNS

### What is the appropriate Company Signage?

Use of the Signator Investors, Inc. ("SII") name and logo must comply with SII's guidelines. Generally, at any SII OSJ, NASD-registered branch office and unregistered office locations the John Hancock logo or the words "Signator Investor Inc, or Signator Insurance Agency" may be displayed on signage outside a building, on a building directory, in office entrances and interior spaces.

Only OSJ and NASD-registered branch office locations may display SII on signage visible to the public. Although SII's name may not be displayed to the public on the outdoor signage of any unregistered office, the name may be displayed inside the office, where it is not visible to the public from the outside. Questions regarding the registration of an office should be directed to Signator's Compliance Coordination Unit.

DBA signage must display only approved DBA names and may not reference Signator or John Hancock. Questions regarding proper company signage should be directed to Signator's Compliance Coordination Unit.

## F. "FOR BROKER/DEALER USE ONLY. NOT FOR USE WITH THE PUBLIC," "FOR TRAINING PURPOSES ONLY. NOT FOR USE WITH THE PUBLIC," "FOR INTERNAL USE ONLY. NOT FOR USE WITH THE PUBLIC," OR "FOR FINANCIAL PROFESSIONAL USE ONLY. NOT FOR USE WITH THE PUBLIC."

Representatives must never use, give to, or show clients or prospects material marked "For Broker/Dealer Use Only. Not for use with the public," "For Training Purposes Only. Not for use with the public," or "For Internal Use Only. Not for use with the public." This material is intended to provide you with investment and insurance product and sales training. It is a serious regulatory violation to use these materials as sales materials with clients.

## G. TITLES/DESIGNATIONS/ASSOCIATIONS

You are required to follow Company policy in connection with the use of approved titles and professional designations. The current approved titles and designations are available on OBC Online. http://library.jhancock.com/livelink/livelink?func=ll&objId=7727&objAction=browse&sort=name

### 1. Prohibited Titles

Both insurance and securities regulations prescribe limitations on the use of certain titles and designations to avoid confusion and misunderstanding by clients regarding the products and services you offer. In particular, titles and terms such as "Financial Planner" and "Financial Consultant" or other similar titles may not be used as they imply that you are engaged in an independent investment advisory business. For these reasons, except as noted below, the professional designations for Chartered Financial Consultant and Certified Financial Planner may be used in their abbreviated form only (ChFC and CFP respectively) on approved business cards and stationery and other marketing materials. Qualified individuals in the Corporate RIA program may spell out the ChFC and CFP designations. You may spell out Chartered Life Underwriter.

### 2. Special Rules for Washington, Wisconsin and Maryland

Unless you are a registered investment adviser, the states of Wisconsin, Maryland and Washington do not permit the use of the ChFC or CFP designation even in abbreviated form.

### 3. NAIFA

You must be level 2 or higher in the corporate RIA program in order to spell out NAIFA and Level 1 to use abbreviation.

## H. SPECIAL ADDITIONAL CONSIDERATIONS FOR SECURITIES ADVERTISING/SALES LITERATURE

Company policy concerning the use of approved marketing materials applies to all products, whether registered securities or non-registered; however, some important distinctions are necessary to keep in mind when promoting securities products.

### 1. Address Requirements for Securities Advertisements

Signator agencies are registered as official NASD branch offices. In keeping with NASD regulations, an office must be designated as a branch office of Signator Investors, Inc. before it can advertise itself as a place that sells securities. A non-branch office (official detached or unregistered) may still place securities advertising, but the advertisement may not contain the street address of either the registered representative or unregistered office. A local post office box and telephone number may be used, but the advertisement must also include the registered Signator Investors, Inc. Branch Office/OSJ or detached Signator Investors, Inc. Branch Office address, telephone number and fax number.

## I. MODIFICATION OF APPROVED MATERIAL

You may not use any modifications you have made to approved material without submitting the modifications to OBC's SMAR Unit for approval.

## J. RECORDS RETENTION REQUIREMENTS FOR MARKETING MATERIAL

**1. Agent Files:** Each of your Client Files should contain a copy of all sales presentations or other material used by you or shown to the client, copies of all illustrations and copies of all client correspondence. For Home Office created materials, a reference to the warehouse identification number and date of any created material is sufficient. See Chapter 7 for a complete list of agent Client File requirements.

**2. Agency Files:** Agency Heads are responsible for maintaining the following files for marketing materials in the Agency Files. These files must be kept indefinitely. See Chapter 26 for a complete listing of Agency File requirements.

- **Field-Created Marketing File – Current Material**

a. Copies of all marketing material currently available for use that was created by anyone in the agency. Material that is submitted and re-approved must be kept in the current Field-Created Marketing file.)

b. Documentation from the OBC's SMAR Unit, approving use of each piece of material, including the material originally submitted.

c. **Clean version of each piece with all of the modifications required by the OBC included.** Clean version must be attached to the approval documentation.

* **Field-Created Marketing File – Expired Material**

a. Copies of all marketing material no longer approved for use that was created by anyone in the agency. (All field-created materials expire three years after their approval date but may be submitted for reapproval. Material, which is submitted and re-approved, must be kept in the current Field-Created Marketing file.)

b. OBC approval documentation, as described above.

c. Clean versions of the material, as described above.

* **Agency Approved Sales Correspondence File**

a. Copies of all sales correspondence approved by Agency Compliance Specialist.

b. Log of all correspondence reviewed and date when forwarded to OBC.

* **Co-Op Advertisements**

The Home Office periodically sends new and updated cooperative advertisements to the field. These new and updated advertisements must be added to the Co-Op Advertising Manual. Old advertisements must be removed to ensure that no one uses them. Current Co-op ads can be found on OBC Online under approved Sales Material.

http://library.jhancock.com/livelink/livelink?func=ll&objId=1513685&objAction=browse&sort=name

## K. APPROVAL PROCEDURES FOR NON-HOME OFFICE CREATED MATERIALS

**1. Approval By Agency Compliance Specialist.** Agency Compliance Specialists who successfully complete the correspondence/review program are qualified to approve sales correspondence at the agency level. Sales correspondence is defined as a piece of correspondence that is addressed to one person and promotes something, whether it is a product, service, particular representative/agency, or the Company.

Agency Compliance Specialists must keep a copy of all sales correspondence approved at the agency in their files. A copy of all sales correspondence approved at the agency must be sent to SMAR within five days of approval.

### Sales Correspondence approval process:

1. **Single Sales**

   a. Agent or Signator-registered broker submits the sales correspondence to the Agency Compliance Specialist who then enters agent, client name and NASD information into the log.

   b. The correspondence is reviewed to first determine that it is on the appropriate approved stationery and that it meets all of the guidelines as outlined in the Checklist provided by SMAR.

   c. If the letter is approved, the Agency Compliance Specialist records the approval date in the log, makes a copy for the Agency Approved Sales Correspondence File and a copy to be mailed to the Home Office, and returns the letter to the Agent or Signator registered broker.

   d. If modifications are required, the Agency Compliance Specialist should mark them on the letter submitted, keep a copy for the file and return the letter to the representative to make the changes.

   e. The representative must provide the Agency Compliance Specialist with a copy of the corrected letter before sending it to the client. The Agency Compliance Specialist can approve this copy, attach the final copy to the modified version for the central file and record this in the log.

f. The Agency Compliance Specialist must send to SMAR all correspondence approved at the agency level each week, with a copy of the log for that week. The Single Sales Correspondence Log is available on OBC Online.
http://library.jhancock.com/livelink/livelink?func=ll&objId=1095554&objAction=browse&sort=name

## 2. Approval through the Home Office

a. **Submit Non-Home Office Created Material to Agency Head or Agency Compliance Specialist.** Whenever possible you should only use marketing materials supplied by the Home Office. These materials meet high marketing standards and adhere to requirements adopted by the appropriate regulatory authorities. If there is no Home Office material to use, you must submit to your Agency Head the non-Home Office material you would like to use through OBC Online.

b. **Agency Head/Agency Compliance Specialist Submits Material to OBC.** Your Agency Head must submit all field-created marketing material to SMAR for approval in accordance with the guidelines outlined below.

Each piece will be reviewed by SMAR and, when necessary, the Marketing departments. All requests for approval must be submitted through OBC Online where the piece will be assigned a reference number electronically. When the review is complete you will receive a notice in your Tasks Box in OBC Online which will state one of the following: a. Pending approval with modifications; b. Approved as is; c. Not approved. Please follow the OBC Online submission and review procedures.
http://library.jhancock.com/livelink/livelink?func=ll&objId=1168809&objAction=browse&sort=name

c. Allow Sufficient Time for Review. SMAR needs a minimum of five days from receipt for a standard review of a field submission. Marathon and Home Office submissions receive a 48 hour turn around barring additional review from a third party (i.e., Law Dept., etc.) This time frame can vary, however, according to the nature of the material submitted. Materials that are complex may take more than 48 hours. If the material requires a state filing or concerns a registered product, and must be submitted to the NASD, allow for a minimum of four to six weeks.

d. Make All Necessary Changes. SMAR will supply the Agency Head or Agency Compliance Specialist with the edits required on the material you submitted on OBC Online. This will incorporate all of the necessary changes, including those of the NASD, LTC file state or state insurance department in certain cases. In order to obtain approval of the material, a final copy must be submitted through OBC Online within the original submission in attachments; incorporating all of the changes. Once this final copy is received by the Gatekeeper, SMAR will notify the submitter of final approval through OBC Online. You must only use the material that includes all the necessary changes. Under no circumstances should the unapproved version be used. When you use the approved materials, you must include the reference number on the materials you give to customers.

e. Approval Expires After Three Years. All Home Office and field materials will expire three years after their approval date. Materials that have expired should not be used again until they have been re-submitted and re-approved through OBC Online. Be sure to retain a record of the original approved material to satisfy recordkeeping requirements.

## L. NASD OR STATE FILING

In addition to approval by SMAR, some marketing materials may require filing with the NASD or an individual state. Pay particular attention to restrictions on use as they may signify that the material has not been filed or approved in certain states and therefore cannot be used in those jurisdictions. Agency Management will be notified if the material must be filed with the NASD or the state. The Home Office will make all such filings. You will be asked to pay the NASD processing fee for securities-related materials you create. Costs will vary based on the length of the piece.

## M. QUESTIONS

If you have any questions related to Home Office marketing material, you may contact the various Marketing and Sales Support areas in the Home Office. Specific compliance related questions or questions concerning field-created marketing material may be directed to SMAR at 1-800-300-6317, ext. 1.

Ex. F

SPECIAL AGENT'S COMMISSION AGREEMENT

(WHOLE-TIME)

PLAN H-STANDARD

THIS AGREEMENT made at _SCHAUMBURG, IL_ this _18_ day of _NOVEMBER_, _1999_

between _ROBERT LYMAN_ General Agent at _CHICAGO 500_, hereinafter called General Agent,

and _MARK BERNHAGEN_ of _PLAINFIELD, IL_ hereinafter called Special Agent.

The provisions hereinafter set forth, and the Schedule of Commission Rates herein incorporated by reference, are hereby made a part of this contract.

The Territory referred to in the General Contract Provisions Section 2, shall be the territory assigned to the General Agent.

The beneficiary referred to in the General Contract Provisions Section 6, shall be:

_LINDA  K.  BERNHAGEN    SPOUSE_

(State full name and relationship. Only one beneficiary, and no contingent beneficiary may be named.)

_____
General Agent

_____
Special Agent

Form 1012H-STANDARD Ed. Jan99

SPECIAL AGENT'S COMMISSION AGREEMENT
GENERAL CONTRACT PROVISIONS

1. General Agent, acting in General Agent's own right, hereby appoints Special Agent to procure applications for insurance and annuities made available through Signator Insurance Agency Inc. and affiliated companies, hereafter called the Company or Signator, such applications to be acceptable to the Company.

Signator Insurance Agency Inc. is a wholly owned indirect subsidiary of John Hancock Mutual Life Insurance Company. Signator is an insurance agency licensed and appointed to sell insurance products issued by John Hancock Mutual Life Insurance Company and its insurance affiliates and other Company approved unaffiliated insurance companies.

Unless otherwise noted the Insurance Products mentioned throughout this agreement refer to products issued by John Hancock Mutual Life Insurance Company and John Hancock Variable Life Insurance Company.

2. Nothing herein contained shall be construed to create the relation of employer and employee between the parties hereto or between either of them and the Company. The parties intend that the Special Agent shall function as a full time life insurance salesperson within the meaning of section 3121(d) of the Internal Revenue Code of 1986, as it may be amended from time to time and Special Agent shall make every reasonable effort to meet the requirements necessary to qualify as such salesperson. Within the territory of the General Agent, Special Agent shall, in common with others, be free to exercise judgment as to the persons from whom applications for insurance and annuities will be solicited and the time and place of solicitation, but the Company may from time to time prescribe rules and regulations under which it will accept applications and handle matters incidental to its business, not interfering with such freedom of action of Special Agent, which rules and regulations shall be observed and conformed to by Special Agent.

3. Special Agent shall act in full accordance with all laws and lawful regulations applicable to the business contemplated herein.

4. The First Year Commission Standard (FYCS), as well as the percentages used to proportion first year commission credits for a calendar year referred to in this agreement will be established annually. In January of each year General Agent shall inform Special Agent of the amount of the FYCS for that calendar year. For the purpose of this agreement the calendar year which shall be determined annually by the Company will extend from approximately the first Monday of January to approximately the last Friday of December.

For the purpose of meeting the requirements stated in this agreement, the annually proportioned percentages of first year commissions used, will be those credited during the calendar year to Special Agent from: Traditional Life, Estate Protection, Universal Life, Flexible Variable Life, Medallion Variable Life, Medallion Executive Variable Life, Medallion Gold Universal Life, Variable Estate Protection, Long Term Care, Annuity Contracts; the products of John Hancock Mutual Life Insurance Co. and John Hancock Variable Life Insurance Co.; proprietary products of Signator Investors, Inc.; and products of the John Hancock Networking Insurance Agency. Signator Investors, Inc., and John Hancock Networking Insurance Agency, commissions are included in this agreement solely for purposes of meeting the requirement specified in this agreement.

5. For purposes of meeting the respective requirement in all parts of this agreement the five-year lives lapse rate shall be determined by dividing the total number of Traditional Life, Estate Protection, Flexible Variable, Variable Estate Protection, Medallion Variable Life, Medallion Gold Universal Life, and Universal Life policies lapsed during the calendar year on which less than five years' premiums have been paid by, average number of in-force Traditional Life, Estate Protection, Flexible Variable, Medallion Variable Life, Variable Estate Protection, and Universal Life policies on which less than five years' premiums have been paid plus total number of Traditional Life, Estate Protection, Flexible Variable, and Universal Life policies issued during the calendar year. Average number of policies in-force will be calculated by the addition of the number of policies in-force each month during the previous twelve months divided by 12. Universal Life, Medallion Variable Life, Medallion Gold Universal Life, and Variable Estate Protection policies on which premium payments during first policy year exceed 200% of target premium will be excluded from lapse rate calculation. A policy shall be considered to be lapsed within the first five policy years if premiums are not paid to the fifth policy anniversary at the time of lapse and, in the case of a surrendered policy, the surrender transaction occurs prior to the fifth policy anniversary date. Term Insurance and Payroll Benefit Life (UL) are excluded entirely from the lapse rate calculation.

6. Any commissions due Special Agent upon death, or falling due thereafter under this or any prior commission agreement between the parties or between Special Agent and any other General Agent of the Company, shall be paid to the beneficiary designated on the signature page of this contract as revocable payee, if such person survives Special Agent, otherwise or if no person is named as payee of any such compensation, they shall be paid to Special Agent's legal representatives, subject to the deduction of any indebtedness of Special Agent to the General Agent. The payment of any such compensation to the payee named in or under this provision shall fully discharge all liability of the General Agent with respect to such commissions, fees or other compensation. Special Agent may from time to time change the payee under this provision by a notice in writing filed with the General Agent.

This Agreement may, subject to Section 13, be assigned or terminated by mutual agreement of the parties, or terminated by either party under Section 17, without notice to or consent of any payee nominated in or under this Section.

7. This agreement shall terminate on the thirty-first day of January next succeeding a full calendar year under this agreement (or Whole Time Agreements) in which the Special Agent has not been credited, according to the rules of the Company, with an amount of first year commission, which equals or exceeds fifty percent (50%) of the annually established FYCS.

If Special Agent is age sixty (60) or older and has continuously been under one or more whole-time Agreements with one or more General Agents of the Company for at least twenty (20) years, such requirement shall be reduced to twenty-five percent (25%) of the FYCS for that calendar year and each calendar year thereafter.



In the event that Special Agent becomes Retired or Totally Disabled, the provisions stated in this section shall apply subject to the conditions and qualifications stated in Section 19 and 20, respectively.

8. If the General Agency contract between the undersigned General Agent and Signator Insurance Agency, Inc. shall be terminated for any cause, this agreement shall also terminate without notice; and in such case the General Agent hereby authorizes said Company to pay Special Agent or Special Agent's legal representatives commissions which become due and payable subsequent to the effective date of General Agents termination, in accordance with the terms hereof, and to deduct any amount so paid from any monies then or thereafter due to the General Agent or General Agent's legal representative.

9. Any payment by General Agent of any commissions not required by this agreement, shall not in any way waive, extend, or modify any of its provisions.

10. The General Agent may withhold and retain from any payments due Special Agent a sum sufficient to discharge any debt, or to repay the balance of any advance due from the Special Agent to General Agent, or any legal expense in connection with any third party action.

11. If the Company shall for any reason refund any premium, the Special Agent shall lose all right to commissions, service fees and bonus on such premium, and pay to the General Agent the full amount received on account thereof. If the General Agent, for any reason, pays to the Special Agent a commission, service fee, or bonus in advance of the payment of the premium and the premium is not subsequently collected from the policyowner, the Special Agent shall repay such amount(s) to the General Agent. The General Agent shall, in lieu of the right to repayment provided hereunder, have the right to offset against any other payment due or which becomes due the Special Agent, the commission, service fee or bonus paid to the Special Agent on premiums which the Company shall for any reason refund or which are not subsequently collected from the policyowners. The amount of such offset will be subject to adjustment according to the rate of commission, service fee or bonus which would be payable to the Special Agent on such premiums at the time the right to offset is exercised.

In the event of and subsequent to the termination of the General Agent's contract between the Company and the General Agent, the Company shall succeed to the rights of the General Agent provided under this section.

12. Special Agent agrees to hold in trust for General Agent any premiums which may be received or collected, and to account for and to pay them over promptly to General Agent.

13. No assignment of this agreement or of commissions hereunder may be made by Special Agent without the consent in writing of the General Agent, or, after the termination of the General Agent except with the consent in writing of the Company.

14. All books, cards, registers, documents, and other papers at any time in the possession of Special Agent that pertain to the business of General Agent, shall be the property of General Agent and shall be at any and all times open to inspection by General Agent or by any duly authorized representative of the Company; and at the termination of this agreement they shall be turned over to General Agent.

15. Fraud, misappropriation, or withholding of funds by Special Agent shall terminate this agreement forthwith, and thereafter no compensation shall be payable to Special Agent.

16. Special Agent shall reimburse General Agent for all medical fees for examinations paid on applications secured by or through Special Agent on risks prohibited by the Company, and for all medical fees for examinations made at the request of Special Agent by any physician not appointed as an examiner by the Company.

17. This agreement cancels and supersedes all previous commission agreements entered into between the parties hereto provided that the commissions heretofore payable to Special Agent in accordance with the terms of any previous agreement, to the extent that they have not been fully discharged at the date hereof, shall be due and payable as though said previous agreement had not been cancelled. Further, this agreement shall be terminated by the death of either party hereto and may be terminated at will, with or without cause, by either of them on seven days' notice in writing to that effect sent to the last known post office address of the other party, unless otherwise terminated by other conditions herein contained.

For a period of two years following the termination of Special Agent, Special Agent shall not directly or indirectly contact policyholder(s) or contractholder(s) who purchased their policy(ies) or contract(s) through Special Agent, for the purpose of inducing or attempting to induce such policyholder(s) or contractholder(s) to cancel, lapse or fail to renew such policyholder's or contractholder's policy(ies) or contract(s) with the Company. Violation of this provision may be enjoined by any legal means available to the General Agent. The General Agent shall be entitled to recover from the other party all costs and expenses incurred in connection with such litigation including all attorney's fees.

For purposes of this Article the term Company shall include Signator Insurance Agency, Inc. and its subsidiary companies whether currently in existence or subsequently established or acquired after the effective date of this agreement.

18. Special Agent shall have no power or authority other than as herein expressly granted, and no other or greater power or authority shall be implied from the grant or denial of power or authority specifically mentioned herein.

Nothing herein shall require General Agent to provide an office or office equipment for Special Agent.

**19. RETIREMENT**

For purposes of this Agreement, Special Agent will be considered retired on the date individual begins to receive a pension under the General Agent's Association sponsored pension plan for personnel in General Agencies.

Failure to meet the requirement described in Section 7 shall not result in termination of this agreement at any time subsequent to Special Agent becoming Retired.

**20. TOTAL DISABILITY**

For purposes of this agreement, Special Agent shall be considered "Totally Disabled", when qualified as such under the applicable rules and regulations provided to eligible individuals through the General Agency Association Group plan for personnel in General Agencies then in effect. Failure to meet the requirement described in Section 7 shall not result in termination of this agreement providing Special Agent is Totally Disabled for the entire preceding calendar year, in the judgment of the carrier providing the above coverage. The requirement for periods of disability of less than a full calendar year will be determined on a pro-rata basis.

**21. INSURANCE MARKETPLACE STANDARDS ASSOCIATION - IMSA**

The Special Agent hereby agrees to comply with (I) all applicable laws and regulations in the solicitation and sale of the Company's products, and (II) all of the policies and procedures set forth in the John Hancock Market Conduct Manual (the Manual), as it may be amended from time to time, which will be provided to the Special Agent by the General Agent.

**22. ARBITRATION**

Any controversy or claim arising out of or relating to this contract or the breach, termination or validity thereof, shall be settled by arbitration in accordance with the Model Employment Arbitration Procedures of the American Arbitration Association before an arbitrator who is licensed to practice law in the state in which the arbitration is convened and who shall apply the substantive law (and the law or remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claims asserted. Such arbitration shall be the sole and exclusive procedure for the resolution of disputes arising out of or relating to this contract or the breach, termination or validity thereof and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. Written notice of any claim under this provision must be given to the party or entity against which relief is sought within one (1) year of the date the claimant first has knowledge of the event giving rise to the claim; otherwise the claim shall be void and deemed waived even if there is a federal or state statute of limitations which would have given more time to pursue the claim.

PART I    GENERAL COMPENSATION PROVISIONS

1. The General Agent will allow the Special Agent, and Special Agent hereby agrees to accept as full compensation, commissions at the rates shown in the agreement, as hereinafter set forth, subject to the provisions of this agreement, upon premiums or installments thereof, paid on policies issued on applications procured under this agreement, and other compensation as provided for in the Schedule of Commission Rates (except where individual states have regulated differently).

Commissions will be due and payable at such time as the premiums have been collected and paid over to the General Agent or the Company and the commissions have been authorized according to the normal accounting procedure of the Company subsequent to the anniversary date of the policy on which the premium would have been payable.

2. Commissions under this agreement will not be paid or allowed after the termination of this agreement, except as follows:

   a. If the Special Agent's Agreement should be terminated by death, commissions as provided in this agreement, but not service fees, shall be allowed after such death.

   b. If the General Agency Contract of the General Agent terminates and simultaneously the Special Agent executes a Whole-Time Agreement with another General Agent of the Company, for the purposes of this paragraph this agreement is not to be considered terminated until the termination of the succeeding Whole-Time Agreement or agreements which provide continuous service as a Whole-Time Agent of a General Agent or of General Agents of the Company.

   c. If at the time of termination the Special Agent had been under one or more Whole-Time Agreements with one or more General Agents of the Company for an aggregate period of at least two (2) years, commissions on: Traditional Life, Estate Protection, Universal Life, Flexible Variable Life, Medallion Variable Life, Medallion Gold, Long Term Care and Variable Estate Protection; the products of John Hancock Mutual Life Insurance Co. and John Hancock Variable Life Insurance Co.; Provident Disability Income obtained through John Hancock Networking Insurance Agency, for the first and second policy years shall be allowed after such termination. No commissions are payable on Annuity contracts after the termination of this agreement.

   d. If at the time of termination the Special Agent had been under one or more Whole-Time Agreements with one or more General Agents of the Company for an aggregate period of at least twenty (20) years, commissions on: Traditional Life, Estate Protection, Universal Life, Flexible Variable Life, Medallion Variable Life, Medallion Gold, Long Term Care and Variable Estate Protection; the products of John Hancock Mutual Life Insurance Co. and John Hancock Variable Life Insurance Co.; Provident Disability Income obtained through John Hancock Networking Insurance Agency, for the first and second policy years shall be allowed after such termination. No commissions are payable on Annuity contracts after the termination of this agreement.

   Such twenty (20) year period will be reduced by one year or one-half year, for each calendar year in which Special Agent is credited with first year commission which equals or exceeds three (3) times the established FYCS, or one and one-half (1 1/2) times the established FYCS, respectively. The Special Agent must have a five year lives lapse rate of no more than 10% during the preceding calendar year.

   Further, such twenty year period will be reduced by one year for each full President's Cabinet qualification or one-half year for each full President's Honor Club qualification, achieved during the calendar years 1980 through 1984.

3. Should the rates of commission provided in the contract of General Agent with the Company be reduced at any time, the General Agent reserves the right to change the rates of commission paid to Special Agent hereunder, on business produced on or after date of said change. Should the provisions for the payment of a quality performance bonus, or service fees provided in the contract of General Agent with the Company be changed at any time, the General Agent reserves the right to change the provisions for the payment of a quality performance bonus or service fees to Special Agent.

4. Commissions, if any, on conversions, except as provided herein, on exchanges to other forms; on policies which in the judgment of the Company take or are to take the place of other insurance; on policies changed by means of a rider; on business secured on special rate quotations; on policies issued on a simplified underwriting basis, and on forms of policies not mentioned herein are to be established by the General Agent within the Company's regulations.

5. On conversion of a Group Certificate to a permanent form of life insurance, the first year commission on the converted policy will be 10% of the premium. On those forms of policies where the first year commission is at the rate of 10% or less, the first year commission will be one half of the rate otherwise applicable to such issue. No renewal commission will be allowed on a policy converted from a Group Certificate.

6. Commissions on Ratings and Sub-Standard Premiums:

A. Life Insurance:



| | Through Class "C" | Above Class "C" | Permanent Dollar | Temporary Dollar |
|---|---|---|---|---|
| Traditional | Full Rate | None | Full Rate | None |
| Estate Protection | Full Rate | Full Rate | None | None |
| Flexible Variable and Universal Life | Paid at *MCRP Rate | Paid at Excess Rate | Paid at *MCRP Rate | Paid at Excess Rate |

Variable Estate Protection — Full rate is paid up to Target Premium

| | |
|---|---|
| Medallion Variable Life | Full commission is paid up to the Commissionable Premium Target (CPT) |
| Medallion Executive Variable Life | Full Commission is paid up to the Commissionable Premium Target (CPT) |
| Medallion Gold Universal Life | Full Commission is paid up to the Commissionable Premium Target (CPT) |
| Universal Life Estate Protection | Full Commission is paid up to the Commissionable Premium Target (CPT) |
| High Band Universal Life | Full Commission is paid up to the Commissionable Premium Target (CPT) |

* MCRP Maximum Commission Rate Premium

B. Long Term Care Substandard: Substandard commissions on LTC policies will be paid at regular rates, in accordance with the schedule of commission rates, on premiums up to and including 130% of standard (no commission will be paid on premiums in excess of 130% of the standard premium).

7. Upon payment of premiums on Mod Plus Policies no additional first year commissions will be allowed on the increase in premium if any, for the sixth policy year. Renewal commissions will be paid on the original premium for the second through the fifth policy years at the regular rate when collected and paid over to the Company.

8. No commissions will be allowed on premium waived under the waiver of premium clause for Long Term Care, Medallion Variable Life or Universal Life Policies. Full commissions (less commission on waiver of premium riders) will be allowed on premiums waived under the waiver of premium clause for Traditional Life, Estate Protection, and Flexible Variable Life Policies.

9. Policies and contracts procured through this Agreement which replace existing policies and contracts will result in reduced commissions or a chargeback of commissions in accordance with the rules in Part IV Special Commission Provisions.

10. SUPPLEMENTARY BENEFIT PROVISIONS

a. Children's Insurance Benefit Provision, Initial Term.

When any such provision is attached to a policy, a first year commission will be paid on the premium applicable to such a provision at the same rate as is applicable to the regular premium on the policy.

Commissions on renewal premiums paid under any of the above provisions will be paid for the full renewal commission period at the same rates as are payable to Special Agent under the regular premiums of the policy to which it is attached or at the rates that would be payable to Special Agent had Special Agent procured the application upon which said policy was issued.

b. Disability Benefit Provision, Accidental Death Benefit Provision, Applicant Waiver of Premium Benefit, or Insurance of Insurability Benefit Provision.

When any such provision is attached to a policy at issue or added thereto during the first policy year, a first year commission will be payable to Special Agent at the same rate as is payable on the regular premium of the policy or rider to which it is attached. When any such benefit provision is added to a policy or rider after the first policy year, no first year commission will be paid; but renewal commissions on such provision will be at the same rates as are payable to Special Agent under the provisions of this Agreement on premiums on policies or riders of the type to which the benefit provision is attached. Renewal commissions will be paid to the end of the regular renewal commission period provided for such policies or riders under the provisions of this Agreement. Commissions, but not service fees, will be paid on any premium waived by the Company under a disability benefit provision.

c. Paid Up Insurance (PUI) Benefit Provision.

When any such provision is attached to a policy at issue or added thereto during the first policy year, a first year commission will be payable. Renewal commissions will be paid to the end of the regular renewal commission period provided for such policies.

Lump sum payments will generate commissions, at first year rates for payments made during the first policy year. Lump sum payments will be considered as renewal commissions if paid beyond the first policy year.

d. Additional Insurance Protection Rider.

When any such provision is attached to a policy at issue, a first year commission will be payable.

Lump sum payments will generate commissions, at first year rates for payments made during the first policy year. Lump sum payments will be considered as renewal commissions if paid beyond the first policy year.

e. Inflation Option Rider to increase benefits on Long Term Care.

First year commissions of 25% are paid on resulting increase in policy premium, in the year benefit is added. Renewal commissions on renewal premiums will be paid for the full renewal commission period at the same rates and for the same duration as are payable under the regular premiums of the policy to which it is attached (if the base policy commission paying period has ended then no renewal commission will be paid).

PART II    SERVICE FEES

If the Special Agent qualifies for payment of service fees, they will be due and payable at such time as the premiums upon which such service fees are based have been collected and paid over to the General Agent or the Company and the service fees have been authorized according to the normal accounting procedure of the Company. Service fees on premiums paid in advance will not be due and payable until authorized, according to the normal accounting procedure of the Company, subsequent to the anniversary date of the policy on which the premium would have been payable. Service fees shall be payable only so long as a Special Agent's Commission Agreement between the Special Agent and the General Agent is in effect at the time of each payment. Should the provisions for the payment of service fees in the contract of the General Agent with the Company be changed at any time, the General Agent reserves the right to change the provisions for the payment of service fees to Special Agent hereunder.

Non-vested, non-transferable service fees will be paid to the Special Agent on an account year basis commencing with approximately the first Monday in February and continuing through the approximately the last Friday of January in the subsequent year on premiums paid during that period, unless previously discontinued by the Company, provided the Special Agent had in force at all times during the full calendar year immediately preceding the account year in which any such service fees become payable a Special Agent's Commission Agreement with the General Agent or any other General Agent of the Company and provided the Special Agent has been credited with an amount of first year commission which equals or exceeds seventy five percent (75%) of the FYCS for such preceding year in accordance with the rules of the Company.

The service fee shall be computed at the end of the commission paying period on the products of John Hancock Mutual Life Insurance Co.: and John Hancock Variable Life Insurance Co.; at the rate of 2% of premiums on Traditional Life Estate Protection, Provident Disability Income obtained through John Hancock Networking Insurance Agency, and Long Term Care premium paying policies, service fees shall be computed at the rate of 3% of premiums on Flexible Variable Life, Medallion Variable Life, and Variable Estate Protection.

If the Special Agent has been continuously under one or more Whole Time Agreements with one or more General Agents of the Company for at least eleven (11) years and has qualified for the payment of service fees, then any service fees payable on Traditional Life, Estate Protection, Provident Disability Income obtained through John Hancock Networking Insurance Agency, and Long Term Care premium paying policies under the provisions stated above shall be payable at the rates provided in the following table:

| Years of Continuous Service At Least | Service Fee Rate Traditional Life, Estate Protection, Provident Disability Income and Long Term Care |
|---|---|
| 11 | 2.1% |
| 12 | 2.2% |
| 13 | 2.3% |
| 14 | 2.4% |
| 15 | 2.5% |
| 16 | 2.6% |
| 17 | 2.7% |
| 18 | 2.8% |
| 19 | 2.9% |
| 20 | 3.0% |

Service fees are not paid on Universal Life Insurance or Annuities.

RETIREMENT
Service fees will be paid to Special Agent in the year following the year in which Special Agent becomes retired, and is receiving a pension under the General Agent's Association sponsored pension plan for personnel in General Agencies, provided both of the following conditions are met:

a)  Special Agent attains the requirement for the calendar year in which Special Agent becomes retired determined by prorating the requirement for that portion of the year extending through the month of retirement, and

b)  Special Agent has qualified for payment of service fees in at least three of the five preceding calendar years.

If Special Agent in the year of retirement qualifies under (a) and (b) above for service fees to be paid in the following year, thereafter, there is no annual commission requirement for the payment of service fees.

TOTAL DISABILITY
If Special Agent is receiving service fees at the inception of total disability, Special Agent will continue to be eligible for payment of such service fees for the remainder of that year in which total disability commences. In determining Special Agent's eligibility for payment of service fees in the year immediately following a year in which there was total disability the requirement is prorated according to Company rules for that period of time during the preceding year in which Special Agent was not totally disabled.

If Special Agent was totally disabled for an entire year, Special Agent will not be eligible for payment of service fees in the following year.

PART III   QUALITY PERFORMANCE BONUS

A quality performance bonus shall be paid to the Special Agent on or about the December 15th next following the completion of the bonus year, so long as the Special Agent qualifies according to the provisions stated herein and provided that a Special Agent's Commission Agreement between the Special Agent and the General Agent is in effect at the time of payment.

If the Special Agent's internal and/or external replacement rate equals or exceeds the annually announced maximum rate, the Special Agent's block of business will be reviewed to determine if a Quality Performance Bonus should be allowed. Final determination will be based upon replacement rates adjusted for excludable cases and a review for a systematic strategy to replace business.

The bonus year will extend from the first commission account date of September in a calendar year to the last commission account date in August in the following calendar year. In order to become eligible for the payment of a bonus Special Agent must have been credited during the bonus year with an amount of first year commission which equals or exceeds one hundred percent (100%) of the First Year Commission Standard (FYCS) established with respect to the calendar year in which the bonus year ends and which commission is paid according to the rules of the Company. Such commissions will be proportioned at an annually announced percentage.

Life Insurance & Provident Disability Basic Bonus

The total renewal commissions on such Traditional Life Insurance, Estate Protection, Universal Life Insurance, Flexible Variable Insurance, Medallion Variable Life, Estate Protection, Medallion Executive Variable Life, Medallion Gold Universal Life on the products of John Hancock Mutual Life Insurance Co. and John Hancock Variable Life Insurance Co.; and Provident Disability Income obtained through John Hancock Networking Insurance Agency, issued through a General Agency of the Company and credited to the Special Agent during the bonus year will be multiplied by the applicable percentage determined in accordance with the schedule set forth below. If the Special Agent qualifies for payment of a quality performance bonus, according to the provisions of this paragraph, the bonus shall be payable at a percentage determined according to the following schedule:

Life and Provident Basic Quality Performance Bonus Rate Payment Schedule

| Five-Year Life Lives Lapse Rate | 100% to 500% of FYCS (Percent of Renewal Commission) |
|---|---|
| 9.0% - 8.1% | 19.5% - 35.0% |
| 8.0% - 7.1% | 21.5% - 39.0% |
| 7.0% - 6.1% | 23.0% - 43.0% |
| 6.0% - 5.1% | 24.0% - 46.0% |
| 5.0% - 4.1% | 25.0% - 47.0% |
| 4.0% - 3.1% | 27.0% - 51.0% |
| 3.0% - 0% | 28.0% - 52.0% |

Long Term Care Basic Bonus

The total renewal commissions on Long Term Care Insurance issued through a General Agency of the Company and credited to the Special Agent during the bonus year will be multiplied by the applicable percentage determined in accordance with the schedule set forth below. If the Special Agent qualifies for payment of a quality performance bonus, according to the provisions of this paragraph, the bonus shall be payable at a percentage determined according to the following schedule:

Long Term Care Basic Quality Performance Bonus Rate Payment Schedule

| Five-Year LTC Lives Lapse Rate | 100% to 500% of FYCS (Percent of Renewal Commission) |
|---|---|
| 5.5% - 5.1% | 24.0% - 46.0% |
| 5.0% - 4.1% | 25.0% - 47.0% |
| 4.0% - 3.1% | 27.0% - 51.0% |
| 3.0% - 0% | 28.0% - 52.0% |

ACTUAL BONUS PAYMENTS RESULTING FROM THE ABOVE CALCULATIONS FOR LIFE, PROVIDENT AND LONG TERM CARE WILL BE INCREASED BY 10% FOR EACH 100% OF FYCS THAT FIRST YEAR COMMISSIONS EXCEED 500% OF FYCS. THE EXACT BONUS RATE WILL BE DETERMINED BY LINEAR INTERPOLATION.

The basic quality performance bonus on Life, Provident and Long Term Care determined according to the foregoing schedules shall be subject to increase according to the following schedule if the Special Agent has been credited, during the bonus year with attainment of 100% or more of the FYCS for the calendar year in which the bonus year ends.

### Years of Service Enhancement

| Number of Qualified Years of Service At Least | Percentage by Which Basic Bonus is Increased |
|---|---|
| 6 | 5.0% |
| 7 | 10.0 |
| 8 | 15.0 |
| 9 | 20.0 |
| 10 | 25.0 |
| 11 | 27.5 |
| 12 | 30.0 |
| 13 | 32.5 |
| 14 | 35.0 |
| 15 | 37.5 |
| 16 | 40.0 |
| 17 | 42.5 |
| 18 | 45.0 |
| 19 | 47.5 |
| 20 | 50.0 |

For the purpose of this section "qualified years of service" shall be the combined total of the following:

1. The number of years prior to 1971 in which the Special Agent qualified for Leader's Meetings sponsored by the Company;

2. The number of bonus years from 1971 through 1976, inclusive, in which the Special Agent, while under a Special Agent's Commission Agreement, was credited with attainment of a first year persistency rate of 85% or greater and with a minimum of $10,000 of first year paid-for annual premium, issued through a General Agency of the Company according to the rules of the Company;

3. The bonus year ending 1977 the Special Agent, while under a Special Agent's Commission Agreement, had been credited with attainment of a first year persistency rate of 85% or greater and had been credited with an amount of first year paid-for annual premium which equals or exceeds 62% of the premium production base for the year 1977;

4. The number of bonus years ending in 1978 through 1984 in which the Special Agent, while under a Special Agent's Commission Agreement, has been credited with attainment of a two-year persistency rate of 78% or greater and has been credited with an amount of first year paid-for annual premium which equals or exceeds 62% of the premium production base for the bonus year.

5. The number of bonus years ending in 1985 and thereafter in which the Special Agent has qualified for the payment of a Quality Performance Bonus under any Whole-Time Agreement according to the Provision of this Part.

The basic bonus plus years of service enhancement (if any) determined according to the foregoing schedules shall be subject to further increase according to the following schedule if the Special Agent has been credited with issue of 50 or more new Traditional Life, Estate Protection, Flexible Variable, Medallion Variable Life, Variable Estate Protection, Universal Life, Long Term Care policies and Annuity contracts and has attained 100% or more of the FYCS during the bonus year:

### Quality Lives Bonus Scale

| Number of Lives | Percentage by Which Bonus is Increased | Number of Lives | Percentage by Which Bonus is Increased |
|---|---|---|---|
| Less than 50 | 0.00 | 100 - 104 | 17.50 |
| 50 - 54 | 5.00 | 105 - 109 | 18.75 |
| 55 - 59 | 6.25 | 110 - 114 | 20.00 |
| 60 - 64 | 7.50 | 115 - 119 | 21.25 |
| 65 - 69 | 8.75 | 120 - 124 | 22.50 |
| 70 - 74 | 10.00 | 125 - 129 | 23.75 |
| 75 - 79 | 11.25 | 130 - 134 | 25.00 |
| 80 - 84 | 12.50 | 135 - 139 | 26.25 |
| 85 - 89 | 13.75 | 140 - 144 | 27.50 |
| 90 - 94 | 15.00 | 145 - 149 | 28.75 |
| 95 - 99 | 16.25 | 150 & Over | 30.00 |

## LIMITATIONS

The total Quality Performance Bonus payment, determined according to the foregoing schedule(s), will be capped at 100% of the renewal commissions for all John Hancock Special Agents who qualify for bonus. Average rate will be calculated by dividing the total bonus payment made to qualifying Special Agents by total renewal commissions earned by all qualifying Special Agents.

## RETIREMENT

If Special Agent retires, and is receiving a pension under the General Agent's Association sponsored pension plan for personnel in General Agencies, at the end of any bonus year, the eligibility requirement for the payment of a quality performance bonus will be reduced to twenty-five percent (25%) of the FYCS.

Basic bonus rate schedule will be revised as follows for retired representatives with greater than 25% of FYCS and less than 100% of the FYCS.

### Life and Provident Basic Quality Performance Bonus Rate Payment Schedule

| Five-Year Life Lives Lapse Rate | 25% to 99% of FYCS (Percent of Renewal Commission) |
|---|---|
| 9.0% - 8.1% | 9.5% |
| 8.0% - 7.1% | 11.0% |
| 7.0% - 6.1% | 12.0% |
| 6.0% - 5.1% | 12.6% |
| 5.0% - 4.1% | 13.2% |
| 4.0% - 3.1% | 13.7% |
| 3.0% - 0% | 14.3% |

### Long Term Care Basic Quality Performance Bonus Rate Payment Schedule

| Five-Year LTC Lives Lapse Rate | 25% to 99% of FYCS (Percent of Renewal Commission) |
|---|---|
| 5.5% - 5.1% | 12.6% |
| 5.0% - 4.1% | 13.2% |
| 4.0% - 3.1% | 13.7% |
| 3.0% - 0% | 14.3% |

PART IV    SPECIAL COMMISSION PROVISIONS

REPLACEMENTS

Following replacement rules are applicable unless modified by subsequent state regulation establishing different rules.  In that event the rules required by the respective State will be applied.

See Part V, Section D for exceptions to the following replacement rules:

A. DEFINITIONS

The following definitions will determine whether or not a policy or contract transaction qualifies as a replacement:

1. Termination Date:
   a. Lapse:  Due date of unpaid premium.
   b. Surrender:  Date of surrender check.
   c. Transfer of all values to new product:  Date the company processes transfer.

2. Replacement Period:

   a. Basic Replacement Period for Life Insurance Policies and Annuity Contracts:  Period commencing 180 days prior to and ending 360 days after date of new policy; which date will be established as follows:

   |  | Date of New Policy |
   |---|---|
   | Life Insurance Policy | Date written (date application is approved for issue). |
   | Annuity Contract | Date premium is received and processed in accordance with normal accounting procedures of the company. |

   b. Extended Replacement Period for Life Insurance Policies and Annuity Contracts:  Period extending from 361 days to 720 days after the date of new policy.  This period is an expansion of the basic replacement period and is activated when a loan is taken on the replaced policy during the basic replacement period.

   c. Long Term Care Replacement Period:  Period commencing 180 days prior to and ending 180 days after the issue date of the new Long Term Care policy.

3. Replaced Premium:

   a. When a Life Insurance policy replaces a Life Insurance policy, or a Long Term Care policy replaces a Long Term Care policy the replaced premium will be the amount of the annual premium of the policy replaced.

   b. When a Life Insurance policy is replaced by an Annuity contract the replaced premium will be the cash value and loans taken during the replacement period from the Life Insurance policy which terminate during the replacement period.

   c. When an Annuity contract is replaced by an Annuity contract the replaced premium will be the total of all withdrawals, surrenders and loans from the replaced contract.

   d. When an Annuity contract is replaced by a Life Insurance policy the replaced premium will be the total of all withdrawals, surrenders, and loans, from the replaced contract taken during the replacement period.

   e. For Variable Estate Protection and Estate Protection the replacement premium is defined as the total annual premium associated with the life policies on either of the two insureds which terminate during the replacement period of the new policy.

4. Admitted Replacement:  Policy will be considered an admitted replacement if application for new insurance or contract indicates that it is intended to replace an existing John Hancock policy or contract and any State required replacement forms accompany new application.

**B.** COMMISSIONS ON LIFE INSURANCE AND ANNUITY REPLACEMENTS

If the termination date of a replaced policy or contract falls within the Basic or Extended Replacement Period, a commission on the new policy or contract on the same life, will be paid as follows:

1. Admitted Replacements:

    a. First Year Commission:

        1) Life replacing Life or Annuity replacing Life:

            a) If a replaced policy has been in-force more than three years, one half (1/2) of the first year commission, as specified in the Schedule of Commission Rates, will be paid on replaced premium.

            b) If a replaced policy has been in-force three years or less, one quarter (1/4) of the first year commission, as specified in the Schedule of Commission Rates, will be paid on replaced premium.

        First year commission will be paid at the rate specified in the Schedule of Commission Rates on any premium amount for the replacing policy or contract in excess of the replaced premium.
        2) Life Insurance policy replacing Annuity contract:

            Commissions will be paid on the replaced Annuity premium at the rate of 3% less than the rate specified in the Schedule of Commission Rates on the base life policy premium.

        3) Annuity replacing Annuity:

            One-half the first year commission, as specified in the Schedule of Commission Rates, will be paid on the replaced premium.

    b. Renewal Commissions:

        Full renewal rates will be paid on all renewal premiums paid on Life Insurance policies made subsequent to the first policy anniversary as provided for in the Schedule of Commission Rates.

2. Non admitted replacements:

    a. First Year Commissions:

        1) If a Replaced policy terminates during the basic replacement period, no first year commission will be paid on replaced premium.
        2) If a Replaced policy terminates during the extended replacement period, one-half (1/2) first year commission, as specified in the Schedule of Commission Rates, will be paid on replaced premium.

        First year commission will be paid at the rate specified in the Schedule of Commission Rates on any premium amount for the replacing policy or contract over the replaced premium.

    b. Renewal Commissions:

        Full renewal commissions will be paid on all renewal premiums paid on Life Insurance policies and on all payments to Annuity contracts made subsequent to the first policy anniversary as provided for in the Schedule of Commission Rates.

C. COMMISSIONS ON LONG TERM CARE REPLACEMENTS
   1. All States except California, Pennsylvania, New York, Wisconsin, Kentucky:

      a) Internal Replacements and Upgrades
         At the replacement date: The increase in premium (resulting from the replacement) is commissionable to the new agent at the First Year Commission Rate.

         The replaced policy premium is commissionable to the original agent only in accordance with its original duration.

         The following years: The increase in premium (resulting from the replacement) is commissionable to the new agent at the Renewal Rate based on the new policy duration.

         The replaced policy premium is commissionable to the original agent only in accordance with its original duration.

      b) External Replacements
         At the replacement date: The total policy premium is commissionable at the First Year Commission Rate.

         The following years: The total policy premium is commissionable at the Renewal rate based on the new policy duration.

   2. California and Pennsylvania:

      a) Internal Replacements
         Same as All State rules.

      b) External Replacements
         At the replacement date: The increase in premium (the difference between the new John Hancock policy premium and the replaced policy premium paid to the prior Insurer) is commissionable at First Year Commission rate.

         The replaced policy premium is commissionable at the Renewal (2nd duration) commission rate.

         The following years: The total policy premium is commissionable at the Renewal rate based on the new policy duration.

   3. New York:

      a) Internal Replacements and Upgrades
         At the replacement date: The increase in premium (resulting from the replacement) is commissionable to the new agent at the Renewal (2nd duration) Commission Rate.

         The replaced policy premium is commissionable to the original agent only in accordance with its original duration.

         The following years: The increase in premium (resulting from the replacement) is commissionable to the new agent at the Renewal Rate based on the new policy duration.

         The replaced policy premium is commssionable to the original agent only in accordance with its original duration.

      b) External Replacements
         At the replacement date: The total policy premium is commissionable at the Renewal (2nd duration) Commission Rate.

         The following years: The total policy premium is commissionable at the Renewal rate based on the new policy duration.

   4. Wisconsin:

      a) Internal Replacements and Upgrades
         Same as All State rules.

      b) External Replacements
         At the replacement date: The total policy premium is commissionable at the Renewal (2nd duration) Commission Rate.

         The following years: The total policy premium is commissionable at the Renewal rate based on the new policy duration.

5. <u>Kentucky</u>:

    a) <u>Internal Replacements</u>
       <u>Same as All State rules.</u>

    b) <u>External Replacements</u>
       <u>At the replacement date</u>:  The total policy premium is commissionable at a rate equal to 2 times the 2nd duration Commission Rate.

       <u>The following years</u>:  The total policy premium is commissionable at the Renewal rate based on the new policy duration.

D. EXCEPTIONS
The following transactions are not considered replacements when:

1. A "Permanent" insurance policy or Annuity contract replaces term insurance.

2. A policy replaces a fully paid-up policy or Immediate Annuity contract.

3. A policy replaces an endowment policy within five years of maturity.

4. A policy replaces a spouse's coverage under a family policy or under a family rider.

5. A policy results from an original date conversion for at least the same sum insured.

6. A non-qualified Retirement Income, or Endowment policy, with an endowment date occurring at age 60 or later is replaced by a new policy which qualifies as an individual retirement account.

7. The owner of an existing policy loses eligibility for special tax sheltered treatment, provided the original policy continues on a reduced paid-up basis.

COMMISSION CHARGEBACKS

**A.** TRADITIONAL LIFE, TERM, ESTATE PROTECTION, MEDALLION GOLD UNIVERSAL LIFE, UNIVERSAL ESTATE PROTECTION, AND LONG TERM CARE INSURANCE

There will be a chargeback of earned first year commission on any policy procured under this agreement or any preceding agreement which is lapsed or surrendered according to the following:

| The Due Date of Unpaid Premium At the Time of Lapse/Surrender | First Year Earned Commission Chargeback |
|---|---|
| 1 month after issue | 100% |
| 2 months after issue | 100% |
| 3 months after issue | 100% |
| 4 months after issue | 75% |
| 5 months after issue | 60% |
| 6 months after issue | 50% |
| 7 months after issue | 42.85% |
| 8 months after issue | 37.50% |
| 9 months after issue | 33.33% |
| 10 months after issue | 30% |
| 11 months after issue | 27.27% |
| 12 months after issue | 25% |
| 13 months after issue | 0% |

If the Special Agent meets the annually announced first year commission, lapse rate and years under contract requirements established by the company, the effect of the chargeback provisions of this section will be waived.

**B.** ADDITIONAL INSURANCE PROTECTION RIDER (AIP)

If during the first three policy years the premium is reduced on an Estate Protection or Traditional Life Policy containing an Additional Insurance Protection (AIP) Rider for which commission was earned at a rate greater than 3% in the first year, is reduced or terminated, the commission paid in the first year will be redetermined as if the reduced portion had been an AIP lump sum payment. Any commission paid in excess of this redetermined commission will be chargedback.

**C.** FLEXIBLE VARIABLE LIFE, MEDALLION VARIABLE LIFE, VARIABLE ESTATE PROTECTION, MEDALLION EXECUTIVE VARIABLE LIFE AND HIGH BAND UNIVERSAL LIFE

If a policy lapses or is surrendered with a premium due date or effective date within the first 24 months, a chargeback will be made equal to the lessor of the total of all commissions paid in the first year up to the MCRP or the amount computed from the following table:

| Paid -To-Date at the Time of Lapse (Month after issue) | First Year Earned Commission Chargeback |
|---|---|
| 1 through 12 | 100% |
| 13 | 91.66% |
| 14 | 83.33% |
| 15 | 74.99% |
| 16 | 66.66% |
| 17 | 58.33% |
| 18 through 24 | 49.99% |

Chargebacks will apply to face amounts surrendered under a full or partial surrender.
If the Special Agent meets the annually announced first year commission, lapse rate & years under contract requirements established by the company, the effect of the chargeback provisions of this section will be waived.

**D.** ANNUITIES

For Allegiance Preferred and Independence 2000, full commissions will be chargedback on any amounts withdrawn, excluding the 10% free withdrawal during the first contract year. During the first 6 months of 1st contract year chargeback will be 100% on amount withdrawn over the 10% free withdrawal amount.
During the last 6 months of the 1st contract year chargeback will be 50%.

For Independence Preferred, full commissions will be chargedback on any amounts withdrawn, less the surrender penalty, if the amount has been held on deposit less than one year.

For all other annuity contracts there is no chargeback provision applicable.

SCHEDULE OF COMMISSION RATES

| PART V    SCHEDULE OF COMMISSION RATES | First Policy Year % | Renewal Commissions % | | |
|---|---|---|---|---|
| **A. Traditional Life Policies:** | | | | |
| Level Premium 100 , Standard & Preferred | | | | |
| Issue ages 65 and under | 45 | 8 | Policy Years | 2-6 |
| Issue ages 66 to 85 | 35 | 8 | Policy Years | 2-6 |
| Issue ages 86 and over | 25 | 8 | Policy Years | 2-6 |
| Additional Insurance Protection Rider (AIP)* | | | | |
| Target Premium Issue Age: | | | | |
| Issue ages 65 and under | 25 | 4 | Policy Years | 2-6 |
| Issue ages 66 and over | 20 | 4 | Policy Years | 2-6 |
| Excess Premium | 3 | 3 | Policy Years | 2-10 |
| Lump Sum | 3 | 3 | Policy Years | 2-10 |
| | | | | |
| Mod Plus | | | | |
| Band 2 ($50,000 - $99,999) | | | | |
| Band 3 ($100,000 - $249,999) | | | | |
| Band 4 ($250,000 - $999,999) | | | | |
| Band 5 ($1,000,000 and above) | | | | |
| Issue ages 65 and under | 50 | 8 | Policy Years | 2-6 |
| Issue ages 66 - 85 | 40 | 8 | Policy Years | 2-6 |
| Additional Insurance Protection Rider (AIP)* | | | | |
| Target Premium Issue Age: | | | | |
| 20 - 65 | 25 | 4 | Policy Years | 2-5 |
| 66 and over | 20 | 4 | Policy Years | 2-5 |
| Lump Sum | 3 | - | | |
| Excess Premium | 3 | 3 | | |
| Paid Up Insurance Rider (PUI) | | | | |
| Reoccurring Scheduled Payments | 3 | 3 | Policy Years | 2-6 |
| Lump Sum Payments | 3 | 3 | In any duration | |

| | First Policy Year % | Renewal Commissions for Policy Years 2-5 % |
|---|---|---|
| LP100 | | |
| Simplified Issue | | |
| Issue ages 50 and under | 40 | 8 |
| Issue ages 51 to 60 | 37.5 | 8 |
| Issue ages 61 to 65 | 35 | 8 |
| Issue ages 66 to 67 | 30 | 8 |
| Issue ages 68 to 70 | 25 | 8 |
| Issue ages 71 and over | 20 | 5.5 |

* For compensation purposes, the AIP Rider Target Premium is one-half of the base policy premium rate, not including the policy fee, times the initial AIP coverage amount in thousands. No commission is payable on the base policy premium increase in the 11th year.

|  | First Policy Year % | Renewal Commissions for Policy Years 2-5 % |
|---|---|---|
| Yearly Renewable Term & 10, 15, 20, 25 & 30 Year Level Premium Term | | |
| Band 1 - 5 | | |
| Issue ages 65 and under | 55 | 3 |
| Issue ages 66 to 70 | 47.5 | 3 |
| Issue ages 71 and over | 40 | 3 |
| | | |
| Preferred Band 3 -5 | | |
| Issue ages 65 and under | 55 | 3 |
| Issue ages 66 to 70 | 47.5 | 3 |
| Issue ages 71 and over | 40 | 3 |

|  | First Policy Year % | Renewal Commissions for Policy Years 2 & 3 % |
|---|---|---|
| Yearly Renewal Term 3 | 2 | 2 |

| Yearly Renewable Term Rider (Insured & Spouse) | First Policy Year % | Renewal Commissions for Policy Years % | | | |
|---|---|---|---|---|---|
| | | 2 | 3 | 4 | 5 |
| Standard Bands 1-4 | | | | | |
| Ratable ages 65 and under | 35 | 7 | 5 | 5 | 4 |
| Ratable ages 66 to 70, incl. | 27.5 | 7 | 5 | 5 | 4 |
| Ratable ages 71 and over | 20 | 7 | 5 | 5 | 4 |
| | | | | | |
| Preferred Bands 3-4 | | | | | |
| Ratable ages 65 and under | 30 | 7 | 5 | 5 | 4 |
| Ratable ages 66 to 70, incl. | 22.5 | 7 | 5 | 5 | 4 |
| Ratable ages 71 and over | 15 | 7 | 5 | 5 | 4 |

|  | First Policy Year<br>% | Renewal Commissions for<br>Policy Years 2 - 10<br>% |
|---|---|---|
| B. Traditional Estate Protection Policies: | | |
| Modified Premium Policy | | |
| Base | | |
| Issue ages*: | | |
| 20 - 70 | 50 | 5 |
| 71 - 75 | 45 | 5 |
| 76 - 80 | 40 | 5 |
| | | |
| Additional Insurance Protection Rider (AIP)** | | |
| Target Premium Issue ages*: | | |
| 20 - 70 | 25 | 3 |
| 71 - 75 | 22.5 | 3 |
| 76 - 85 | 20 | 3 |
| Lump Sum | 3 | |
| Excess Premium | 3 | 3 |
| | | |
| Paid-Up Insurance Rider (PUI) | | |
| Reoccurring Scheduled Payments | 3 | 3 |
| Lump Sum Payments | 3 | |

\*    Ages based on younger insured.

\*\*   For compensation purposes, AIP Rider Target Premium is one-half of the base policy premium rate, not including the policy fee, times the initial AIP coverage amount in thousands.  No commission is payable on the base policy premium increase in the 11th year.

|  | First Policy Year<br>% | Renewal Commissions for<br>Policy Years 2 - 10<br>% |
|---|---|---|
| Level Premium Policy: | | |
| Base | | |
| Issue ages: | | |
| 20 - 70 | 45 | 5 |
| 71 - 75 | 40 | 5 |
| 76 - 80 | 35 | 5 |
| 81 - 85 | 30 | 5 |
| | | |
| Additional Insurance Protection Rider (AIP) | | |
| Target Premium Issue ages: | | |
| 20 - 70 | 25 | 3 |
| 71 - 75 | 22.5 | 3 |
| 76 - 80 | 20 | 3 |
| 81 - 85 | 17.5 | 3 |
| Excess Premium | 3 | 3 |
| Lump Sum | 3 | 3 |
| | | |
| Paid-Up Insurance Rider (PUI) | | |
| Scheduled Premium | 3 | 3 |
| Lump Sum | 3 | 3 |

SCHEDULE OF COMMISSION RATES

C. Flexible Premium Adjustable Life Policies (Universal Life):

| | First Policy Year | Policy Years 2-5 Option 1* | Policy Years 2-5 Option 2* | Policy Years 6 - Beyond* |
|---|---|---|---|---|
| | % | % | % | % |
| Payable on maximum commission rate premium: | | | | |
| Policy Base less than $250,000 | | | | |
| Issue ages 65 and under | 50 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 45 | 4 | 6 | 3 |
| Issue ages 71 to 75 | 40 | 4 | 6 | 3 |
| Issue ages 76 and over | 35 | 4 | 6 | 3 |
| Policy Base $250,000 and over | | | | |
| Issue ages 65 and under | 45 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 40 | 4 | 6 | 3 |
| Issue ages 71 to 75 | 35 | 4 | 6 | 3 |
| Issue ages 76 and over | 30 | 4 | 6 | 3 |
| Yearly Renewable Term Rider | | | | |
| Standard | | | | |
| Issue ages 65 and under | 35 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 27.5 | 4 | 6 | 3 |
| Issue ages 71 and over | 20 | 4 | 6 | 3 |
| Preferred | | | | |
| Issue ages 65 and under | 30 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 22.5 | 4 | 6 | 3 |
| Issue ages 71 and over | 15 | 4 | 6 | 3 |
| Add-Ons (Increases) | | | | |
| Policy Base $249,999 and under | 47 | - | - | - |
| Policy Base $250,000 and over | 42 | - | - | - |
| Excess Premium, and Premium for ratings greater than Class C, and temporary dollar amount ratings (Option 1 & 2) | 3 | 3.5 | 3.5 | 3 |

* The date of receipt of premium payments will determine the policy year for the commission on Flexible Premium Adjustable Life.

MCRP (Maximum Commission Rate Premium) for Flexible Premium Adjustable Life equals 12 times the minimum monthly premium for Option 1, plus the premium on all riders and substandard extra premiums, excluding temporary dollar ratings or premiums in excess of Class C.

Special Agents entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization on Universal Life only on premiums paid during first policy year up to the MCRP (no annualization will be paid after first policy year on any premiums).

REFER TO PART IV SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

## SCHEDULE OF COMMISSION RATES

**D. Medallion Variable Life Policies:**

| | First Policy Year | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|
| | CPT % | Excess % | CPT % | Excess % | CPT % | Excess % |
| **Medallion Variable Life** | | | | | | |
| **Standard & Preferred** | | | | | | |
| Less than $250,000 | | | | | | |
| Issue ages 65 and under | 50 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 45 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 40 | 3 | 6 | 3 | 3 | 3 |
| | | | | | | |
| $250,000 and Over | | | | | | |
| Issue ages 65 and under | 45 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 40 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 35 | 3 | 6 | 3 | 3 | 3 |
| | | | | | | |
| **Yearly Renewable Term Rider** | | | | | | |
| **Standard** | | | | | | |
| Issue ages 65 and under | 35 | | 6 | | 3 | |
| Issue ages 66 - 70 | 27.5 | | 6 | | 3 | |
| Issue ages 71 and over | 20 | | 6 | | 3 | |
| | | | | | | |
| **Preferred** | | | | | | |
| Issue ages 65 and under | 30 | | 6 | | 3 | |
| Issue ages 66 - 70 | 22.5 | | 6 | | 3 | |
| Issue ages 71 and over | 15 | | 6 | | 3 | |

| | First Year Rates Payable Policy Years | | Excess | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|---|
| | 1 % | 2-4** % | % | CPT % | Excess % | CPT % | Excess % |
| **Optional Group Sales Provision\*** | | | | | | | |
| **Standard & Preferred** | | | | | | | |
| Less than $250,000 | | | | | | | |
| Issue ages 65 and under | 35 | 6 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 30 | 6 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 25 | 6 | 3 | 6 | 3 | 3 | 3 |
| $250,000 and Over | | | | | | | |
| Issue ages 65 and under | 30 | 6 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 25 | 6 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 20 | 6 | 3 | 6 | 3 | 3 | 3 |

\*In order to meet higher early policy cash value needs, the optional Group Sales provision may be offered in employer-employee cases where at least 3 policies are to be paid by a payroll deduction method. Under this optional arrangement the payment of first year commissions will be spread out as set forth in the commission table.

\*\*Deferred 6% first year commission will be paid at the start of month three in policy years 2-4. Commissions on excess premiums and renewal premiums are not impacted by this option and will be paid at the rates provided in the commission table.

Commissionable Premium Target (CPT) is equal to the sum of the base policy target and rider premiums (excluding YRT) as calculated at issue and at each anniversary.

The date of receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in arrears will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice for a premium due the following year will receive the rate for the following year.

Excess premiums is any premium in a given year that exceed the CPT

Special Agents entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization only on Medallion Variable Life premiums paid during the first policy year up to the CPT (no annualization will be paid after first policy year on any premiums or if paid monthly, the lessor of the CPT or 12 times the monthly premium).

REFER TO PART IV SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

SCHEDULE OF COMMISSION RATES

E. Variable Estate Protection Policies:

| | First Policy Year | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|
| | Target % | Excess % | Target % | Excess % | Target % | Excess % |
| Variable Estate Protection | | | | | | |
| Younger insured age 70 or younger | 45 | 3 | 5 | 3 | 3 | 3 |
| Younger insured age 71 or older | 40 | 3 | 5 | 3 | 3 | 3 |

Target premium for Variable Estate Protection is the amount of premium that is fully commissionable.

Excess premiums is any premium in a given year that exceed the Target.

Special Agents entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization only on Variable Estate Protection premiums paid during the first policy year up to the lesser of the target or twelve times the special modal premium (no annualization will be paid after first policy year on any premiums).

REFER TO PART IV SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

## SCHEDULE OF COMMISSION RATES

f. Flexible Variable Life Policies:

| | First Policy Year | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|
| | MCRP % | Excess % | MCRP % | Excess % | MCRP % | Excess % |
| Flexible Variable Whole-Life | | | | | | |
| Standard & Preferred | | | | | | |
| Less than $250,000 | | | | | | |
| Issue ages 65 and under | 50 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 45 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 71 and over | 40 | 3 | 8 | 3 | 3 | 3 |
| | | | | | | |
| $250,000 and Over | | | | | | |
| Issue ages 65 and under | 45 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 40 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 71 and over | 35 | 3 | 8 | 3 | 3 | 3 |
| Yearly Renewable Term Rider (YRT) | | | | | | |
| Standard | | | | | | |
| Issue ages 65 and under | 35 | | 8 | | 3 | |
| Issue ages 66 - 70 | 27.5 | | 8 | | 3 | |
| Issue ages 71 and over | 20 | | 8 | | 3 | |
| | | | | | | |
| Preferred | | | | | | |
| Issue ages 65 and under | 30 | | 8 | | 3 | |
| Issue ages 66 - 70 | 22.5 | | 8 | | 3 | |
| Issue ages 71 and over | 15 | | 8 | | 3 | |

| | First Year Rates Payable Policy Years | | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|---|
| | 1 % | 2-4** % | Excess % | CPT % | Excess % | CPT % | Excess % |
| Optional Group Sales Provision* | | | | | | | |
| Standard & Preferred | | | | | | | |
| Less than $250,000 | | | | | | | |
| Issue ages 65 and under | 35 | 6 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 30 | 6 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 71 and over | 25 | 6 | 3 | 8 | 3 | 3 | 3 |
| $250,000 and Over | | | | | | | |
| Issue ages 65 and under | 30 | 6 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 25 | 6 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 71 and over | 20 | 6 | 3 | 8 | 3 | 3 | 3 |

*In order to meet higher early policy cash value needs, the optional Group Sales provision may be offered in employer-employee cases where at least 3 policies are to be paid by a payroll deduction method. Under this optional arrangement the payment of first year commissions will be spread out as set forth in the commission table.

**Deferred 6% first year commission will be paid at the start of month three in policy years 2-4. Commissions on excess premiums and renewal premiums are not impacted by this option and will be paid at the rates provided in the commission table.

MCRP (Maximum Commission Rate Premium) equals sum of Modified Scheduled Premium plus the premium on all riders (excluding YRT) and substandard extra premiums, excluding temporary dollar ratings or premiums in excess of Class C rating.

Excess premium is any premium payment in a given policy year that exceeds the policy MCRP for that same policy year.

The date of receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in default will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice for a premium due the following year will receive the rate for the following year.

Special Agents entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization only on Flexible Variable Life premiums paid during the first policy year up to the MCRP (no annualization will be paid after first policy year on any premiums).

REFER TO PART IV SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

SCHEDULE OF COMMISSION RATES

G. Long Term Care Policies:

Following rates are payable unless modified by subsequent State regulations establishing a different commission schedule. In that event, the commission rates required by the respective State will be paid.

| | POLICY YEARS | | | | |
|---|---|---|---|---|---|
| | 1 % | 2 % | 3 % | 4 % | 5 % |
| **All States except Michigan (ages 65 and above), New York, New Jersey, Indiana, Maine, Delaware, Pennsylvania and Gold and Classic for Wisconsin only** | | | | | |
| Non EC | 40 | 12.5 | 12.5 | 12.5 | 12.5 |
| 3 - 49 Lives EC | 40 | 10 | 10 | 10 | 10 |
| 50 - 100 Lives EC | 35 | 8 | 4 | 4 | 2 |
| 100 + Lives EC (Ohio only) | 32 | 6 | 4 | 4 | 2 |
| | | | | | |
| Gold and Classic - Sponsored Group | 35 | 5 | 5 | 5 | 5 |
|      - Non Sponsored Group | 40 | 12.5 | 12.5 | 12.5 | 12.5 |

Indexed Inflation Option 25%

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Michigan** | | | | | |
| Long Term Care Advantage Ages 65 - 84: | | | | | |
| Non EC | 23 | 23 | 23 | 12.5 | 12.5 |
| 3 - 49 Lives EC | 22 | 22 | 22 | 10 | 10 |
| 50 + Lives EC | 18 | 18 | 18 | 4 | 2 |
| | | | | | |
| Gold and Classic - Sponsored Group | 18 | 18 | 18 | 3 | 3 |
|      - Non Sponsored Group | 23 | 23 | 23 | 12.5 | 12.5 |

Indexed Inflation Option 25%

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **New York and Maine** | | | | | |
| Long Term Care Advantage Ages 18 - 65: | | | | | |
| Non EC | 40 | 12.5 | 12.5 | 12.5 | 12.5 |
| 3 - 49 Lives EC | 40 | 10 | 10 | 10 | 10 |
| 50 + Lives EC | 35 | 5 | 5 | 5 | 5 |
| | | | | | |
| Gold and Classic - Sponsored Group | 35 | 5 | 5 | 5 | 5 |
|      - Non Sponsored Group | 40 | 12.5 | 12.5 | 12.5 | 12.5 |
| | | | | | |
| Long Term Care Advantage Ages 66 - 84: | | | | | |
| Non EC | 35 | 12.5 | 12.5 | 12.5 | 12.5 |
| 3 - 49 Lives EC | 35 | 10 | 10 | 10 | 10 |
| 50 + Lives EC | 30 | 5 | 5 | 5 | 5 |
| | | | | | |
| Gold and Classic - Sponsored Group | 30 | 5 | 5 | 5 | 5 |
|      - Non Sponsored Group | 35 | 12.5 | 12.5 | 12.5 | 12.5 |

Indexed Inflation Option 25%

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **New Jersey** | | | | | |
| Non EC | | | | | |
| Long Term Care Advantage Ages 18 - 65: | 40 | 12.5 | 12.5 | 12.5 | 12.5 |
| Long Term Care Advantage Ages 66+ | 35 | 12.5 | 12.5 | 12.5 | 12.5 |
| | | | | | |
| Gold and Classic - Sponsored Group | 30 | 5 | 5 | 5 | 5 |
|      - Non Sponsored Group | 35 | 12.5 | 12.5 | 12.5 | 12.5 |

Indexed Inflation Option 25%

## SCHEDULE OF COMMISSION RATES

| | POLICY YEARS | | | | | |
|---|---|---|---|---|---|---|
| | 1 % | 2 % | 3 % | 4 % | 5 % | 6 % |
| **Indiana** | | | | | | |
| Long Term Care Advantage Ages 18 - 84: | | | | | | |
| Non EC | 28 | 14 | 14 | 14 | 14 | 14 |
| 3 - 49 Lives EC | 26 | 13 | 13 | 13 | 13 | 13 |
| 50 + Lives EC | 20 | 10 | 10 | 10 | 10 | 10 |
| Gold and Classic - Sponsored Group | 20 | 10 | 10 | 10 | 10 | 10 |
| - Non Sponsored Group | 28 | 14 | 14 | 14 | 14 | 14 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **Delaware:** | | | | | | |
| Long Term Care Advantage Ages 18 - 84: | | | | | | |
| Non EC | 25 | 25 | 20 | 12.5 | 12.5 | |
| 3 - 49 Lives EC | 25 | 20 | 20 | 10 | 10 | |
| 50 + Lives EC | 20 | 15 | 15 | 5 | 5 | |
| | | | | | | |
| Gold and Classic - Sponsored Group | 18 | 11 | 11 | 11 | 11 | 11 |
| - Non Sponsored Group | 18 | 18 | 18 | 18 | 18 | 18 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **Pennsylvania:** | | | | | | |
| Advantage Non EC and Gold and Classic | 40 | 10 | 10 | 10 | 10 | 10 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |
| | | | | | | |
| **Wisconsin:** | | | | | | |
| Gold and Classic - Sponsored Group | 28 | 7 | 7 | 7 | 7 | 7 |
| - Non Sponsored Group | 40 | 10 | 10 | 10 | 10 | 10 |
| | | | | | | |
| Indexed Inflation Option 25% | | | | | | |

REFER TO PART IV SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

### SCHEDULE OF COMMISSION RATES

**H. Annuities:**

Before engaging in the marketing of or servicing of an individual Variable Annuity product the Special Agent must be appropriately registered with the National Association of Securities Dealers (NASD) and meet all appropriate State licensing regulations for this product.

| | Rates of Commission All Policy Years % |
|---|---|
| **1. Deferred Variable Annuities** | |
| Independence 2000 | |
| Issue Age 79 and under | 3 |
| Issue Age 80-84 | 2 |
| | |
| **2. Deferred Fixed Annuities** | |
| Allegiance Preferred | 2.75 |
| | |
| **3. Immediate Variable Annuities** | |
| Accommodator | 3 |
| | |
| **4. Immediate Fixed Annuities** | |
| John Hancock Managed | 3 |

Annuity commissions are not payable after the termination of this agreement.

REFER TO PART V SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS.

**I. High Band Universal Life**

No Reduction for Higher Ages

HB-1

| First Policy Year | | Policy Years 2-5 | |
|---|---|---|---|
| Target % | Excess % | Target % | Excess % |
| 35 | 3 | 3 | 3 |

HB-2

| First Policy Year | | Policy Years 2-4 | | Policy Year 5 | |
|---|---|---|---|---|---|
| Target % | Excess % | Target % | Excess % | Target % | Excess % |
| 20 | 3 | 8 | 3 | 3 | 3 |

Special Agents entitled to receive annualized commissions according to the rules of the Company will be entitled to receive such annualization only on High Band Universal Life premiums paid during the first policy year up to the lesser of the Target or twelve times the special model premium.

Target Premium for High Band Universal Life is the amount of premium that is fully commissionable.
Excess is any premium payment in a given year that exceeds the policy target for that same policy year.

REFER TO PART IV SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

## SCHEDULE OF COMMISSION RATES

**J. Medallion Executive Variable Life Policies:**

| | First Policy Year CPT* % | First Policy Year Excess % | Policy Years 2 - 4 CPT % | Policy Years 2 - 4 Excess % | Policy Years 5 - 10 CPT % | Policy Years 5 - 10 Excess % |
|---|---|---|---|---|---|---|
| Issue ages 20 - 65 | 20 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 15 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 10 | 3 | 6 | 3 | 3 | 3 |

Commissionable Premium Target (CPT) is the amount of premium which is fully commissionable.

Excess premium is any premium payment in a given policy year that exceeds the policy CPT for that same policy year.

*An additional Deferred First Year Commission of 6% will be paid on the lesser of the First Year Aggregate or the first year CPT premium, on the Base Policy in years 2-4.

Trail commissions of .2% will be paid starting at the end of the 5th policy year. Trail commissions are a percent of assets (less loans) at the end of the policy year.

Special Agents entitled to receive annualized commissions according to the rules of the Company will be entitled to receive such annualization only on Medallion Executive Variable Life premiums paid during the first policy year up to the lesser of the CPT or the annualized special modal premium.

**K. Medallion Gold Universal Life Policies (Low Target UL):**

| | First Policy Year CPT % | First Policy Year Excess % | Policy Years 2 - 5 CPT % | Policy Years 2 - 5 Excess % |
|---|---|---|---|---|
| No Reduction for Higher Ages | 45 | 3 | 5 | 3 |

Commissionable Premium Target (CPT) is the amount of premium which is fully commissionable.

Excess premium is any premium payment in a given policy year that exceeds the policy CPT for that same policy year. The date of the receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in default will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice, for a premium due the following year, will receive the rate for the following year.

Special Agents entitled to receive annualized commissions according to the rules of the Company will be entitled to receive such annualization only on Medallion Gold Universal Life premiums paid during the first policy year up to the lesser of the CPT or the annualized special modal premium.

**L. Universal Life Estate Protection Policies:**

| | First Policy Year CPT % | First Policy Year Excess % | Policy Years 2 - 5 CPT % | Policy Years 2 - 5 Excess % | Policy Years 6 - 10 CPT % | Policy Years 6 - 10 Excess % |
|---|---|---|---|---|---|---|
| Issue ages 75 and under | 45 | 3 | 5 | 3 | 3 | 3 |
| Issue ages 76 and over | 40 | 3 | 5 | 3 | 3 | 3 |

Commissionable Premium Target (CPT) is the amount of premium which is fully commissionable.

Excess premium is any premium payment in a given policy year that exceeds the policy CPT for that same policy year. The date of the receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in default will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice, for a premium due the following year, will receive the rate for the following year.

Special Agents entitled to receive annualized commissions according to the rules of the Company will be entitled to receive such annualization only on Universal Life Estate Protection premiums paid during the first policy year up to the lesser of the CPT or the annualized special modal premium.

REFER TO PART IV SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

M. PAYROLL BENEFIT LINE UL):

| No Reduction for Higher Ages | First Policy Year | | Years 2 and Beyond | |
|---|---|---|---|---|
| | Target | Excess | Target | Excess |
| | % | % | % | % |
| | 50 | 3 | 3 | 3 |

## SUPER HEAPED LTC AMENDMENT

It is hereby agreed on this __2ND__ day of __JULY__, __2002__ by and between

__ROBERT D. LYMAN__ (General Agent) and __MARK BRENWALD__ (Special Agent or

Independent Producer) (collectively referred to hereinafter as the "Parties") to amend the Commission Agreement,

Plan __H__, dated __NOVEMBER 1, 1999__ as follows:

1.  Commission Schedule as set forth in the Commission Agreement is amended as follows:
    Long Term Care compensation, as allowed by individual states, will be according to the following schedule:

|  | First Year |
|---|---|
| No Discount | 62.5% |
| 5% sponsored group or family discount | 52.5% |
| 10% sponsored group discount | 42.5% |

No renewals or service fees in subsequent years
Commissions apply to life pay premiums only
For limited pay premiums no commission on the excess
Not available in DE, IN, WI, PA or MI (age 65+)

2.  There will be a chargeback of earned first year commissions on any policy procured under this amendment
    which is lapsed or surrendered according to the following:

**Earned Commission Chargebacks**
(%'s shown are applied to earned first year commission)

Super Heaped Producers

| due date of unpaid premium | Non-Discounted Premiums | | 5% sponsored group or family discount | | 10% sponsored group discount | |
|---|---|---|---|---|---|---|
|  | Agents# | Brokers | Agents# | Brokers | Agents^ | Brokers |
| 1 month after issue | 100% | 28% | 100% | 14% | 100% | 0% |
| 2 months after issue | 100% | 28% | 100% | 14% | 100% | 0% |
| 3 months after issue | 100% | 28% | 100% | 14% | 100% | 0% |
| 4 months after issue | 75% | 28% | 75% | 14% | 75% | 0% |
| 5 months after issue | 60% | 28% | 60% | 14% | 60% | 0% |
| 6 months after issue | 50% | 28% | 50% | 14% | 50% | 0% |
| 7 months after issue | 42.85% | 28% | 42.85% | 14% | 42.85% | 0% |
| 8 months after issue | 37.50% | 28% | 37.50% | 14% | 37.50% | 0% |
| 9 months after issue | 33.33% | 28% | 33.33% | 14% | 33.33% | 0% |
| 10 months after issue | 30% | 28% | 30% | 14% | 30% | 0% |
| 11 months after issue | 28% | 28% | 27.27% | 14% | 27.27% | 0% |
| 12 months after issue | 28% | 28% | 25% | 14% | 25% | 0% |
| 13 months after issue | 22% | 22% | 7% | 7% | 0% | 0% |
| 14 months after issue | 16% | 16% | 0% | 0% | 0% | 0% |
| 15 months after issue | 10% | 10% | 0% | 0% | 0% | 0% |
| 16 months after issue | 4% | 4% | 0% | 0% | 0% | 0% |
| 17 months after issue | 0% | 0% | 0% | 0% | 0% | 0% |

#Contracts issued under this Super Heaped Amendment will not be exempt from earned commission chargebacks. Top producers will be subject to the brokers charge back schedule

^top producers get full exemption

12. The above mentioned Special Agent's Commission Agreement between the General Agent and the Special Agent is to remain in full force and effect as modified by this Amendment.

13. This Amendment shall terminate:

a) Upon termination of the Special Agent's or Independent Producer's Commission Agreement between the parties unless such termination is caused by the execution of a new Commission Agreement between said parties; or

b) Upon written agreement of said parties; or

c) Upon seven days' notice in writing by either party to the other party.

_____
General Agent

_____
Special Agent

# Addendum to Special Agent's Commission Agreement

This Addendum to the Special Agent's Commission Agreement is entered into by and between _MARK BERNHAGEN_ ("Special Agent") and General Agent _ROBERT LYMAN_ ("General Agent") on this _19TH_ day of _NOVEMBER_, 19 99.

In consideration of Special Agent's appointment on _NOVEMBER 1_ 19 99 as a Special Agent for General Agent, I understand and agree to:

✱ 1. Attend the Home Office Career Foundation Workshop within 9 months of appointment. This will not be required for individuals with more than one year previous life insurance sales experience.

✱✱✱ 2. Fulfill my annual training and continuing education requirements as outlined in the Market Conduct Manual and Personal Tracking Booklet (TRNG-1111), and Dearborn Ethics Course;

✱✱ 3. Read and thoroughly understand the John Hancock Market Conduct Manual within 30 days of appointment.

This Addendum incorporates by reference all of the terms of the Special Agent's Commission Agreement between the parties.

Failure to achieve all the foregoing on a timely basis may result in sanctions, including the termination of my Special Agent's Commission Agreement by the General Agent.

✱ I WAS THE CO-CREATOR
OF CAREER FOUNDATIONS
IN 1993 & HAVE ALREADY
ATTENDED NUMEROUS
WORKSHOPS AS REGIONAL
MGR & AGENCY MANAGER
OVER MY TENURE WITH
THE MANAGERIAL DEPT.

_____
Special Agent

_____
General Agent

General Agency
12/98

✱✱ SIGNED OFF " MARKET CONDUCT ACKNOWLEDGMENT
FORM " 8/2/99

✱✱✱ COMPLETED ETHICS COURSE 1995 & WILL UTILIZE
THE VIRTUAL UNIVERSITY TO TRACK CE CREDITS

Ex. G



## John Hancock

### Distributors, Inc.

**BOSTON • MASSACHUSETTS • 02117**

Name _____ Mark R. Bernhagen _____

Agency _____ Fox Valley _____ Ord. Code __229__

Registered Rep. Mutual Fund No. | 1 | 7 | 4 | 1 | 4 |

# Sales Representative's Agreement

CRT UPDATE
DEC 0 9 1992
YANICK "DUCY" ARMANO

RECEIVED
DEC 0 9 1992
NASD LICENSING

## REPRESENTATIVE'S COMMISSIONS
### JOHN HANCOCK MUTUAL FUNDS

### FULL LOAD

John Hancock U.S. Government Guaranteed Mortgages Trust
John Hancock Special Equities Trust
John Hancock Growth Trust
John Hancock Global Trust
John Hancock U.S. Government Securities Trust
John Hancock Bond Trust

### LOW LOAD

John Hancock Tax-Exempt Income Trust
John Hancock High Income Trust
John Hancock Tax-Exempt Series
John Hancock Asset Allocation

The Representative's commission shall be a percentage of the Public Offering Price (net asset value of the shares purchased plus the applicable sales charge) determined in accordance with the table set forth below. Both the Amount Invested and the Public Offering Price used to determine the amount of the Representative's commission shall be determined in accordance with the provision of the current Prospectus for each Fund as it may be amended from time to time. If the sales charge on the purchase is reduced in accordance with the provisions of the Fund's then current Prospectus pertaining to "Methods of Obtaining Reduced Sales Charges", the Representative's commission shall be reduced in the same proportion. In all cases commissions are subject to the provisions outlined in Sections 7, 8, 9 and 10 of this Agreement.

### REPRESENTATIVE'S COMMISSION AS PERCENTAGE OF PUBLIC OFFERING PRICE[*]

| AMOUNT INVESTED | J.H. MUTUAL FUNDS LOW LOAD | | J.H. MUTUAL FUNDS FULL LOAD | |
|---|---|---|---|---|
| | HALF RATE | REGULAR | HALF RATE | REGULAR |
| Less than $10,000 | 1.69% | 2.23% | 3.00% | 4.00% |
| $10,000 but less than $25,000 | 1.69% | 2.23% | 2.75% | 3.65% |
| $25,000 but less than $50,000 | 1.60% | 2.21% | 2.22 | 2.94% |
| $50,000 but less than $100,000 | 1.42% | 1.88% | 1.69% | 2.23% |
| $100,000 but less than $250,000 | 1.16% | 1.53% | 1.25% | 1.64% |
| $250,000 but less than $500,000 | 0.98% | 1.29% | 0.90% | 1.18% |
| $500,000 but less than $1,000,000 | 0.71% | 0.94% | 0.71% | 0.94% |
| $1,000,000 but less than $3,000,000 | 0.36% | 0.47% | 0.44% | 0.59% |
| $3,000,000 but less than $5,000,000 | 0.36% | 0.47% | 0.17% | 0.23% |
| $5,000,000 and over | 0.36% | 0.47% | 0.08% | 0.11% |

[*] The prospectuses of certain of the above-listed John Hancock Mutual Funds state that when funds used to purchase shares are derived from death claims and matured endowments of fixed dollar insurance policies issued by John Hancock Mutual Life Insurance Company, the sales charge is at one-half the rate otherwise applicable for the first 60 days after the date of the check in payment of such insurance. In that event, the Representative's commission shall be determined in accordance with the "Half-Rate" table provided above. All other commissions shall be determined as previously stated, using the "Regular" table.
No commission will be paid on sales of John Hancock Cash Management Trust or any John Hancock Mutual Fund that is without a sales charge.

### LIMITED PARTNERSHIPS

The Representative's commission on limited partnerships sponsored by one of the affiliate John Hancock companies shall generally be 4%. The commission to representatives on products sponsored by other companies which have a selling agreement with John Hancock Distributors, Inc., shall generally be 3 1/2% In the event the gross commission payable to John Hancock Distributors, Inc. is reduced based on volume discounts the representative's commission will be reduced proportionately.

### UNIT INVESTMENT, BROKERAGE SERVICES, NON-JOHN HANCOCK MUTUAL FUNDS, AND OTHER SECURITIES

Distributor has currently and may from time to time enter into selling agreements with other securities sponsors. Commission schedules for sales of these securities may vary, and such schedules will be provided upon the request of the Representative.

JHD-8 8/89

# JOHN HANCOCK DISTRIBUTORS, INC.

## SALES REPRESENTATIVE'S AGREEMENT

John Hancock Distributors, Inc., a Delaware corporation with its Home Office in Boston, Massachusetts, hereinafter called "Distributor", and ___Mark R. Bernhagen___ currently of ___Lisle, IL___, hereinafter called "Representative", in consideration of the terms and conditions set forth in this Agreement or otherwise made a part thereof, do mutually agree as follows:

**1. AUTHORIZATION.** Distributor hereby authorizes Representative as an independent contractor to solicit applications for the purchase of securities which Distributor is authorized to offer for sale. Such solicitations shall be made only within the territory in which such securities are registered and qualified for sale and in which Distributor and Representative are qualified to do business in accordance with licensing requirements and other applicable federal and state laws or regulations. Representative is not authorized to act for Distributor in the acceptance of any application for purchase of securities; rather, applications shall be accepted only by Distributor at its Home Office in Boston, Massachusetts.

**2. RELATIONSHIP.** The relationship of Representative to Distributor is that of an independent contractor and nothing contained herein shall be construed to create an employer and employee relationship between Representative and Distributor nor between Representative and any issuer of securities. Representative shall be free to exercise his/her own judgement as to the persons whom he/she shall solicit as well as the time, place, manner and means of such solicitation, and as to the procuring and remission of applications and payment, and as to all other transactions and activities engaged in by Representative, so long as his/her actions are consistent with the provisions of this Agreement, the provisions of the security offering, and any applicable state and federal laws or administrative regulations. Distributor shall not pay to Representative any expenses or compensation whatsoever except as provided in Sections 7, 8 and 9 of this Agreement. Representative shall not represent or accept any payments from any other securities broker or dealer, directly or indirectly, while this Agreement is in effect without prior written approval of Distributor.

Representative also agrees to notify Distributor in writing in the event Representative contemplates entering into a private securities transaction as defined in Section 40 of the National Association of Securities Dealers, Inc., hereinafter called "NASD", Rules of Fair Practice. Distributor will have an opportunity to notify Representative that Distributor approves or disapproves of the private securities transaction prior to Representative's participation in such transaction. Furthermore, in the event Distributor disapproves of the transaction, the Representative shall not participate in the transaction in any manner, directly or indirectly.

Representative also agrees to comply with and be bound by the continuing education requirements imposed by Distributor including, but not limited to, attendance at training and compliance related seminars.

**3. REMISSION OF MUTUAL FUNDS, UNIT INVESTMENT TRUSTS, LIMITED PARTNERSHIPS OR OTHER APPLICATIONS.** Representative shall remit to the transfer agent (or to Distributor when directed by Distributor to do so), immediately upon receipt, the investment application, the new account form and full payment in the form of the customer's personal check, a bank cashier's check or a money order payable to the custodian bank, fund, trust or escrow agent for securities to be purchased. Representative shall not accept any other form of payment for securities sold, including cash, tendered by a customer. Representative shall comply with all procedures established by Distributor in connection with the handling and remission of applications. Distributor and the issuer of the security shall have the right to refuse any application at their discretion.

account card to establish account. Under no circumstances should Representative hold funds or securities on behalf of the investor.

**5. SHAREHOLDER INQUIRIES.** Representative shall immediately refer all customer inquiries and correspondence from mutual fund shareholders and planholders regarding accounts to the transfer agent or investment company about which inquiry is made. Representative shall immediately refer all limited partnership security holder inquiries to the appropriate general partner or trustee of the investment. Representative shall immediately refer all other inquiries and correspondence from customer regarding accounts to Customer Account Services.

**6. RULES AND REGULATIONS.** (a) Representative shall remain familiar with and abide by all rules, regulations and requirements of applicable state and federal law and state and federal regulatory bodies, including particularly the Securities and Exchange Commission and the NASD; (b) Representative shall make no representations concerning the securities offered for sale by Distributor except such as are contained in current prospectus or private placement memorandums and authorized supplementary sales literature made available by Distributor; (c) Representative shall not solicit business through mailing, advertisement or any other media except by the use of authorized sales literature made available by Distributor; (d) All books, documents, prospectuses, private placement memorandums, application forms, customer records, transaction records, correspondence files or other materials or supplies in the possession of Representative that pertain to the business of Distributor shall be the property of Distributor, at any and all times shall be open to inspection by any duly authorized Representative of Distributor and at the termination of this Agreement shall be immediately returned to Distributor; (e) Representative understands that failure to comply with all rules, regulations and requirements of applicable state and federal law may result in disciplinary action against Representative by the NASD and by any governmental authorities having jurisdiction and such failure may result in a fine by Distributor and suspension by Distributor of Representative's authority to represent it or the termination of this Agreement by Distributor; (f) Representative shall immediately inform Distributor as to any change of address, and civil suit, action or litigation commenced against him/her, any formal criminal complaints made against him/her, any arrests other than for minor traffic violations where the fine is less than $50, any disciplinary action taken against him/her by any regulatory agency, or any customer complaints about securities purchased from Representative.

**7. MUTUAL FUND, UNIT INVESTMENT TRUSTS, LIMITED PARTNERSHIPS AND OTHER COMMISSIONS.** Distributor shall pay a commission to Representative subject to the provisions of this Agreement and on all purchases made by a customer pursuant to an application accepted by Distributor and the issuer according to the provisions of Section 3 of this Agreement (a) where an application is personally obtained and remitted by Representative or (b) where an application is not personally obtained and remitted by Representative but a purchase is added to an existing shareholder account and Representative continues to be recognized by such customer as the Representative servicing his account. Under no circumstances will Distributor be obligated to pay Representative more than fifty percent of the gross commissions received by Distributor from the sale of any security which Distributor is authorized to sell.

**8. BROKERAGE COMMISSIONS.** Distributor shall pay a commission to Representative subject to the provisions of this Agreement on all purchases and sales made to a customer pursuant to an order resulting in a trade by Distributors' brokerage affiliate according to the provisions of Section 4 of this Agreement (a) where an order is personally obtained and remitted by Representative or (b) where an order is not personally obtained and remitted by Representative but that purchase or sale is transacted in an existing shareholder account and Representative continues to be recognized by such customer as the Representative servicing his account. Under no circumstances will Distributor be obligated to pay Representative more than fifty percent of the gross commissions received by Distributor from Distributor's brokerage affiliate with respect to the purchase or sale of any security.

**9. PAYMENT OF COMMISSIONS.** The amount of said commission shall be determined in accordance with Distributor's "Schedule of Representative's Commissions" in effect when the shares of securities purchased are issued by the investment company, such Schedule of Representative's Commissions" currently in effect being attached hereto. The "Schedule of Representative's Commissions" shall be subject to change by Distributor at any time without notice, but no such change shall affect commissions payable with respect to securities sold prior to the effective date of such change. Commissions shall be paid to Representative only so long as Representative shall remain a duly licensed Representative of Distributor. Furthermore, commissions shall be paid for sales made by Representative who is duly licensed at the time the sale is made. Commissions payable under this Agreement shall be paid to Representative not less frequently than monthly; provided, however, if the total amount of commissions payable to Representative in any calendar month shall be less than $20.00, then such commissions may be held for Representative's account until accumulated with other commissions, if any, hereafter accruing until a month in which the aggregate commissions equal at least $20.00. Notwithstanding the foregoing, commissions shall be payable to Representative only to the extent that gross commissions are received and in the possession of Distributor. In the event Distributor is legally prevented from offering for sale any or all securities or from receiving further payment on any or all securities sold, Representative agrees that Distributor shall not be liable to him for any expenses, damages or costs resulting therefrom or for any commissions on such securities which would or may have otherwise become payable to him under this Agreement. Distributor reserves the right to at any time and from time to time in its discretion to cease to offer shares of certain or all securities, in which event Distributor shall not be liable to Representative for any expenses, damages, costs or subsequently accruing commissions whatsoever.

**10. COMMISSION FORFEITURE.** If for any reason any purchase transaction is reversed, Representative shall lose all right to commissions on such purchase and shall pay to Distributor on demand the full amount received by him on account thereof. Distributor may withhold and retain from any commission due Representative a sum sufficient to discharge any debt due from Representative to Distributor. Representative understands that commission may or may not be paid in the event that an investor receives distributions from a limited partnership or real estate investment trust and elects reinvestment of those funds in the same limited partnership or real estate investment trust or subsequent program from the same sponsor, depending upon the program.

**11. TERMS OF AGREEMENT.** This Agreement shall remain in full force and effect until terminated by written notice by the Representative or Distributor. This Agreement will be immediately terminated (unless Representative is otherwise notified by Distributor) in the event that the Representative should cease to be associated with a General Agent or Agency Manager of John Hancock Mutual Life Insurance Company, or if he/she should breach any of the provisions of this Agreement (including, without limitation, failure to comply with applicable securities laws or Distributor supervisory rules), or in the event that his/her NASD registration with Distributor or qualification under any state securities law should be terminated. Any notice of termination by Distributor to the Representative shall be sent to the residence address designated in his/her NASD application which shall be kept current at all times by the Representative. Temporary suspension of a Representative's right to act as a representative of John Hancock Mutual Life Insurance Company during a labor dispute shall not operate as a termination or suspension of this Agreement. If Representative terminates this Agreement by written notice to Distributor, Representative shall concurrently submit to the NASD a resignation in writing addressed to the NASD Board of Governors as required by the NASD By-laws. This Agreement shall automatically terminate upon the death of Representative.

**12. INDEMNIFICATION.** Representative agrees to indemnify Distributor in the event of any claim, suit, judgement or any liability whatsoever which may be imputed to Distributor as a result of any act or omission or any negligent, willful, intentional, fraudulent or criminal act by Representative, or any violation of federal and state securities laws or Rules of Fair Practice of the NASD, which may result from the sale of any security by Representative during the term of this Agreement or after termination. Representative agrees to cooperate fully with Distributor and not impede or hinder any of Distributor's responsibilities to supervise Representative as mandated in Section 27 of the NASD Rules of Fair Practice. Furthermore, Representative agrees not to conceal from Distributor any securities sales activities whether authorized by Distributor or not, and agrees to fully inform Distributor of any securities sales on behalf of customers.

**13. MISCELLANEOUS.** This Agreement supersedes all previous agreements, oral or written, between the parties hereto, and may be amended by written notice to Representative by Distributor at any time.

**14.** The invalidity of unenforceability of any provisions hereof shall in no way affect the validity or enforceability of any other provision of this Agreement.

**15.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

IN WITNESS WHEREOF, the parties hereto on behalf of themselves, their heirs and assigns have made and executed this Agreement in duplicate as a sealed instrument on ___ 12/3 ___ 19__.

by _____
          Representative

Rep. # 17 414

John Hancock Distributors, Inc.

by _____
          President

JHD-9 Ed 8/89

Ex. H

SIGNATOR SELECT
COMMISSION AGREEMENT

PLAN R-SIGNATOR SELECT

THIS AGREEMENT made at _Schaumburg, IL_ this _1ST_ day of _January_ _2002_

between _Robert D. Lyman_ General Agent at _Chicago 500_ , hereinafter called General Agent,

and _Keith B. Mooney_ of _Chicago 500_ hereinafter called Producer.

The provisions hereinafter set forth, and the Schedule of Commission Rates herein incorporated by reference, are hereby made a part of this contract.

The Territory referred to in the General Contract Provisions Section 2, shall be the territory assigned to the General Agent.

The beneficiary referred to in the General Contract Provisions Section 6, shall be:

_Loci Lynn Mooney Spouse_

(State full name and relationship. Only one beneficiary, and no contingent beneficiary may be named.)

_____
General Agent

_Keith Mooney_
Producer

SIGNATOR SELECT COMMISSION AGREEMENT
GENERAL CONTRACT PROVISIONS

SIGNATOR SELECT May 2001

SIGNATOR SELECT COMMISSION AGREEMENT
GENERAL CONTRACT PROVISIONS

1. General Agent, acting in General Agent's own right, hereby appoints Producer to procure applications for insurance and annuities made available through Signator Insurance Agency Inc. and affiliated companies, hereafter called the Company or Signator, such applications to be acceptable to the Company.

Signator is an insurance agency licensed and appointed to sell insurance products issued by John Hancock Life Insurance Company and its insurance affiliates and other Company approved unaffiliated insurance and annuity companies.

Unless otherwise noted the Insurance Products mentioned throughout this agreement refer to products issued by John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company.

2. Nothing herein contained shall be construed to create the relation of employer and employee between the parties hereto or between either of them and the Company. Within the territory of the General Agent, Producer shall, in common with others, be free to exercise judgment as to the persons from whom applications for insurance and annuities will be solicited and the time and place of solicitation, but the Company may from time to time prescribe rules and regulations under which it will accept applications and handle matters incidental to its business, not interfering with such freedom of action of Producer, which rules and regulations shall be observed and conformed to by Producer.

3. Producer shall act in full accordance with all laws and lawful regulations applicable to the business contemplated herein.

4. The First Year Commission Standard (FYCS), as well as the percentages used to proportion first year commission credits for a calendar year referred to in this agreement will be established annually. In January of each year General Agent shall inform Producer of the amount of the FYCS for that calendar year. For the purpose of this agreement the calendar year which shall be determined annually by the Company will extend from approximately the first Monday of January to approximately the last Friday of December.

5. For purposes of meeting the respective requirement in this agreement the five-year lives lapse rate shall be determined by dividing the total number of Traditional Life, Estate Protection, Flexible Variable, Variable Estate Protection, Medallion Variable Life, Medallion Gold Universal Life, and Universal Life policies lapsed during the calendar year on which less than five years' premiums have been paid by, average number of in-force Traditional Life, Estate Protection, Flexible Variable, Medallion Variable Life, Variable Estate Protection, and Universal Life policies on which less than five years' premiums have been paid plus total number of Traditional Life, Estate Protection, Flexible Variable, and Universal Life policies issued during the calendar year. Average number of policies in-force will be calculated by the addition of the number of policies in-force each month during the previous twelve months divided by 12. Universal Life, Medallion Variable Life, Medallion Gold Universal Life, and Variable Estate Protection policies on which premium payments during first policy year exceed 200% of target premium will be excluded from lapse rate calculation. A policy shall be considered to be lapsed within the first five policy years if premiums are not paid to the fifth policy anniversary at the time of lapse and, in the case of a surrendered policy, the surrender transaction occurs prior to the fifth policy anniversary date. Term Insurance and Payroll Benefit Life (UL) are excluded entirely from the lapse rate calculation.

6. Any commissions due Producer upon death, or falling due thereafter under this or any prior commission agreement between the parties or between Producer and any other General Agent of the Company, shall be paid to the beneficiary designated on the endorsement page of this contract as revocable payee, if such person survives Producer, otherwise or if no person is named as payee of any such commissions, they shall be paid to Producer's legal representatives, subject to the deduction of any indebtedness of Producer to the General Agent. The payment of any such commissions to the payee named in or under this provision shall fully discharge all liability of the General Agent with respect to such commissions. Producer may from time to time change the payee under this provision by a notice in writing filed with the General Agent.

This Agreement may, subject to Section 13, be assigned or terminated by mutual agreement of the parties, or terminated by either party under Section 17, without notice to or consent of any payee nominated in or under this Section.

7. This agreement shall terminate on the thirty-first day of January next succeeding a full calendar year under this agreement in which the Producer has not been credited, according to the rules of the Company, with an amount of first year commission, which equals or exceeds one hundred percent (100%) of the annually established FYCS. For the purpose of meeting this requirement, the annually proportioned percentages of first year commission used will be those credited during the calendar year to producer from all Life, annuity and long term care products of the John Hancock Variable Life Insurance Company and John Hancock Life Insurance Company; products of Signator Investors, Inc. and products of John Hancock Networking Insurance Agency.

8. If the General Agency contract between the undersigned General Agent and Signator Insurance Agency Inc. shall be terminated for any cause, this agreement shall also terminate without notice; and in such case the General Agent hereby authorizes said Company to pay Producer or Producer's legal representatives commissions which become due and payable subsequent to the effective date of General Agents termination, in accordance with the terms hereof, and to deduct any amount so paid from any monies then or thereafter due to the General Agent or General Agent's legal representative.

9. Any payment by General Agent of any commissions not required by this agreement, shall not in any way waive, extend, or modify any of its provisions.

10. General Agent may withhold and retain from any payments due Producer a sum sufficient to discharge any debt, or to repay the balance of any advance due from the Producer to General Agent, or any legal expense in connection with any third party action.

-1-

11. If the Company shall for any reason refund any premium, the Producer shall lose all right to commissions, and service fees on such premium, and pay to the General Agent the full amount received on account thereof. If the General Agent, for any reason, pays to the Producer a commission or service fee, in advance of the payment of the premium and the premium is not subsequently collected from the policyowner, the Producer shall repay such amount(s) to the General Agent. The General Agent shall, in lieu of the right to repayment provided hereunder, have the right to offset against any other payment due or which becomes due the Producer, the commission or service fee paid to the Producer on premiums which the Company shall for any reason refund or which are not subsequently collected from the policyowners. The amount of such offset will be subject to adjustment according to the rate of commission or service fee which would be payable to the Producer on such premiums at the time the right to offset is exercised.

In the event of and subsequent to the termination of the General Agent's contract between the Company and the General Agent, the Company shall succeed to the rights of the General Agent provided under this section.

12. Producer agrees to hold in trust for General Agent any premiums which may be received or collected, and to account for and to pay them over promptly to General Agent.

13. No assignment of this agreement or of commissions hereunder may be made by Producer without the consent in writing of the General Agent.

14. All books, cards, registers, documents, and other papers at any time in the possession of Producer that pertain to the business of General Agent, shall be the property of General Agent and shall be at any and all times open to inspection by General Agent or by any duly authorized representative of the Company; and at the termination of this agreement they shall be turned over to General Agent.

15. Fraud, misappropriation, or withholding of funds by Producer shall terminate this agreement forthwith, and thereafter no commission shall be payable to Producer.

16. Producer shall reimburse General Agent for all medical fees for examinations paid on applications secured by or through Producer on risks prohibited by the Company, and for all medical fees for examinations made at the request of Producer by any physician not appointed as an examiner by the Company.

17. This agreement cancels and supersedes all previous commission agreements entered into between the parties hereto provided that the commissions heretofore payable to Producer in accordance with the terms of any previous agreement, to the extent that they have not been fully discharged at the date hereof, shall be due and payable as though said previous agreement had not been cancelled. Further, this agreement shall be terminated by the death of either party hereto and may be terminated at will, with or without cause, by either of them on seven days' notice in writing to that effect sent to the last known best office address of the other party, unless otherwise terminated by other conditions herein contained.

For a period of two years following the termination of Producer, Producer shall not directly or indirectly contact policyholder(s) or contractholder(s) who purchased their policy(ies) or contract(s) through Producer, for the purpose of inducing or attempting to induce such policyholder(s) or contractholder(s) to cancel, lapse or fail to renew such policyholder's or contractholder's policy(ies) or contract(s) with the Company. Violation of this provision may be enjoined by any legal means available to the General Agent. The General Agent shall be entitled to recover from the other party all costs and expenses incurred in connection with such litigation including all attorney's fees.

For purposes of this Article the term Company shall include Signator Insurance Agency, Inc. and its subsidiary companies whether currently in existence or subsequently established or acquired after the effective date of this agreement.

18. Producer shall have no power or authority other than as herein expressly granted, and no other or greater power or authority shall be implied from the grant or denial of power or authority specifically mentioned herein.

Nothing herein shall require General Agent to provide an office or office equipment for Producer.

19. INSURANCE MARKETPLACE STANDARDS ASSOCIATION - IMSA
The Producer hereby agrees to comply with (I) all applicable laws and regulations in the solicitation and sale of the Company's products, and (II) all of the policies and procedures set forth in the John Hancock Market Conduct Manual (the Manual), as it may be amended from time to time, which will be provided to the Producer by the General Agent.

20. ARBITRATION
Any controversy or claim arising out of or relating to this contract or the breach, termination or validity thereof, shall be settled by arbitration in accordance with the Model Employment Arbitration Procedures of the American Arbitration Association before an arbitrator who is licensed to practice law in the state in which the arbitration is convened and who shall apply the substantive law (and the law or remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claims asserted. Such arbitration shall be the sole and exclusive procedure for the resolution of disputes arising out of or relating to this contract or the breach, termination or validity thereof and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. Written notice of any claim under this provision must be given to the party or entity against which relief is sought within one (1) year of the date the claimant first has knowledge of the event giving rise to the claim; otherwise the claim shall be void and deemed waived even if there is a federal or state statute of limitations which would have given more time to pursue the claim.

21. If the Producer becomes associated with the National Association of Securities Dealers, Inc. (NASD), Producer may only be registered therewith on behalf of Signator Investors Inc. (SII). Should the Producer become registered with the NASD on behalf of another Broker Dealer this agreement shall terminate effective with that registration.

SIGNATOR SELECT May 2001

PART I   GENERAL COMPENSATION PROVISIONS

1. The General Agent will allow the Producer, and Producer hereby agrees to accept as full compensation, commissions and service fees at the rates shown in the agreement, as hereinafter set forth, subject to the provisions of this agreement, upon premiums or installments thereof, paid on policies issued on applications procured under this agreement, and other compensation as provided for in the Schedule of Commission Rates (except where individual states have regulated differently).

Commissions will be due and payable at such time as the premiums have been collected and paid over to the General Agent or the Company and the commissions have been authorized according to the normal accounting procedure of the Company subsequent to the anniversary date of the policy on which the premium would have been payable.

2. If at the time of termination the Producer had been under one or more Signator Select Commission Agreements with one or more General Agents of the Company for an aggregate period of at least two (2) years, renewal commissions on: Traditional Life, Estate Protection, Universal Life, Flexible Variable Life, Medallion Variable Life, Medallion Gold, Long Term Care and Variable Estate Protection; the products of John Hancock Life Insurance Co. and John Hancock Variable Life Insurance Co.; and Provident Disability Income obtained through John Hancock Networking Insurance Agency, shall be allowed after such termination.

Any aggregate period Producer was previously under a Special Agent's Whole Time Commission Agreement with one or more General Agents of the Company will be credited to satisfy the two (2) year requirement set forth above.

At the time of termination any aggregate period Producer was under a Signator Select Commission Agreement with one or more General Agents of the Company, will be credited towards satisfying the respective length of contract provision(s) required to continue the payment of commission(s) in accordance with the terms of the Special Agent's Commission Agreement which was cancelled and superceded by the execution of a Signator Select Commission Agreement.

Annuity commissions will be allowed after termination of this agreement provided the Producer simultaneously with the termination of this agreement executes another Signator Select or Independent Producer's Commission Agreement with a General Agent.

3. Should the rates of commission provided in the contract of General Agent with the Company be reduced at any time, the General Agent reserves the right to change the rates of commission paid to Producer hereunder, on business produced on or after date of said change. Should the provisions for the payment of asset fees, or service fees provided in the contract of General Agent with the Company be changed at any time, the General Agent reserves the right to change the provisions for the payment of asset, or service fees to Producer.

4. Commissions, if any, on policy exchanges to other forms; on policies which in the judgment of the Company are to take the place of other insurance; on policies changed by means of a rider; on business secured on special rate quotations; on policies issued on a simplified underwriting basis, and on forms of policies not mentioned herein are to be established by the General Agent within the Company's regulations.

No commission will be paid on any allowances or premium discounts which result from policy conversions.

5. On conversion of a Group Certificate to a permanent form of life insurance, the first year commission on the converted policy will be 10% of the premium. On those forms of policies where the first year commission is at the rate of 10% or less, the first year commission will be one half of the rate otherwise applicable to such issue. No renewal commission will be allowed on a policy converted from a Group Certificate.

6. Commissions on Ratings and Sub-Standard Premiums:

A. Life Insurance:

|  | Through Class "MC" | Above Class "MC" | Permanent Dollar | Temporary Dollar |
|---|---|---|---|---|
| Traditional | Full Rate | None | Full Rate | None |
| Estate Protection | Full Rate | Full Rate | None | None |
| Flexible Variable and Universal Life | Paid at *MCRP Rate | Paid at Excess Rate | Paid at *MCRP Rate | Paid at Excess Rate |
| Variable Estate Protection | Full rate is paid up to Target Premium | | | |
| Medallion Variable Life | Full commission is paid up to the Commissionable Premium Target (CPT) | | | |
| Medallion Executive Variable Life | Full Commission is paid up to the Commissionable Premium Target (CPT) | | | |
| Medallion Gold Universal Life | Full Commission is paid up to the Commissionable Premium Target (CPT) | | | |
| Universal Life Estate Protection | Full Commission is paid up to the Commissionable Premium Target (CPT) | | | |
| High Band Universal Life | Full Commission is paid up to the Commissionable Premium Target (CPT) | | | |

* MCRP Maximum Commission Rate Premium

6. Long Term Care Substandard: Substandard commissions on LTC policies will be paid at regular rates, in accordance with the schedule of commission rates, on premiums up to and including 150% of standard (no commission will be paid on premiums in excess of 150% of the standard premium).

7. Upon payment of premiums on Mod Plus Policies no additional first year commissions will be allowed on the increase in premium if any, for the sixth policy year. Renewal commissions will be paid on the original premium for the second through the fifth policy years at the regular rate when collected and paid over to the Company.

8. No commissions will be allowed on premium waived under the waiver of premium clause for Long Term Care, Medallion Variable Life or Universal Life Policies. Full commissions (less commission on waiver of premium riders) will be allowed on premiums waived under the waiver of premium clause for Traditional Life, Estate Protection, and Flexible Variable Life Policies.

9. Policies and contracts procured through this Agreement which replace existing policies and contracts will result in reduced commissions or a chargeback of commissions in accordance with the rules in Part III Special Commission Provisions.

10. SUPPLEMENTARY BENEFIT PROVISIONS

   a. Children's Insurance Benefit Provision, Initial Term.

      When any such provision is attached to a policy, a first year commission will be paid on the premium applicable to such a provision at the same rate as is applicable to the regular premium on the policy.

      Commissions on renewal premiums paid under any of the above provisions will be paid for the full renewal commission period at the same rates as are payable to Producer under the regular premiums of the policy to which it is attached or at the rates that would be payable to Producer had Producer procured the application upon which said policy was issued.

   b. Disability Benefit Provision, Accidental Death Benefit Provision, Applicant Waiver of Premium Benefit, or Insurance of Insurability Benefit Provision.

      When any such provision is attached to a policy at issue or added thereto during the first policy year, a first year commission will be payable to Producer at the same rate as is payable on the regular premium of the policy or rider to which it is attached. When any such benefit provision is added to a policy or rider after the first policy year, no first year commission will be paid; but renewal commissions on such provision will be at the same rates as are payable to Producer under the provisions of this Agreement on premiums on policies or riders of the type to which the benefit provision is attached. Renewal commissions will be paid to the end of the regular renewal commission period provided for such policies or riders under the provisions of this Agreement.

   c. Paid Up Insurance (PUI) Benefit Provision.

      When any such provision is attached to a policy at issue or added thereto during the first policy year, a first year commission will be payable. Renewal commissions will be paid to the end of the regular renewal commission period provided for such policies.

      Lump sum payments will generate commissions, at first year rates for payments made during the first policy year. Lump sum payments will be considered as renewal commissions if paid beyond the first policy year.

   d. Additional Insurance Protection Rider.

      When any such provision is attached to a policy at issue, a first year commission will be payable.

      Lump sum payments will generate commissions, at first year rates for payments made during the first policy year. Lump sum payments will be considered as renewal commissions if paid beyond the first policy year.

   e. Inflation Option Rider to increase benefits on Long Term Care.

      First year commissions are paid on resulting increase in policy premium, in the year benefit is added. Renewal commissions on renewal premiums will be paid for the full renewal commission period at the same rates and for the same duration as are payable under the regular premiums of the policy to which it is attached (if the base policy commission paying period has ended then no renewal commission will be paid).



-4-

PART II SERVICE FEES

If the Producer qualifies for payment of service fees, they will be due and payable at such time as the premiums upon which such service fees are based have been collected and paid over to the General Agent or the Company and the service fees have been authorized according to the normal accounting procedure of the Company. Service fees on premiums paid in advance will not be due and payable until authorized, according to the normal accounting procedure of the Company, subsequent to the anniversary date of the policy on which the premium would have been payable. Service fees shall be payable only so long as a Signator Select Commission Agreement between the Producer and the General Agent is in effect at the time of each payment. However, if at the time of termination the Producer has been continuously under a Signator Select Commission Agreement and any "H" or "R" Special Agent's Commission Agreement (Whole Time) with one or more General Agents of the Company for an aggregate period of ten or more years, and is age 55 or older, Service fees will continue to be paid on a life long basis to the Producer. Should the provisions for the payment of service fees in the contract of the General Agent with the Company be changed at any time, the General Agent reserves the right to change the provisions for the payment of service fees to Producer hereunder.

Non-transferable service fees will be paid to the Producer on an account year basis commencing with approximately the first Monday in February and continuing through the approximately the last Friday of January in the subsequent year on premiums paid during that period, unless previously discontinued by the Company, provided the Producer had in force at all times during the full calendar year immediately preceding the account year in which any such service fees become payable a Producer's Commission Agreement with the General Agent or any other General Agent of the Company and provided the Producer has been credited with an amount of first year commission which equals or exceeds one hundred percent (100%) of the FYCS for such preceding year in accordance with the rules of the Company. For the purpose of meeting this requirement, the annually proportioned percentages of first year commission used will be those credited during the calendar year to producer from all life, fixed annuity and long term care products of the John Hancock Variable Life Insurance Company and John Hancock Life Insurance Company.

The service fee shall be computed at the end of the commission paying period on the products of John Hancock Life Insurance Co. and John Hancock Variable Life Insurance Co. at the rate of 2% of premiums on Traditional Life, Estate Protection (exclusive of Employee Insurance, conversions from Group and Employee Insurance and exchanges from Group Permanent Insurance), Provident Disability Income obtained through John Hancock Networking Insurance Agency, and Long Term Care premium paying policies, which policies have been in force ten (10) or more years. Service fees shall be computed at the rate of 3% of premiums on Flexible Variable Life, Medallion Variable Life, and Variable Estate Protection, which policies have been in force for ten years or more.

If the Producer has been continuously under one or more Signator Select Agreements and any "H" or "R" Special Agent's Commission Agreements with one or more General Agents of the Company for at least eleven (11) years and has qualified for the payment of service fees, then any service fees payable on Traditional Life, Estate Protection, Provident Disability Income obtained through John Hancock Networking Insurance Agency, and Long Term Care premium paying policies under the provisions stated above shall be payable at the rates provided in the following table:

| Years of Continuous Service At Least | Service Fee Rate Traditional Life, Estate Protection, Provident Disability Income and Long Term Care |
|---|---|
| 11 | 2.1% |
| 12 | 2.2% |
| 13 | 2.3% |
| 14 | 2.4% |
| 15 | 2.5% |
| 16 | 2.6% |
| 17 | 2.7% |
| 18 | 2.8% |
| 19 | 2.9% |
| 20 | 3.0% |

Service fees are not paid on Universal Life Insurance or Annuities.

PART III    SPECIAL COMMISSION PROVISIONS

- REPLACEMENTS

Following replacement rules are applicable unless modified by subsequent state regulation establishing different rules.  In that event the rules required by the respective State will be applied.

See Part III, Section D for exceptions to the following replacement rules:

A. DEFINITIONS

The following definitions will determine whether or not a policy or contract transaction qualifies as a replacement:

1. Termination Date:
   a. Lapse:  Due date of unpaid premium.
   b. Surrender:  Date of surrender check.
   c. Transfer of all values to new product:  Date the company processes transfer.

2. Replacement Period:

   a. Basic Replacement Period for Life Insurance Policies and Annuity Contracts:  Period commencing 180 days prior to and ending 360 days after date of new policy; which date will be established as follows:

                          Date of New Policy

      Life Insurance Policy       Date written (date application is approved for issue).
      Annuity Contract            Date premium is received and processed in accordance with normal accounting
                                  procedures of the company.

   b. Extended Replacement Period for Life Insurance Policies and Annuity Contracts:  Period extending from 361 days to 720 days after the date of new policy.  This period is an expansion of the basic replacement period and is activated when a loan is taken on the replaced policy during the basic replacement period.

   c. Long Term Care Replacement Period:  Period commencing 180 days prior to and ending 180 days after the issue date of the new Long Term Care policy.

3. Replaced Premium:

   a. When a Life Insurance policy replaces a Life Insurance policy, or a Long Term Care policy replaces a Long Term Care policy the replaced premium will be the amount of the annual premium of the policy replaced.

   b. When a Life Insurance policy is replaced by an Annuity contract the replaced premium will be the cash value and loans taken during the replacement period from the Life Insurance policy which terminate during the replacement period.

   c. When an Annuity contract is replaced by an Annuity contract the replaced premium will be the total of all withdrawals, surrenders and loans from the replaced contract.

   d. When an Annuity contract is replaced by a Life Insurance policy the replaced premium will be the total of all withdrawals, surrenders, and loans, from the replaced contract taken during the replacement period.

   e. For Variable Estate Protection and Estate Protection the replacement premium is defined as the total annual premium associated with the life policies on either of the two insureds which terminate during the replacement period of the new policy.

4. Admitted Replacement:  Policy will be considered an admitted replacement if application for new insurance or contract indicates that it is intended to replace an existing John Hancock policy or contract and any State required replacement forms accompany new application.

SIGNATOR SELECT May 2001

E. COMMISSIONS ON LIFE INSURANCE AND ANNUITY REPLACEMENTS

If the termination date of a replaced policy or contract falls within the Basic or Extended Replacement Period, a commission on the new policy or contract on the same life, will be paid as follows:

1. Admitted Replacements:

   a. First Year Commission:

      1) Life replacing Life or Annuity replacing Life:

         a) If a replaced policy has been in-force more than three years, one half (1/2) of the first year commission, as specified in the Schedule of Commission Rates, will be paid on replaced premium.

         b) If a replaced policy has been in-force three years or less, one quarter (1/4) of the first year commission, as specified in the Schedule of Commission Rates, will be paid on replaced premium.

         First year commission will be paid at the rate specified in the Schedule of Commission Rates on any premium amount for the replacing policy or contract in excess of the replaced premium.

      2) Life Insurance policy replacing Annuity contract:

         Commissions will be paid on the replaced Annuity premium at the rate of 3% less than the rate specified in the Schedule of Commission Rates on the base life policy premium.

      3) Annuity replacing Annuity:

         One-half the first year commission, as specified in the Schedule of Commission Rates, will be paid on the replaced premium.

   b. Renewal Commissions:

      Full renewal rates will be paid on all renewal premiums paid on Life Insurance policies made subsequent to the first policy anniversary as provided for in the Schedule of Commission Rates.

2. Non admitted replacements:

   a. First Year Commissions:

      1) If a Replaced policy terminates during the basic replacement period, no first year commission will be paid on replaced premium.

      2) If a Replaced policy terminates during the extended replacement period, one-half (1/2) first year commission, as specified in the Schedule of Commission Rates, will be paid on replaced premium.

      First year commission will be paid at the rate specified in the Schedule of Commission Rates on any premium amount for the replacing policy or contract over the replaced premium.

   b. Renewal Commissions:

      Full renewal commissions will be paid on all renewal premiums paid on Life Insurance policies and on all payments to Annuity contracts made subsequent to the first policy anniversary as provided for in the Schedule of Commission Rates.

1. COMMISSIONS ON LONG TERM CARE REPLACEMENTS
    1. All States except California, Pennsylvania, New York, Wisconsin, Kentucky:

        a) Internal Replacements and Upgrades
        At the replacement date:  The increase in premium (resulting from the replacement) is commissionable to the new agent at the First Year Commission Rate.

        The replaced policy premium is commissionable to the original agent only in accordance with its original duration.

        The following years:  The increase in premium (resulting from the replacement) is commissionable to the new agent at the Renewal Rate based on the new policy duration.

        The replaced policy premium is commissionable to the original agent only in accordance with its original duration.

        b) External Replacements
        At the replacement date:  The total policy premium is commissionable at the First Year Commission Rate.

        The following years:  The total policy premium is commissionable at the Renewal rate based on the new policy duration.

    2. California and Pennsylvania:

        a) Internal Replacements
        Same as All State rules.

        b) External Replacements
        At the replacement date:  The increase in premium (the difference between the new John Hancock policy premium and the replaced policy premium paid to the prior Insurer) is commissionable at First Year Commission rate.

        The replaced policy premium is commissionable at the Renewal (2nd duration) commission rate.

        The following years:  The total policy premium is commissionable at the Renewal rate based on the new policy duration.

    3. New York:

        a) Internal Replacements and Upgrades
        At the replacement date:  The increase in premium (resulting from the replacement) is commissionable to the new agent at the Renewal (2nd duration) Commission Rate.

        The replaced policy premium is commissionable to the original agent only in accordance with its original duration.

        The following years:  The increase in premium (resulting from the replacement) is commissionable to the new agent at the Renewal Rate based on the new policy duration.

        The replaced policy premium is commissionable to the original agent only in accordance with its original duration.

        b) External Replacements
        At the replacement date:  The total policy premium is commissionable at the Renewal (2nd duration) Commission Rate.

        The following years:  The total policy premium is commissionable at the Renewal rate based on the new policy duration.

    4. Wisconsin:

        a) Internal Replacements and Upgrades
        Same as All State rules.

        b) External Replacements
        At the replacement date:  The total policy premium is commissionable at the Renewal (2nd duration) Commission Rate.

        The following years:  The total policy premium is commissionable at the Renewal rate based on the new policy duration.

-8-

4. Kentucky:

    a) Internal Replacements
       Same as All State rules.

    b) External Replacements
       At the replacement date: The total policy premium is commissionable at a rate equal to 2 times the 2nd duration Commission Rate.

       The following years: The total policy premium is commissionable at the Renewal rate based on the new policy duration.

C. EXCEPTIONS
The following transactions are not considered replacements when:

1. A "Permanent" insurance policy or Annuity contract replaces term insurance.

2. A policy replaces a fully paid-up policy or Immediate Annuity contract.

3. A policy replaces an endowment policy within five years of maturity.

4. A policy replaces a spouse's coverage under a family policy or under a family rider.

5. A policy results from an original date conversion for at least the same sum insured.

6. A non-qualified Retirement Income, or Endowment policy, with an endowment date occurring at age 60 or later is replaced by a new policy which qualifies as an individual retirement account.

7. The owner of an existing policy loses eligibility for special tax sheltered treatment, provided the original policy continues on a reduced paid-up basis.

-9-

COMMISSION CHARGEBACKS

A. TRADITIONAL LIFE, TERM, ESTATE PROTECTION, MEDALLION GOLD UNIVERSAL LIFE, UNIVERSAL ESTATE PROTECTION, AND LONG TERM CARE INSURANCE

There will be a chargeback of earned first year commission on any policy procured under this agreement or any preceding agreement which is lapsed or surrendered according to the following:

| The Due Date of Unpaid Premium at the Time of Lapse/Surrender | First Year Earned Commission Chargeback |
|---|---|
| 1 month after issue | 100% |
| 2 months after issue | 100% |
| 3 months after issue | 100% |
| 4 months after issue | 75% |
| 5 months after issue | 60% |
| 6 months after issue | 50% |
| 7 months after issue | 42.85% |
| 8 months after issue | 37.50% |
| 9 months after issue | 33.33% |
| 10 months after issue | 30% |
| 11 months after issue | 27.27% |
| 12 months after issue | 25% |
| 13 months after issue | 0% |

If the Producer meets the annually announced first year commission, lapse rate, number of paid cases and years under contract requirements established by the company, the effect of the chargeback provisions of this section will be waived.

B. ADDITIONAL INSURANCE PROTECTION RIDER (AIP)

If during the first three policy years the premium is reduced on an Estate Protection or Traditional Life Policy containing an Additional Insurance Protection (AIP) Rider for which commission was earned at a rate greater than 3% in the first year, is reduced or terminated, the commission paid in the first year will be redetermined as if the reduced portion had been an AIP lump sum payment. Any commission paid in excess of this redetermined commission will be chargeback.

C. FLEXIBLE VARIABLE LIFE, MEDALLION VARIABLE LIFE, VARIABLE ESTATE PROTECTION, MEDALLION EXECUTIVE VARIABLE LIFE AND HIGHBAND UNIVERSAL LIFE

If a policy lapses or is surrendered with a premium due date or effective date within the first 24 months, a chargeback will be made equal to the lessor of the total of all commissions paid in the first year up to the MCRP or the amount computed from the following table:

| Paid -To-Date at the Time of Lapse (Month after issue) | Flexible Variable Medallion Variable First Year Earned Commission Chargeback | Variable Estate Protection Medallion Executive Variable High Band Universal First Year Earned Commission Chargeback |
|---|---|---|
| 1 through 12 | 100% | 100% |
| 13 | 91.66% | 100% |
| 14 | 83.33% | 0.00% |
| 15 | 74.99% | 0.00% |
| 16 | 66.66% | 0.00% |
| 17 | 58.33% | 0.00% |
| 18 through 24 | 49.99% | 0.00% |

Chargebacks will apply to face amounts surrendered under a full or partial surrender.
If the Producer meets the annually announced first year commission, lapse rate, number of paid cases and & years under contract requirements established by the company, the effect of the chargeback provisions of this section will be waived.

D. ANNUITIES

For Allegiance Preferred and Independence 2000, full commissions will be chargeback on any amounts withdrawn, excluding the 10% free withdrawal during the first contract year. During the first 6 months of 1st contract year chargeback will be 100% on amount withdrawn over the 10% free withdrawal amount.
During the last 6 months of the 1st contract year chargeback will be 50%.

For Independence Preferred, full commissions will be chargeback on any amounts withdrawn, less the surrender penalty, if the amount has been held on deposit less than one year.

For Revolution Annuities, commissions will be charged back on amounts withdrawn, excluding the 10% free withdrawals. During the first 6 months of the first contract year, the chargeback will be 100% of the amount withdrawn. During the last 6 months of the first contract year the chargeback will be 50%.

For all other annuity contracts there is no chargeback provision applicable.

-10-

SIGNATOR SELECT May 2001

SCHEDULE OF COMMISSION RATES

Part IV    SCHEDULE OF COMMISSION RATES

| | First Policy Year % | Renewal Commissions for Policy Years 2 - 10 % |
|---|---|---|
| Traditional Life Policies: | | |
| Level Premium 100 | | |
| Issue ages 65 and under | 45 | 5 |
| Issue ages 66 - 85 | 35 | 5 |
| Issue ages 86 and over | 25 | 5 |
| | | |
| Additional Insurance Protection Rider (AIP)* | | |
| Target Premium Issue Age: | | |
| Issue ages 65 and under | 25 | 3 |
| Issue ages 66 and over | 20 | 3 |
| Excess Premium | 3 | 3 |
| Lump Sum | 3 | 3 |
| Paid Up Insurance Rider (PUI) | | |
| Schedule Premium | 3 | 3 |
| Lump Sum | 3 | 3 |
| | | |
| Mod Plus | | |
| Band 2 ($50,000 - $99,999) | | |
| Band 3 ($100,000 - $249,999) | | |
| Band 4 ($250,000 - $999,999) | | |
| Band 5 ($1,000,000 and above) | | |
| Issue ages 65 and under | 50 | 5 |
| Issue ages 66 - 85 | 40 | 5 |
| | | |
| Additional Insurance Protection Rider (AIP)* | | |
| Target Premium Issue Age: | | |
| 20 - 65 | 25 | 3 |
| 66 and over | 20 | 3 |
| Lump Sum | 3 | - |
| Excess Premium | 3 | 3 |
| | | |
| Paid Up Insurance Rider (PUI) | | |
| Reoccurring Scheduled Payments | 3 | 2 |
| Lump Sum Payments | 3 | 3 |
| | | |
| LP100 | | |
| Simplified Issue | | |
| | | |
| Issue ages 50 and under | 40 | 4 |
| Issue ages 51 to 60 | 37.5 | 4 |
| Issue ages 61 to 65 | 35 | 4 |
| Issue ages 66 to 67 | 30 | 4 |
| Issue ages 68 to 70 | 25 | 4 |
| Issue ages 71 and over | 20 | 3 |

* For compensation purposes, the AIP Rider Target Premium is one-half of the base policy premium rate, not including the policy fee, times the initial AIP coverage amount in thousands.  No commission is payable on the base policy premium increase in the 11th year.

| | First Policy Year % | Renewal Commissions for Policy Years 2 - 10 % |
|---|---|---|
| Yearly Renewable Term | | |
| Band 1 - 5 | | |
| Issue ages 65 and under | 55 | 3 |
| Issue ages 66 to 70 | 47.5 | 3 |
| Issue ages 71 and over | 40 | 3 |
| | | |
| Preferred Band 3 -5 | | |
| Issue ages 65 and under | 55 | 3 |
| Issue ages 66 to 70 | 47.5 | 3 |
| Issue ages 71 and over | 40 | 3 |
| | | |
| One Year Renewable Term (YRT1) | 2 | - |
| | | |
| Yearly Renewable Term Rider (Insured & Spouse) | | |
| | | |
| Standard Bands 1-4 | | |
| Ratable ages 65 and under | 35 | 5 |
| Ratable ages 66 to 70, incl. | 27.5 | 5 |
| Ratable ages 71 and over | 20 | 5 |
| | | |
| Preferred Bands 3-4 | | |
| Ratable ages 65 and under | 30 | 5 |
| Ratable ages 66 to 70, incl. | 22.5 | 5 |
| Ratable ages 71 and over | 15 | 5 |
| | | |
| 10, 15, 20, 25 and 30 Year Level Premium Term | | |
| all issue ages | 70* | - |

* Policy fee is Non-Commissionable

REFER TO PART II: SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

SIGNATOR SELECT May 2001

|  | First Policy Year % | Renewal Commissions for Policy Years 2 - 10 % |
|---|---|---|
| **Traditional Estate Protection Policies:** | | |
| **Modified Premium Policy** | | |
| Base | | |
| Issue ages*: | | |
| 20 - 70 | 50 | 5 |
| 71 - 75 | 45 | 5 |
| 76 - 80 | 40 | 5 |
| | | |
| Additional Insurance Protection Rider (AIP)** | | |
| Target Premium Issue ages*: | | |
| 20 - 70 | 25 | 3 |
| 71 - 75 | 22.5 | 3 |
| 76 - 85 | 20 | 3 |
| Lump Sum | 3 | - |
| Excess Premium | 3 | 3 |
| | | |
| Paid-Up Insurance Rider (PUI) | | |
| Reoccurring Scheduled Payments | 3 | 3 |
| Lump Sum | 3 | - |

\*    Ages based on younger insured.

\*\*   For compensation purposes, AIP Rider Target Premium is one-half of the base policy premium rate, not including the
      policy fee, times the initial AIP coverage amount in thousands.  No commission is payable on the base policy premium
      increase in the 11th year.

|  | First Policy Year % | Renewal Commissions for Policy Years 2 - 10 % |
|---|---|---|
| **Level Premium Policy:** | | |
| Base | | |
| Issue ages: | | |
| 20 - 70 | 45 | 5 |
| 71 - 75 | 40 | 5 |
| 76 - 80 | 35 | 5 |
| 81 - 85 | 30 | 5 |
| | | |
| Additional Insurance Protection Rider (AIP) | | |
| Target Premium Issue ages: | | |
| 20 - 70 | 25 | 3 |
| 71 - 75 | 22.5 | 3 |
| 76 - 80 | 20 | 3 |
| 81 - 85 | 17.5 | 3 |
| Excess Premium | 3 | 3 |
| Lump Sum | 3 | 3 |
| | | |
| Paid-Up Insurance Rider (PUI) | | |
| Scheduled Premium | 3 | 3 |
| Lump Sum | 3 | 3 |

REFER TO PART III SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

EP-1

SCHEDULE OF COMMISSION RATES

Variable Estate Protection Policies:

| | First Policy Year | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|
| | Target % | Excess % | Target % | Excess % | Target % | Excess % |
| Variable Estate Protection | | | | | | |
| Younger insured age 70 or younger | 45 | 3 | 5 | 3 | 3 | 3 |
| Younger insured age 71 or older | 40 | 3 | 5 | 3 | 3 | 3 |
| Variable Estate Protection II without ECV Rider | | | | | | |
| Younger insured age 70 or younger | 45 | 3 | 5 | 3 | 3 | 3 |
| Younger insured age 71 to 80 | 40 | 3 | 5 | 3 | 3 | 3 |
| Younger insured age 81 to 85 | 35 | 3 | 5 | 3 | 3 | 3 |
| Variable Estate Protection II with ECV Rider | | | | | | |
| Younger insured age 70 or younger | 35 | 3 | 9 | 3 | 3 | 3 |
| Younger insured age 71 to 80 | 30 | 3 | 9 | 3 | 3 | 3 |
| Younger insured age 81 to 85 | 25 | 3 | 9 | 3 | 3 | 3 |

Target Premium for Variable Estate Protection is the amount of premium that is fully commissionable.
Excess premiums is any premium in a given year that exceed the Target.

Producers entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization only on Variable Estate Protection premiums paid during the first policy year up to the lesser of the target or twelve times the special modal premium (no annualization will be paid after first policy year on any premiums).

Universal Life Estate Protection Policies

| | First Policy Year | | Policy Years 2-5 | | Policy Years 6 - 10 | |
|---|---|---|---|---|---|---|
| | CPT % | Excess % | CPT % | Excess % | CPT % | Excess % |
| Universal Life Estate Protection | | | | | | |
| Issue ages 75 and under | 45 | 3 | 5 | 3 | 3 | 3 |
| Issue ages 76 and over | 40 | 3 | 5 | 3 | 3 | 3 |

Commissionable Premium Target (CPT) is the amount of premium which is fully commissionable.

Excess premium is any premium payment in a given policy year that exceeds the policy CPT for that same policy year. The date of the receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in default will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice, for a premium due the following year, will receive the rate for the following year.

Producers entitled to receive annualized commissions according to the rules of the Company will be entitled to receive such annualization only on Universal Life Estate Protection premiums paid during the first policy year up to the lesser of the CPT or the annualized special modal premium.

REFER TO PART III SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

SIGNATOR SELECT May 2001

SCHEDULE OF COMMISSION RATES

Medallion Variable Life Policies (MVL):

| | First Policy Year | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|
| | CPT % | Excess % | CPT % | Excess % | CPT % | Excess % |
| **Medallion Variable Life** | | | | | | |
| Standard & Preferred | | | | | | |
| Less than $250,000 | | | | | | |
| Issue ages 65 and under | 50 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 45 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 40 | 3 | 6 | 3 | 3 | 3 |
| $250,000 and Over | | | | | | |
| Issue ages 65 and under | 45 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 40 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 35 | 3 | 6 | 3 | 3 | 3 |
| **Yearly Renewable Term Rider** | | | | | | |
| Standard | | | | | | |
| Issue ages 65 and under | 35 | - | 6 | - | 3 | - |
| Issue ages 66 - 70 | 27.5 | - | 6 | - | 3 | - |
| Issue ages 71 and over | 20 | - | 6 | - | 3 | - |
| Preferred | | | | | | |
| Issue ages 65 and under | 30 | - | 6 | - | 3 | - |
| Issue ages 66 - 70 | 22.5 | - | 6 | - | 3 | - |
| Issue ages 71 and over | 15 | - | 6 | - | 3 | - |

| | First Year Rates Payable Policy Years | | Excess | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|---|
| | 1 % | 2-4** % | % | CPT % | Excess % | CPT % | Excess % |
| **Optional Group Sales Provision*** | | | | | | | |
| Standard & Preferred | | | | | | | |
| Less than $250,000 | | | | | | | |
| Issue ages 65 and under | 35 | 5 | 3 | 7 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 30 | 5 | 3 | 7 | 3 | 3 | 3 |
| Issue ages 71 and over | 25 | 5 | 3 | 7 | 3 | 3 | 3 |
| $250,000 and Over | | | | | | | |
| Issue ages 65 and under | 30 | 5 | 3 | 7 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 25 | 5 | 3 | 7 | 3 | 3 | 3 |
| Issue ages 71 and over | 20 | 5 | 3 | 7 | 3 | 3 | 3 |

*In order to meet higher early policy cash value needs, the optional Group Sales provision may be offered in employer-employee cases where at least 3 policies are to be paid by a payroll deduction method. Under this optional arrangement the payment of first year commissions will be spread out as set forth in the commission table.

**Deferred 6% first year commission will be paid at the start of month three in policy years 2-4. Commissions on excess premiums and renewal premiums are not impacted by this option and will be paid at the rates provided in the commission table.

Commissionable Premium Target (CPT) is equal to the sum of the base policy target and rider premiums (excluding YRT) as calculated at issue and at each anniversary.

The date of receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in arrears will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice for a premium due the following year will receive the rate for the following year.

Excess premiums is any premium in a given year that exceed the CPT

Producers entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization only on Medallion Variable Life premiums paid during the first policy year up to the CPT (no annualization will be paid after first policy year on any premiums or if paid monthly, the lessor of the CPT or 12 times the monthly premium).



VLI-1

| Medallion Variable Life Plus (MVL II) | First Policy Year | | Policy Years 2-4 | | Policy Years 5-10 | | Service Fee 11+ | |
|---|---|---|---|---|---|---|---|---|
| | CPT | Excess | CPT | Excess | CPT | Excess | CPT | Excess |
| Less than $250,000 | | | | | | | | |
| Issue age 65 and under | 50 | 3 | 6 | 3 | 3 | 3 | 3 | 3 |
| Issue age 66-70 | 50 | 3 | 6 | 3 | 3 | 3 | 3 | 3 |
| Issue age 71 and over | 50 | 3 | 6 | 3 | 3 | 3 | 3 | 3 |
| | | | | | | | | |
| $250,000 and over | | | | | | | | |
| Issue age 65 and under | 45 | 3 | 6 | 3 | 3 | 3 | 3 | 3 |
| Issue age 65 and under | 45 | 3 | 6 | 3 | 3 | 3 | 3 | 3 |
| Issue age 71 and over | 45 | 3 | 6 | 3 | 5 | 3 | 3 | 3 |

Medallion Variable Life III (MVL EDGE)

| | First Policy Year | | Policy Years 2-10 | |
|---|---|---|---|---|
| | Target | Excess | Target | Excess |
| | 45%* | 3% | 3% | 2% |

First year commission rates specified are applicable to Target (up to class D medical rating)

* First year commission will be paid on any premium amount collected (up to the Target premium amount) during the first two policy years.

An asset fee of 0.30% (30 basis points) will be paid at the end of policy years 2-10. An asset fee of 0.20% will be paid at the end of the eleventh and subsequent policy years. Asset fees are a percent of assets (less loans) at the end of the policy year.

REFER TO PART III SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

SIGNATOR SELECT May 2001

SCHEDULE OF COMMISSION RATES

Flexible Variable Life Policies:

| | | First Policy Year | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|---|
| | | MCRP % | Excess % | MCRP % | Excess % | MCRP % | Excess % |
| Flexible Variable Whole-Life | | | | | | | |
| Standard & Preferred | | | | | | | |
| Less than $250,000 | | | | | | | |
| Issue ages 65 and under | | 50 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 66 - 70 | | 45 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 71 and over | | 40 | 3 | 8 | 3 | 3 | 3 |
| $250,000 and Over | | | | | | | |
| Issue ages 65 and under | | 45 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 66 - 70 | | 40 | 3 | 8 | 3 | 3 | 3 |
| Issue ages 71 and over | | 35 | 3 | 8 | 3 | 3 | 3 |
| Yearly Renewable Term Rider (YRT) | | | | | | | |
| Standard | | | | | | | |
| Issue ages 65 and under | | 35 | | 8 | | 3 | |
| Issue ages 66 - 70 | | 27.5 | | 8 | | 3 | |
| Issue ages 71 and over | | 20 | | 8 | | 3 | |
| Preferred | | | | | | | |
| Issue ages 65 and under | | 30 | | 8 | | 3 | |
| Issue ages 66 - 70 | | 22.5 | | 8 | | 3 | |
| Issue ages 71 and over | | 15 | | 8 | | 3 | |

| | First Year Rates | | | Policy Years 2 - 4 | | Policy Years 5 - 10 | |
|---|---|---|---|---|---|---|---|
| | Payable Policy Years | | Excess | MCRP | Excess | MCRP | Excess |
| | 1 % | 2 - 4** % | % | % | % | % | % |
| Optional Group Sales Provision* | | | | | | | |
| Standard & Preferred | | | | | | | |
| Less than $250,000 | | | | | | | |
| Issue ages 65 and under | 35 | 5 | 3 | 9 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 30 | 5 | 3 | 9 | 3 | 3 | 3 |
| Issue ages 71 and over | 25 | 5 | 3 | 9 | 3 | 3 | 3 |
| $250,000 and Over | | | | | | | |
| Issue ages 65 and under | 30 | 5 | 3 | 9 | 3 | 3 | 3 |
| Issue ages 66 - 70 | 25 | 5 | 3 | 9 | 3 | 3 | 3 |
| Issue ages 71 and over | 20 | 5 | 3 | 9 | 3 | 3 | 3 |

*In order to meet higher early policy cash value needs, the optional Group Sales provision may be offered in employer-employee cases where at least 3 policies are to be paid by a payroll deduction method. Under this optional arrangement the payment of first year commissions will be spread out as set forth in the commission table.

**Deferred 6% first year commission will be paid at the start of month three in policy years 2-4. Commissions on excess premiums and renewal premiums are not impacted by this option and will be paid at the rates provided in the commission table.

MCRP (Maximum Commission Rate Premium) equals sum of Modified Scheduled Premium plus the premium on all riders (excluding YRT) and substandard extra premiums, excluding temporary dollar ratings or premiums in excess of Class C rating.

Excess premium is any premium payment in a given policy year that exceeds the policy MCRP for that same policy year.

The date of receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in default will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice for a premium due the following year will receive the rate for the following year.

Producers entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization only on Flexible Variable Life premiums paid during the first policy year up to the MCRP (no annualization will be paid after first policy year on any premiums).

REFER TO PART III SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

SIGNATOR SELECT May 2001

<u>SCHEDULE OF COMMISSION RATES</u>

Long Term Care Policies:

Following rates are payable unless modified by subsequent state regulations establishing a different commission schedule. In that event, the commission rates required by the respective state will be paid.

Commission rates for Advantage Gold Lifetime Pay Premium

| | | Policy Years | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 % | 2 % | 3 % | 4 % | 5 % | 6 % | Service Fee 6-10 |
| **A. Non-Sponsored Group** | | | | | | | |
| All States except those listed below | 40 | 10 | 10 | 10 | 10 | - | 10 |
| Michigan (ages 65 and over) | 23 | 23 | 23 | 10 | 10 | - | 10 |
| Indiana | 28 | 14 | 14 | 14 | 14 | - | 14 |
| Delaware | 25 | 18 | 18 | 18 | 18 | - | - |
| **B. Sponsored Group** | | | | | | | |
| All States except those listed below | 35 | 5 | 5 | 5 | 5 | - | - |
| Michigan ( Issue Age 65+) | 18 | 18 | 18 | 2 | 2 | - | - |
| Indiana | 18 | 9.5 | 9.5 | 9.5 | 9.5 | 9.5* | - |
| Wisconsin | 28 | 7 | 7 | 7 | 7 | 7* | - |
| Pennsylvania | 35 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5* | - |
| Delaware | 25 | 8 | 8 | 8 | 8 | - | - |

*Commission in year 6.  Service fees in years 7+.

**In order to qualify for the payment of Service Fees, agents must meet the annual Service Fee production requirement as outlined in part II of the General Contract Provisions of the Producer's Commission Agreement.

C. Family Discount

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| All States except those listed below | 38 | 8 | 8 | 8 | 8 | - | 8 |
| Michigan (ages 65 and over) | 20 | 20 | 20 | 8 | 8 | - | 8 |
| Indiana | 22 | 12 | 12 | 12 | 12 | - | 12 |
| Delaware | 25 | 11 | 11 | 11 | 11 | - | 11 |
| Wisconsin | 34 | 9 | 9 | 9 | 9 | - | 9 |

Commission rates for Advantage Gold Limited Pay Premium

For Limited Pay Premium options of 10 year or paid up at 65

The Limited Pay premium is split between Lifetime pay premium and excess premium

In each year, the applicable lifetime premium commission or service fee rate will be paid on  the lifetime pay premium PLUS an additional commission or service fee of three (3)% will be paid on the excess premium.

REFER TO PART II SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

SIGNATOR SELECT May 2001

Annuities:

### SCHEDULE OF COMMISSION RATES

Before engaging in the marketing of or servicing of an individual Variable Annuity product the Producer must be appropriately registered with the National Association of Securities Dealers (NASD) and meet all appropriate State licensing regulations for this product.

Rates of Commission
All Policy Years
%

1. Deferred Variable Annuities
   Independence 2000
   Issue Age 79 and under ......... 3
   Issue Age 80 - 84 ............... 2

Revolution Value

| | With Care Solutions Plus | | Without Care Solutions Plus | |
|---|---|---|---|---|
| | Comm | Asset Fee | Comm | Asset Fee |
| Ages 0 - 80 | | | | |
| Option A | 3.500% | -- | 3.250% | -- |
| Option B | 2.900% | 0.15% | 2.650% | 0.15% |
| Option C | 1.300% | 0.50% | 1.050% | 0.50% |
| Ages 81 - 84 | | | | |
| Option A | 1.750% | -- | 1.600% | -- |
| Option B | 1.450% | 0.15% | 1.350% | 0.15% |
| Option C | 0.650% | 0.50% | 0.500% | 0.50% |

Revolution Extra @ 3.5%

| | With Care Solutions Plus | | Without Care Solutions Plus | |
|---|---|---|---|---|
| | Comm | Asset Fee | Comm | Asset Fee |
| Ages 0 - 80 | | | | |
| Option A | 2.550% | -- | 2.300% | -- |
| Option B | 2.000% | 0.15% | 1.750% | 0.15% |
| Option C | not available | | | |
| Ages 81 - 84 | | | | |
| Option A | 1.250% | -- | 1.150% | -- |
| Option B | 1.000% | 0.15% | 0.850% | 0.15% |
| Option C | not available | | | |

Revolution Extra @ 5.0%

| | With Care Solutions Plus | | Without Care Solutions Plus | |
|---|---|---|---|---|
| | Comm* | Asset Fee | Comm* | Asset Fee |
| Ages 0 - 80 | | | | |
| Option A | 1.850% | -- | 1.600% | -- |
| Option B | 1.250% | 0.15% | 1.050% | 0.15% |
| Option C | not available | | | |
| Ages 81 - 84 | | | | |
| Option A | 0.950% | -- | 0.800% | -- |
| Option B | 0.650% | 0.15% | 0.500% | 0.15% |
| Option C | not available | | | |

*Revolution Extra - the entire amount of the first deposit that brings the cumulative total to or beyond $2.5 million, will be compensated at the lower rate.

Revolution Access

| | With Care Solutions Plus | | Without Care Solutions Plus | |
|---|---|---|---|---|
| | Comm | Asset Fee | Comm | Asset Fee |
| Ages 0 - 80 | | | | |
| Option A | not available | | | |
| Option B | 0.950% | 0.50% | 0.700% | 0.50% |
| Option C | not available | | | |
| Ages 81 - 84 | | | | |
| Option A | not available | | | |
| Option B | 0.450% | 0.25% | 0.350% | 0.25% |
| Option C | not available | | | |

ANN-1

SCHEDULE OF COMMISSION RATES

2. Deferred Fixed Annuities

Allegiance Preferred                                    2.75

REVOLUTION EV ANNUITY

OPTION A COMPENSATION SCHEDULE

AGE LESS THAN OR EQUAL TO 80

| Guarantee Period (years) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1st Year Commission (a) | 0.95% | 1.40% | 2.00% | 2.10% | 1.15% | 2.45% | 1.40% | 2.80% | 2.90% | 3.00% |
| Asset Fee (Years 2+) (b) | NONE | NONE | NONE | NONE | NONE | NONE | NONE | NONE | NONE | NONE |

AGE GREATER THAN 80

| Guarantee Period (years) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1st Year Commission (a) | 0.45% | 0.70% | 1.00% | 1.05% | 0.60% | 1.20% | 0.70% | 1.40% | 1.45% | 1.50% |
| Asset Fee (Years 2+) (b) | NONE | NONE | NONE | NONE | NONE | NONE | NONE | NONE | NONE | NONE |

OPTION B COMPENSATION SCHEDULE

AGE LESS THAN OR EQUAL TO 80

| Guarantee Period (years) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1st Year Commission (a) | NONE | 0.95% | 1.50% | 1.60% | 1.85% | 2.00% | 2.10% | 2.20% | 2.30% | 2.45% |
| Asset Fee (Years 2+) (b) | NONE | 0.15% | 0.15% | 0.15% | 0.15% | 0.15% | 0.15% | 0.15% | 0.15% | 0.15% |

AGE GREATER THAN 80

| Guarantee Period (years) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1st Year Commission (a) | NONE | 0.45% | 0.75% | 0.80% | 0.95% | 1.00% | 1.05% | 1.10% | 1.15% | 1.25% |
| Asset Fee (Years 2+) (b) | NONE | 0.15% | 0.15% | 0.15% | 0.15% | 0.15% | 0.15% | 0.15% | 0.15% | 0.15% |

OPTION C COMPENSATION SCHEDULE

AGE LESS THAN OR EQUAL TO 80

| Guarantee Period (years) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1st Year Commission (a) | 0.45% | 0.45% | 0.45% | 0.45% | 0.45% | 0.45% | 0.45% | 0.45% | 0.45% | 0.45% |
| Asset Fee (Years 2+) (b) | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% |

AGE GREATER THAN 80

| Guarantee Period (years) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1st Year Commission (a) | 0.23% | 0.23% | 0.23% | 0.23% | 0.23% | 0.23% | 0.23% | 0.23% | 0.23% | 0.23% |
| Asset Fee (Years 2+) (b) | 0.25% | 0.25% | 0.25% | 0.25% | 0.25% | 0.25% | 0.25% | 0.25% | 0.25% | 0.25% |

NOTES:

(a) = Commissions are expressed as a percent of deposit

(b) = Asset Fees are expressed as a percent of account value

IRA Choice Annuity (Guaranteed Principle Annuity)

|  | % of Deposit |
|---|---|
| Up to Age 79 | 3.05% |
| Over Age 79 | 2.50% |

3. Immediate Variable Annuities
   Accommodator                                    3

4. Immediate Fixed Annuities
   John Hancock Managed                            3

REFER TO PART III SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

ANN-2

SCHEDULE OF COMMISSION RATES

Flexible Premium Adjustable Life Policies (Universal Life):

| | First Policy Year % | Policy Years 2-5 Option 1* % | Policy Years 2-5 Option 2* % | Policy Years 6 - Beyond* % |
|---|---|---|---|---|
| Payable on maximum commission rate premium: | | | | |
| Policy Base less than $250,000 | | | | |
| Issue ages 65 and under | 50 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 45 | 4 | 6 | 3 |
| Issue ages 71 to 75 | 40 | 4 | 6 | 3 |
| Issue ages 76 and over | 35 | 4 | 6 | 3 |
| Policy Base $250,000 and over | | | | |
| Issue ages 65 and under | 45 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 40 | 4 | 6 | 3 |
| Issue ages 71 to 75 | 35 | 4 | 6 | 3 |
| Issue ages 76 and over | 30 | 4 | 6 | 3 |
| Yearly Renewable Term Rider | | | | |
| Standard | | | | |
| Issue ages 65 and under | 35 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 27.5 | 4 | 6 | 3 |
| Issue ages 71 and over | 20 | 4 | 6 | 3 |
| Preferred | | | | |
| Issue ages 65 and under | 30 | 4 | 6 | 3 |
| Issue ages 66 to 70 | 22.5 | 4 | 6 | 3 |
| Issue ages 71 and over | 15 | 4 | 6 | 3 |
| Add-Ons (Increases) | | | | |
| Policy Base $249,999 and under | 47 | - | - | - |
| Policy Base $250,000 and over | 42 | - | - | - |
| Excess Premium, and Premium for ratings greater than Class C, and temporary dollar amount ratings (Option 1 & 2) | 3 | 3.5 | 3.5 | 3 |

* The date of receipt of premium payments will determine the policy year for the commission on Flexible Premium Adjustable Life.

MCRP (Maximum Commission Rate Premium) for Flexible Premium Adjustable Life equals 12 times the minimum monthly premium for Option 1, plus the premium on all riders and substandard extra premiums, excluding temporary dollar ratings or premiums in excess of Class C.

Producers entitled to receive annualized commissions according to the rules of the company will be entitled to receive such annualization on Universal Life only on premiums paid during first policy year up to the MCRP (no annualization will be paid after first policy year on any premiums).

REFER TO PART III SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

SIGNATOR SELECT May 2001

SCHEDULE OF COMMISSION RATES

High Band Universal Life Policies

HB-1

| High Band Universal Life<br>No Reduction for Higher Ages | First Policy Year | | Policy Years 2-10 | |
|---|---|---|---|---|
| | Target<br>% | Excess<br>% | Target<br>% | Excess<br>% |
| | 35 | 3 | 3 | 3 |

HB-2

| | First Policy Year | | Policy Years 2-4 | | Policy Years 5-10 | |
|---|---|---|---|---|---|---|
| | Target<br>% | Excess<br>% | Target<br>% | Excess<br>% | Target<br>% | Excess<br>% |
| | 20 | 3 | 8 | 3 | 3 | 3 |

Producers entitled to receive annualized commissions according to the rules of the Company will be entitled to receive such annualization only on High Band Universal Life premiums paid during the first policy year up to the lesser of the Target or twelve times the special modal premium.

Target Premium for High Band Universal Life is the amount of premium that is fully commissionable.
Excess is any premium payment in a given year that exceeds the policy target for that same policy year.

Medallion Gold Universal Life Policies ( Low Target UL)

| Medallion Gold Universal Life<br>No Reduction for Higher Ages | First Policy Year | | Policy Years (2-5) | | Policy Years (6-10) | |
|---|---|---|---|---|---|---|
| | CPT<br>% | Excess<br>% | CPT<br>% | Excess<br>% | CPT<br>% | Excess<br>% |
| | 45 | 3 | 5 | 3 | 3 | 3 |

Commissionable Premium Target (CPT) is the amount of premium which is fully commissionable.

Excess premium is any premium payment in a given policy year that exceeds the policy CPT for that same policy year. The date of the receipt of premium payments will determine the policy year for the commission. However, premiums received in a grace period to cover an amount in default will receive the commission rate in effect prior to the grace period. Premiums received at year end accompanied by a billing notice, for a premium due the following year, will receive the rate for the following year.

Producer entitled to receive annualized commissions according to the rules of the Company will be entitled to receive such annualization only on Medallion Gold Universal Life premiums paid during the first policy year up to the lesser of the primary no lapse guarantee premium or the annualized special modal premium.

Payroll BENEFIT LIFE (UL)

| | First Policy Year | | Years 2 and Beyond | |
|---|---|---|---|---|
| | Target<br>% | Excess<br>% | Target<br>% | Excess<br>% |
| Payroll Benefit Life<br>No Reduction for Higher Ages | 50 | 3 | 3 | 3 |



REFER TO PART IV SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.

SIGNATOR SELECT May 2001

MEDALLION EXECUTIVE VARIABLE LIFE POLICIES (MEVL)

| | First Policy Year | | Policy Years 2-4 | | Policy Years 5-10 | |
|---|---|---|---|---|---|---|
| | CPT % | Excess % | CPT % | Excess % | CPT % | Excess % |
| Medallion Executive Variable Life | | | | | | |
| Issue ages 20-65 | 20 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 66-70 | 15 | 3 | 6 | 3 | 3 | 3 |
| Issue ages 71 and over | 10 | 3 | 6 | 3 | 3 | 3 |

Commissionable Premium Target (CPT): is the amount of premium which is fully commisionable.

Excess premium is any premium payment in a given policy year that exceeds the policy CPT for that same policy year.

*An additional Deferred First Year Commission of 6% will be paid on the lesser of the First Year Aggregate or the first year CPT premium, on the Base Policy in years 2-4.

Asset fee of .2% will be paid starting at the end of the 5th policy year. Asset fees are a percent of assets (less loans) at the end of the policy year.

Producers entitled to receive annualized commissions according to the rules of the Company will be entitled to receive such annualization only on Medallion Executive Variable Life premiums paid during the first policy year up to the lesser of the CPT or the annualized special modal premium.

MEDALLION EXECUTIVE VARIABLE LIFE POLICIES (MEVL III)

| | First Policy Year | | Policy Years 2-3 | | Policy Year 4 | | Policy Year 5 | |
|---|---|---|---|---|---|---|---|---|
| | Target | Excess | Target | Excess | Target | Excess | Target | Excess |
| Medallion Executive Variable Life III Without ECV rider | 14% | 3.25% | 7.75% | 2.25% | 7.75% | 2.25% | 2.25% | 2.25% |
| Medallion Executive Variable Life III With ECV rider | 13% | 3.25% | 8.75% | 2.25% | 7.75% | 2.25% | 2.25% | 2.25% |

An Asset Fee of 14 basis points will be paid starting at the end of the 1st policy year. Asset Fees are a percent of assets (less loans) at the end of the policy year.

A Service Fee will be payable beginning year 6 at 2.25% of premium for individuals meeting service fee qualification requirements, per the terms of their respective commission agreements.

REFER TO PART III SPECIAL COMMISSION PROVISIONS REGARDING REPLACEMENTS AND COMMISSION CHARGEBACKS.
SIGNATOR SELECT May 2001

EX. I



## Distributors, Inc.

Boston • Massachusetts • 02117

# Sales Representative's Agreement

Name _Keith Mooney_

Agency _Chicago North 279_ Ord. Code _279_

Registered Rep. Number _58387_

# JOHN HANCOCK DISTRIBUTORS, INC.
## SALES REPRESENTATIVE'S AGREEMENT

John Hancock Distributors, Inc., a Delaware corporation with its Home Office in Boston, Massachusetts, hereinafter called "Distributors", and (Representative name) Keith Mooney currently of (home address) 843 Tipperary Gilberts, Il 60136 , hereinafter called "Representative", in consideration of the terms and considerations set forth in this Sales Representative's Agreement ("Agreement") or otherwise made a part of hereof, do mutually agree as follows:

1. **AUTHORIZATION.** Distributors hereby authorizes Representative ("he/she") as an independent contractor to represent Distributors in conducting its securities business and offer for sale only those securities which Distributors is authorized to offer, including, but not limited to, mutual funds, variable life insurance, variable annuities, limited partnerships, unit investment trusts and general securities. Distributors reserves the right from time to time at its discretion to limit the offering and sale of certain securities to certain of its representatives. Solicitations shall be made only within the territory in which such securities are registered and qualified for sale and in which Distributors and Representative are qualified to do business in accordance with licensing requirements and other applicable federal and state laws or regulations. Representative is not authorized to act for Distributors in the acceptance of any application for purchase of securities; rather, applications shall be accepted only by Distributors at its Home Office in Boston, Massachusetts.

2. **RELATIONSHIP.** The relationship of Representative to Distributors is that of an independent contractor and nothing contained herein shall be construed to create an employer and employee relationship between Representative and Distributors nor between Representative and any issuer of securities. Representative shall be free to exercise his/her own judgment as to the persons whom he/she shall solicit as well as the time, place, manner and means of such solicitation, and as to the procuring and remission of applications and payment, and as to all other transactions and activities engaged in by Representative, so long as his/her actions are consistent with the provisions of this Agreement, the provisions of the security offering, the Rules and Regulations of the National Association of Securities Dealers ("NASD") and any applicable Federal and state laws or administrative regulations. Distributors shall not pay to Representative any expenses or compensation whatsoever except as provided in Sections 10, 11, 12, 13, 14 and 15 of this Agreement. Representative shall not represent or accept any payments from any other securities broker or dealer, directly or indirectly, or the offers to sell any security from anyone whether or not registered as a broker/dealer, while this Agreement is in effect, without prior written approval of Distributors.

It is hereby specifically acknowledged and agreed by Distributors and Representative that nothing contained in this Sales Representative's Agreement shall in any way impact the employer/employee relationship between John Hancock Mutual Life Insurance Company ("JHMLICO") and a Representative associated with a Managerial Agency of JHMLICO whose employment is subject to the Collective Bargaining Contract. Furthermore, it is expressly acknowledged and agreed by Distributors and Representative that this Sales Representative's Agreement shall not impact the Collective Bargaining Contract in any way, and that, if any provision of the Collective Bargaining Contract with JHMLICO conflicts with a provision of this Sales Representative's Agreement, such provision of the Collective Bargaining Contract shall prevail and control.

Representative agrees to notify Distributors in writing in the event Representative contemplates entering into a private securities transaction as defined in Rule 3040 of the Conduct Rules of the NASD. Distributors will have an opportunity to notify Representative that Distributors approves or disapproves of the private securities transaction prior to Representative's participation in such transaction. Furthermore, in the event Distributors disapproves of the transaction, the Representative shall not participate in the transaction in any manner, directly or indirectly.

Representative also agrees to comply with and be bound by the continuing education requirements imposed by Distributors including, but not limited to, attendance at training and compliance-related seminars.

In addition to the foregoing, Representative agrees to become thoroughly knowledgeable, and to comply in all aspects, with the provisions of the "Market Conduct Manual", prepared and provided jointly by JHMLICO and Distributors. Representative also agrees to promptly update this publication upon receipt of periodic updates.

3. **VARIABLE PRODUCTS, MUTUAL FUNDS, UNIT INVESTMENT TRUSTS, LIMITED PARTNERSHIPS OR OTHER APPLICATIONS.** Representative shall remit to Distributors immediately upon receipt the investment or policy application, the new account form/client profile (applicable to all securities other than variable insurance products) and full payment in the form of the customer's personal check, a bank cashier's check or money order payable to JHMLICO or John Hancock Variable Life Insurance Company ("JHVLICO"), as insurance company, applicable for proprietary variable products, or Distributors or the transfer agent, custodian bank, fund, trust or escrow agent for other securities to be purchased as directed by Distributors. Representative shall not accept any other form of payment for securities sold, including cash, tendered by a customer. Representative shall comply with all procedures established by Distributors and JHMLICO in connection with the handling and remission of applications or order(s) to purchase securities. Distributors and the issuer of the security shall have the right to refuse any application or order(s) at their discretion.

4. **GENERAL SECURITIES.** Representative shall follow the procedures for General Securities transactions detailed in the "Market Conduct Manual" prepared by JHVLICO and Distributors. Representative must complete and submit to Distributors a new brokerage account application to establish an account. Under no circumstances may Representative hold funds or securities on behalf of the investor; all funds or securities must be promptly sent to the Home Office of Distributors.

5. **SHAREHOLDER INQUIRIES/COMPLAINTS.** Representative shall immediately refer all customer inquiries and correspondence regarding John Hancock securities products to John Hancock Signature Services, Inc. ("JHSS"). Representative shall immediately refer limited partnership unit holder inquiries to the appropriate general partner or trustee of the investment. Representative shall immediately refer all inquiries and correspondence from customers regarding other non-proprietary investments to the applicable transfer agent, investment company or investment manager about which inquiry is made.

Pursuant to procedures more fully described in the "Market Conduct Manual", all complaints shall be directed immediately to the NASD Compliance Unit in the John Hancock Office of Business Conduct or to the Customer Relations Department of JHMLICO.

6. **RULES AND REGULATIONS.** (a) Representative shall remain familiar with and abide by all rules, regulations and requirements of applicable federal and state laws and industry regulatory bodies, including particularly the Securities and Exchange Commission and the NASD;

(b) Representative shall make no representations concerning the securities offered for sale by Distributors except such as are contained in current prospectuses or private placement memoranda and authorized advertising and sales literature made available by Distributors; (c) Representative shall not solicit business through mailing, advertisements or any other media except by the use of authorized advertising and sales literature made available by Distributors or JHMLICO and approved prior to use by a principal of Distributors; (d) All books, documents, prospectuses, private placement memoranda, application forms, customer records, transaction records, correspondence files or other materials or supplies in the possession of Representative that pertain to the business of Distributors shall be the property of Distributors, at any and all times shall be open to inspection by any duly authorized representative of Distributors or JHMLICO and at the termination of this Agreement shall be immediately returned to Distributors or JHMLICO; (e) Representative understands that failure to comply with all rules, regulations and requirements of applicable federal and state laws and of the NASD may result in disciplinary action against Representative by the NASD and by any governmental authorities having jurisdiction. Such failure, as well as violations of internal company rules set forth in the "Market Conduct Manual" or determinations made by the Compliance Review Group of Distributors may result in a fine by Distributors, suspension by Distributors of Representative's authority to represent it or the termination of this Agreement by Distributors; (f) Representative shall immediately inform Distributors as to any change of address, any civil suit, action or litigation commenced against him/her, any formal criminal complaints made against him/her, any arrests other than for minor traffic violations where the fine is less than $50, any disciplinary action taken against him/her by any regulatory agency or any customer complaints about securities purchased from Representative.

7.    SUITABILITY STANDARDS (Multiclass Fund Shares).  Certain mutual funds sold by Distributors are being offered with two or more classes of shares of the same investment portfolio; each mutual fund prospectus must be reviewed for availability and details.  It is essential that the following minimum compliance/suitability standards be adhered to in offering and selling shares of these funds to investors.  Representative agrees to comply with these general suitability and compliance standards.

When two mutual funds with more than one class of shares are available to individual investors, it is important that investors purchase not only the fund that best suits their investment objectives but also the class of shares that offers the most beneficial distribution financing based upon their particular situation and preferences.  Fund share recommendations and orders must be carefully reviewed by Representative in light of all the facts and circumstances to ascertain that the class of shares to be purchased by each investor is appropriate and suitable.  These recommendations should be based on several factors, including but not limited to:

a.  the amount of money to be invested initially and over a period of time;

b.  the current level of front-end sales load or back-end sales load imposed by the fund;

c.  the period of time over which the client expects to retain the investment;

d.  the current yields from fixed income funds' multiclass shares;

e.  any other relevant circumstances such as the availability of reduced sales charges under letter of intent and/or rights of accumulation.

There are instances when one distribution financing may be more appropriate than another.  For example, shares subject to a front-end sales charge may be more appropriate than shares subject to a

# EXHIBIT 1

## SCHEDULES OF REPRESENTATIVE'S COMMISSIONS

### Dealer Commissions

The Representative's commission on mutual funds, unit investment trusts and limited partnerships offered by John Hancock Distributors, Inc. shall be a percentage of the dealer commission/reallowance received by John Hancock Distributors, Inc. as the selling Broker/Dealer. In the event that the dealer commission payable to John Hancock Distributors, Inc. is reduced based on volume discounts, the Representative's commission will be reduced proportionately.

For example, the dealer commission on a mutual fund purchase is a percentage of the public offering price (net asset value of the shares purchased plus applicable sales charge) determined in accordance with the provisions of the current prospectus of the fund. If the sales charge on the purchase is reduced based on sales volume discount, the dealer commission and resulting representative commission shall be reduced by the same proportion.

The incentive bonus level is tiered, based upon production, and is paid as a percentage of the dealer commission, as described below. Production bonus levels are based on rolling total of the dealer commission generated in the last 26 pay cycles, including the current cycle.

### Distribution Plan Compensation (12b-1 Service Fees)

The 12b-1 service fees paid to a Representative are based on the dealer 12b-1 commission earned by John Hancock Distributors, Inc. on the Representative's book of mutual fund business. The Registered Representative's 12b-1 compensation is calculated as a percentage of the dealer 12b-1 commission received on proprietary and non-proprietary products combined, using a quarterly rolling total and tiered payout schedule.

Representatives are paid these fees quarterly. Each quarterly 12b-1 service fee payment to the Representative is calculated by multiplying the total dealer 12b-1 commissions received by John Hancock Distributors regarding the Representative's book of business during that quarter by the appropriate percentage in the current payout schedule, based on a quarterly rolling total. (The total dealer 12b-1 commission received by John Hancock Distributors, Inc. on the Representative's book of business during the current and prior three calendar quarters determines the Representative's quarterly rolling total and qualification level in the schedule.)

Note: Proprietary products pay a 12b-1 service fee on those assets that have been under John Hancock management for a period of one year. Non-proprietary products may or may not have a distribution plan or asset retention qualification period. All non-proprietary 12b-1 service fees are defined by the respective fund sponsor.

The schedule of payments relating to dealer commission, applicable bonuses and 12b-1 fees is as follows:

(10/97)

### New Registered Representatives

Representatives transferring their license from another Broker/Dealer will be paid at a compensation level based on their past production. Documentation from their prior Broker/Dealer that shows **gross dealer commissions on qualifying products** earned for the past 12 months must be provided. New Representatives who are not able, or who elect not, to provide John Hancock Distributors, Inc. with a record of their prior production on qualifying products will be paid at the first bonus level of 20.0% as a minimum, for the first 13 cycles after the effective date of their license. After that time period, the Representative will be paid according to his or her production level.

### 401(k) Compensation

Mutual fund 401(k) compensation will be paid the same as mutual funds, unit investment trusts and limited partnerships. 401(k) plans will follow the same compensation schedule and qualify for production bonuses.

### JHMLICO Credits

Mutual funds, 401(k) plans, unit investment trusts and limited partnerships sold through John Hancock Distributors, Inc. qualify for JHMLICO credits. The schedule below reflects the percentage of base commission applied toward JHMLICO credits. Production bonuses do not count toward any credits.

|                                  | MA RATE | CA RATE |
|----------------------------------|---------|---------|
| Contract Continuance             | 100.0%  | 60.0%   |
| Subsidized Insurance             | N/A     | 60.0%   |
| Hancock Conventions              | 60.0%   | 60.0%   |
| Convention/Leaders Recognition   | 60.0%   | 60.0%   |

### General Securities

General securities compensation is paid only to Representatives who are properly registered and who are selected to participate in the full John Hancock Distributors, Inc. general securities program. Compensation on general securities trading is 40.0% of the commission received by John Hancock Distributors, Inc. less the applicable ticket charge. There will be no commission paid on transactions introduced to John Hancock Distributors, Inc. as part of the client referral (deep discount) program.

### John Hancock Variable Products (Proprietary Variable Products)

The Representative's commissions on variable life insurance and variable annuities issued by John Hancock Variable Life Insurance Company and John Hancock Mutual Life Insurance Company shall be paid by or on behalf of Distributors as specified in:

1.  The Independent Producer's Commission Agreement for a Representative associated with a John Hancock General Agency or Affiliated General Agency or

2.  The Collective Bargaining Agreement for a Representative associated with a Managerial Agency.

### Non-proprietary Variable Products

The Representative's commission on variable life insurance and variable annuities issued by an insurance company other than John Hancock Mutual Life Insurance Company or John Hancock Variable Life Insurance Company will be based on the current commission and allowance schedule applicable to specific products at the time business is placed, as a percentage of the amount received by Distributors from the product sponsor.

(10/97)

Rolling Total Production
Less than $80,000 Dealer Commission
and Less than $25,000 12b-1 Fees

**Commission**

| | Dealer Commission * | Base Commission | Bonus | TOTAL |
|---|---|---|---|---|
| $0 to $5,999 | 35.0% | 00.0% | 35.0% |
| $6,000 to $19,999 | 35.0% | 20.0% | 55.0% |
| $20,000 to $39,999 | 35.0% | 32.5% | 67.5% |
| $40,000 to $59,999 | 35.0% | 40.0% | 75.0% |
| $60,000 to $79,999 | 35.0% | 45.0% | 80.0% |

**12b-1 Fees**

| Dealer 12b-1 Fees (Quarterly Rolling Average) | Payout on 12b-1 Fees |
|---|---|
| $0 to $749 | 00.0% |
| $750 to $2,999 | 43.0% |
| $3,000 to $14,999 | 46.0% |
| $15,000 to $24,999 | 50.0% |

* Includes proprietary and non-proprietary mutual funds and all 401(k) plans, limited partnerships, UITs, and net wrap fees.

Effective October 1997

After a Representative attains $80,000 or more in dealer commission or $25,000 in 12b-1 fees, the bonus level is determined using the table below as a combination of dealer commissions and 12b-1 fees.

Rolling Total Production
More than $80,000 Dealer Commission
or More than $25,000 12b-1 Fees

| Total of Dealer Commission and Dealer 12b-1 Fees | Base Commission on Dealer Commissions | Bonus Payout on Dealer Commission | Total Payout on Dealer Commission | Payout on 12b-1 Fees |
|---|---|---|---|---|
| $0 to $9,999 | 35.0% | 00.0% | 35.0% | (as applicable) |
| $10,000 to $29,999 | 35.0% | 20.0% | 55.0% | 55.0% |
| $30,000 to $54,999 | 35.0% | 32.5% | 67.5% | 67.5% |
| $55,000 to $79,999 | 35.0% | 40.0% | 75.0% | 75.0% |
| $80,000 and over | 35.0% | 45.0% | 80.0% | 80.0% |

| Example: | $55,000 | Dealer Concession | | Base Commission | 35.0% |
|---|---|---|---|---|---|
| | $30,000 | 12b-1 Fees | = | Bonus | 45.0% |
| | $85,000 | | | | 80.0% |
| | | | | 12b-1 Fees | 80.0% |

(10/97)

contingent deferred sales charge for investors who qualify for a significant quantity discount on the front-end sales charge. In addition, shares subject to a contingent deferred sales charge may be more appropriate for investors whose orders would not qualify for quantity discounts and who, therefore, may prefer to defer sales charges and also for investors who determine it to be advantageous to have all of their funds invested without deduction of a front-end sales commission. However, if it is anticipated that an investor may redeem his or her shares within a short period of time, the investor may, depending on the amount of his or her purchase, bear higher distribution expenses by purchasing contingent deferred sales charge shares than if he or she had purchased shares subject to a front-end sales charge.

8. **INSTITUTIONAL SHARES.** Certain mutual funds sold by Distributors may be offered to institutional investors and qualified benefit plans, including pension funds, and are sold without a sales charge or 12b-1 fee. (See each mutual fund prospectus for details.)

9. **VARIABLE PRODUCTS SUITABILITY.** Variable life insurance and variable annuity products are considered securities products. In addition to their being subject to state insurance laws, the laws and regulations of the SEC and the Conduct Rules of the NASD also apply to the sale of those products, including non-registered group variable contracts.

Representatives must meet NASD registration requirements as well as state insurance licensing requirements for each state where their clients reside and where business is written.

Representatives must only recommend variable contracts that are suitable in light of their customers' insurable needs, financial objectives, family profile, risk tolerance and investment sophistication, based on facts obtained from the customer through a fact-finding process.

10. **COMMISSIONS: VARIABLE PRODUCTS, MUTUAL FUNDS, UNIT INVESTMENT TRUSTS, LIMITED PARTNERSHIPS AND OTHER INVESTMENTS.** Distributors shall pay a commission to Representative subject to the provisions of this Agreement on all purchases made by a customer pursuant to an application or transaction record accepted by Distributors and the issuer according to the provisions of Section 3 of this Agreement (a) where an application is personally obtained and remitted by Representative or (b) where an application is not personally obtained and remitted by Representative but a purchase or subsequent contribution is added to an existing shareholder or policyholder account and Representative continues to be recognized by such customer as the Representative servicing his or her account.

11. **COMMISSIONS: GENERAL SECURITIES.** Distributors shall pay a commission to Representative subject to the provisions of this Agreement on all purchases and sales made by or to a customer pursuant to an order resulting in a trade by Distributors through its general securities operations according to the provisions of Section 4 of this Agreement (a) where an order is personally obtained and remitted by Representative or (b) where an order is not personally obtained and remitted by Representative but that purchase or sale is transacted in an existing customer account and Representative continues to be recognized by such customer as the Representative servicing his or her account. The amount of commissions paid on general securities transactions and any restrictions regarding payment of these commissions is described in Exhibit 1, attached hereto and made a part hereof.

12. **PAYMENT OF COMPENSATION.** The amount of commissions payable to Representative hereunder shall be determined in accordance with Distributors' "Schedules of Representative's Commissions" in effect when the securities are purchased. Such "Schedules of Representative's

Commissions" currently in effect are attached hereto as Exhibit 1, which Exhibit may be updated as circumstances warrant. The "Schedules of Representative's Commissions" shall be subject to change by Distributors at any time without notice, with the exception of proprietary variable products sold by a Representative associated with a Managerial Agency whose employment is subject to the Collective Bargaining Contract, but no such change shall affect commissions payable with respect to securities sold prior to the effective date of such change. Commissions shall be paid to Representative so long as the securities were sold while the Representative was a duly licensed Representative of Distributors. Commissions payable under this Agreement shall be paid to Representative not less frequently than monthly; provided, however, with the exception of proprietary variable products, if the total amount of commissions payable to Representative in any calendar month is less than $50.00, then such commissions may be held for Representative's account and accumulated with other commissions, if any, hereafter accruing until a month in which the aggregate commissions equal at least $50.00 or until the last pay cycle of a calendar year. Notwithstanding the foregoing, commissions shall be payable to Representative only to the extent that gross commissions are received and in the possession of Distributors. In the event Distributors is legally prevented from offering for sale any or all securities or from receiving further payment on any or all securities sold, Representative agrees that Distributors shall not be liable to him/her for any expenses, damages or costs resulting therefrom or for any commissions on such securities which would or may have otherwise become payable to him/her under this Agreement. Distributors reserves the right at any time and from time to time in its discretion to cease to offer shares of certain or all securities, in which event Distributors shall not be liable to Representative for any expenses, damages, costs or subsequently accruing commissions whatsoever.

13. **COMMISSION FORFEITURE.** With the exception of proprietary variable products sold by a Representative associated with a Managerial Agency whose employment is subject to the Collective Bargaining Contract, if for any reason any purchase transaction is reversed, Representative shall automatically lose all right to commissions on such purchase and shall pay to Distributors on demand the full amount received by him/her on account thereof. Distributors may withhold and retain from any commission due Representative, with the exception of proprietary variable products sold by a Representative associated with a Managerial Agency whose employment is subject to the Collective Bargaining Contract, a sum sufficient to discharge any debt due from Representative to Distributors. Representative understands that commissions may or may not be paid in the event that an investor receives distributions from a limited partnership or real estate investment trust and elects reinvestment of those funds in the same limited partnership or real estate investment trust or subsequent program from the same sponsor.

14. **OTHER COMPENSATION.** Certain of the mutual funds sold by Distributors, including John Hancock Funds, have adopted plans under Rule 12b-1 of the Investment Company Act of 1940. To the extent that Representative provides certain distribution and marketing services in the promotion of the sales of fund shares, including but not limited to furnishing services and assistance such as answering inquiries regarding the funds and assisting in changes to distribution options, account designations and addresses, to his/her customers who invest in and own shares of the funds, Representative shall be entitled to receive compensation in accordance with the provisions of Section 15 of this Agreement.

15. **PAYMENT OF OTHER COMPENSATION.** The amount of compensation made pursuant to Rule 12b-1 shall be determined in accordance with Distributors' "Distribution Plan Schedule of Compensation" in effect at time of payment. Such "Distribution Plan Schedule of Compensation" currently in effect is attached hereto as Exhibit 2, which Exhibit may be updated as circumstances warrant. The "Distribution Plan Schedule of Compensation" shall be subject to change by

NO. 791    P11

Distributors at any time without notice. Compensation payable under this Agreement shall be paid to Representative quarterly and compensation shall be paid to Representative only so long as Representative is a duly licensed Representative of Distributors, as such compensation is based on continuing service, and such compensation shall be payable to Representative only to the extent the monies are available to Distributors.

16.    **TERMS OF AGREEMENT.** This Agreement shall remain in full force and effect until terminated by written notice by the Representative or Distributors. This Agreement will be immediately terminated (unless Representative is otherwise notified by Distributors) in the event that the Representative should cease to be associated with a General Agency or Managerial Agency of JHMLICO, or if he/she should breach any of the provisions of this Agreement (including, without limitation, failure to comply with applicable laws or Distributors' supervisory rules), or in the event that his/her NASD registration with Distributors or qualification under any state securities law should be terminated. Distributors reserves the right to assess an annual maintenance fee based on the volume of business or compensation earned from the sale of products, with the exception of proprietary variable products, and to terminate this Agreement and Representative's NASD registration with Distributors if, under NASD rules or interpretations, the Representative may be deemed inactive. Any notice of termination by Distributors to the Representative shall be sent to the residence address designated in his/her NASD application, which shall be kept current at all times by the Representative. If Representative terminates this Agreement by written notice to Distributors, Distributors shall concurrently submit to the NASD a notice of termination. This Agreement shall automatically terminate upon the death of Representative.

17.    **INDEMNIFICATION.** Representative agrees to indemnify Distributors in the event of any claim, suit, judgment or any liability whatsoever which may be imputed to Distributors as a result of any act or omission by Representative which may be construed or considered as negligent, willful, intentional, fraudulent or criminal, or any violation of Federal and state securities laws or Conduct Rules of the NASD, which may result from the offer or sale of any security or purported security by Representative during the term of this Agreement or after termination. Representative agrees to cooperate fully with Distributors and not impede or hinder any of Distributors' responsibilities to supervise Representative, as mandated in Rule 3010 of the NASD Conduct Rules, including the investigation of customer complaints. Representative may be liable for any losses incurred by Distributors in connection with Representative's failure to comply with any law, rule, industry regulation or Distributors policy. Furthermore, Representative agrees not to conceal from Distributors any securities sales activities, whether authorized by Distributors or not, and agrees to fully inform Distributors of any securities sales on behalf of customers.

18.    **MANDATORY ARBITRATION.** With the exception of a Representative associated with a Managerial Agency of JHMLICO whose employment is subject to the Collective Bargaining Contract, Distributors and Representative mutually consent to the resolution by arbitration of all claims or controversies ("claims"), whether or not arising out of the Representative's status as a representative (or its termination), that Distributors may have against Representative or that Representative may have against Distributors or against its officers, directors, employees or representatives in their capacity as such or otherwise. The claims covered by this consent to arbitration include all claims arising out of or in connection with the business of Distributors, including but not limited to the following: claims for commissions or other compensation due; claims for breach of any contract or covenant (express or implied); tort claims; claims for discrimination (including, but not limited to, race, sex, religion, national origin, age, marital status or medical condition, handicap or disability); claims for benefits (except where a benefit or pension plan specifies that its claims procedure shall culminate in an arbitration procedure different from this one),

and claims for violations of any Federal, state or other governmental law, statute, regulation, or ordinance.

19. **MISCELLANEOUS.** This Agreement supersedes all previous agreements, oral or written, between the parties hereto regarding the subject matter hereof, and may be amended by written notice to Representative by Distributors at any time.

The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision of this Agreement.

20. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

IN WITNESS WHEREOF, the parties hereto on behalf of themselves, their heirs and assigns have made and executed this Agreement in duplicate as a sealed instrument on ____10/21____, 19 97 .


**JOHN HANCOCK DISTRIBUTORS, INC.**          **REPRESENTATIVE**


_____            By: _____

_____Jason H. Diamond_____             Name_____

_Président & Chief Operating Officer_       Rep.# _5838 7_____


JHD-9 (10/97)

Ex. J

# We're Moving
## March 9th, 2004

**Keith B. Mooney & Associates**
**1 Executive Court**
**Suite 5**
**South Barrington, IL 60010**

**Phone: 847-382-2600**
**Fax: 847-382-4143**
**E-mail: kmooney@kbmooney.com**

Ex. K



WHERE DOING BUSINESS IS AN ART

**ASSOCIATED SECURTIES CORP.**

# Redacted

The past several years have brought dramatic changes to the world's financial markets. Now more than ever, it takes patience, diligence and a keen understanding of the global economy to be successful at investing.

These are the qualities I have focused on throughout my working relationship with you, while developing investment strategies tailored to meet your specific needs. Now I am taking a career step which I am convinced will allow me to continue serving you in the best manner possible.

I am pleased to let you know I have affiliated with the independent brokerage firm of Associated Securities Corp. (ASC), a subsidiary of Associated Financial Group, Inc. which is owned by Pacific Select Distributors, Inc., a wholly owned subsidiary of the 135-year old Pacific Life Insurance Company.

ASC clears transactions through Pershing LLC, a subsidiary of The Bank of New York with equity capital of $8 billion, and total assets of almost $90 billion. As a member of SIPC, Pershing LLC provides protection for the assets held in its custody. Although this protection doesn't cover losses from the rise and fall of the market, SIPC applies if a member firm fails financially and is unable to meet its obligations to securities customers. SIPC provides $500,000 of securities coverage, including $100,000 of coverage for cash balances. In addition, Pershing, LLC provides unlimited coverage through a private insurer.

ASC's motto, "Where Doing Business is an Art," holds true for both its clients and its financial professionals. ASC is comprised of seasoned financial professionals who have established a network of branch offices dedicated to helping clients meet their financial objectives. I am confident my new affiliation with ASC will increase the quality and variety of financial services, products and solutions that I can offer my clients.

My 7-year association with (Signator Investors) has been very pleasant one. However, I know this change is the right, as it will enhance my ability to provide you with superior financial planning and money management services, including:

- ❑ A wide range of high quality investments;
- ❑ Instant, around the clock access to important investment information; and
- ❑ Direct Linkage to all major exchanges

ASC shares my commitment to the preservation and growth of your assets through a careful program of investment planning and selection. I am proud of my new affiliation and confident you will be pleased with the range of services you will receive as a result of it.

I encourage you to join me by transferring your securities account to Associated Securities Corp. I have enclosed the forms to begin this process. Please sign and return the forms back to me in the enclosed envelope. Please do not detach any copies at this time, as you will be receiving copies of all paperwork when your account is processed. Should you have any questions please contact me at (847) 382-2600.

I look forward to discussing my new affiliation and the reasons it will be advantageous to you.

Sincerely,

Tom Kochan
1 Executive Court – Unit #5
South Barrington, IL 60010

Ex. L

⎯⎯|File for:
CRD# 2562218
KEITH BRIAN MOONEY

Data Current as of: 03/19/2004

# ALL CURRENT EMPLOYMENTS

This section provides all current employments (investment-related and non-investment related) as reported on the individual broker's Form U-4. It displays the name of the employing brokerage firm that employs this individual broker, the brokerage firm's CRD number (if applicable), the location of the office where the individual broker is employed, and the individual broker's start date.

To view information on NASD registered firms, you can click on the brokerage firm name hyperlink.

If the individual broker is currently employed with an investment adviser, the investment adviser's name and CRD number will display. However, additional information is not available on investment advisers through NASD BrokerCheck as they are not NASD registered brokerage firms.

If the individual broker is currently employed with a brokerage firm registered with any self-regulatory organization other than NASD (e.g., the NYSE), either the brokerage firm's name or "Other Business" will display as the Employing Firm. To obtain the brokerage firm's name when "Other Business" displays as the Employing Firm, please call the NASD BrokerCheck Hotline number, 1-800-289-9999.

A Brokerage Firm CRD Number will display for NASD registered brokerage firms the individual broker is currently associated with. A Brokerage Firm CRD Number will not display for NASD registered firms the individual broker was formerly associated with.

In addition, a Brokerage Firm CRD Number will not display for employing brokerage firms that are not NASD registered firms. Information on these employing brokerage firms is not available through NASD BrokerCheck.

| | |
|---|---|
| **Employing Brokerage Firm:** | ASSOCIATED SECURITIES CORP. |
| **Brokerage Firm CRD Number:** | 12969 |
| **Office of Employment Address:** | 1 EXECUTIVE CT., STE. 5 SOUTH BARRINGTON, IL 60118 USA |
| **Start Date:** | 03/17/2004 |
| **End Date:** | to present |

| | |
|---|---|
| **Employing Brokerage Firm:** | SIGNATOR INVESTORS, INC. |
| **Brokerage Firm CRD Number:** | 468 |
| **Office of Employment Address:** | 1901 N ROSELLE RD SCHAUMBURG, IL 60195 USA |
| **Start Date:** | 06/09/1997 |
| **End Date:** | to present |

**Other Business**

AETNA-151 FARMINGTON AVENUE, HARTFORD, CT 06156 (860)273-7807. AMERICAN UNITEDLIFE INS. CO.-ONE AMERICAN SQUARE, P.O. BOX 368, INDIANAPOLIS, IN. 1-800-208-8105. BENEFICIAL STANDARD-P.O. BOX 1911, CARMEL, IN. 46032 (317)817-6800. BLUE CROSS BLUE SHIELD-223 N. MICHIGAN AVENUE, CHICAGO,IL. 60601-5655, (312) 938-6000. CENTENNIAL LIFE INS. CO.-9000 W. 67TH ST., MERRIAM,KS. CNA-P.O. BOX 78222, INDIANAPOLIS,IN 46278-0222, 1-800-477-9195. CONNECTICUT NATIONAL-SCHAUMBURG, IL. 60173., (773)685-9200. DELTA DENTAL-2001 BUTTEFIELD ROAD, SU 900, DOWNERS GROVE, IL. 60515, (630)964-2400. EMPLOYERS HEALTH- 1100 EMPLOYERS BLVD., GREEN BAY, WI 54344, 1-800-558-4444. FIRST COLONY-LYNCHBURG, VA, 24505, (804)845-0911. GOLDEN RULE INS. CO.-712 11TH ST.,LAWRENCEVILLE, IL 62439-2395, (618)943-8000. GREAT-WEST-P.O. BOX 1080, DENVER, CO. 80201, (847)685-1259. INSURANCE BROKER

**NASD**

Broker Search    Firm Search    Deliver Report    Glossary    Help    FAQs

NASD BrokerCheck

Individual Broker File Contents

Employment History
  Current **(2)**
  Previous **(4)**
Registrations **(29)**
Disclosure Events: **Maybe**
By selecting the Deliver Report option (at the top of the screen) any disclosure information that exists will be forwarded to you within approximately 2 business days.

View Description of Individual Broker Category

____File for:
CRD# 2562218
KEITH BRIAN MOONEY

Data Current as of: 03/19/2004

# Registrations

This section provides the jurisdictions with which the individual broker is currently registered or licensed to do business, the category of each registration, and the date on which the registration approval was granted.

## Employer: ASSOCIATED SECURITIES CORP.

| Jurisdiction/SRO | Category | Status | Status As Of Date |
|---|---|---|---|
| AZ | Agent | Temporary Registration | 03/18/2004 |
| CO | Agent | Temporary Registration | 03/18/2004 |
| MI | Agent | Temporary Registration | 03/18/2004 |
| NASD | General Securities Principal | Approved Pending Prints | 03/18/2004 |
|  | General Securities Representative | Approved Pending Prints | 03/18/2004 |
| NJ | Agent | Temporary Registration | 03/18/2004 |
| NV | Agent | Temporary Registration | 03/18/2004 |
| OH | Agent | Temporary Registration | 03/18/2004 |
| PA | Agent | Temporary Registration | 03/18/2004 |
| PCX | General Securities Representative | Approved | 03/18/2004 |
| WA | Agent | Temporary Registration | 03/18/2004 |
| WI | Agent | Temporary Registration | 03/18/2004 |

## Employer: SIGNATOR INVESTORS, INC.

| Jurisdiction/SRO | Category | Status | Status As Of Date |
|---|---|---|---|
| AZ | Agent | Approved | 08/31/2000 |
| CA | Agent | Approved | 07/25/2002 |
| CO | Agent | Approved | 01/12/2000 |
| FL | Agent | Approved | 03/01/2002 |
| IA | Agent | Approved | 08/21/2000 |
| IL | Agent | Approved | 07/24/1997 |

| IN | Agent | Approved | 03/31/1999 |
| MI | Agent | Approved | 09/05/2000 |
| NASD | General Securities Principal | Approved | 06/12/1998 |
| | General Securities Representative | Approved | 07/24/1997 |
| NC | Agent | Approved | 03/11/2004 |
| NJ | Agent | Approved | 11/15/1999 |
| NV | Agent | Approved | 03/03/1999 |
| OH | Agent | Approved | 06/29/2000 |
| PA | Agent | Approved | 10/16/2002 |
| WA | Agent | Approved | 02/25/2002 |
| WI | Agent | Approved | 07/25/1997 |

NASD BrokerCheck

Individual Broker File Contents

📂 Employment History
  📄 Current (0)
  📄 Previous (2)
📄 Registrations (0)
📂 Disclosure Events: No

View Description of Individual Broker Category



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

# Civil Cover Sheet

**DOCKETED**

MAR 2 4 2004

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

---

**Plaintiff(s): SIGNATOR INSURANCE AGENCY, INC., SIGNATOR INVESTORS, INC., individually and as wholly-owned subsidiaries of JOHN HANCOCK FINANCIAL SERVICES, INC.**

**Defendant(s):ROBERT LYMAN, MARK BERNHAGEN, KEITH MOONEY & THOMAS KOCHAN**

**DOCKETED**

County of Residence: Suffolk County, Massachusetts

County of Residence: Lake County, Illinois    MAR 2 4 2004

Plaintiff's Atty:   Michael J. Sheehan
                    Connelly Sheehan & Moran
                    150 S. Wacker Dr., Suite 1600,
                    Chicago, IL 60606
                    312-372-1969

Defendant's Atty:

**04C 2149**

---

II. Basis of Jurisdiction:     **4. Diversity (complete item III)**

III. Citizenship of Principal
Parties (Diversity Cases Only)
              Plaintiff:-**2 Citizen of Another State**
              Defendant:-**1 Citizen of This State**

IV. Origin :                   **1. Original Proceeding**

V. Nature of Suit:             **190 Other Contract**

VI.Cause of Action:            **Pursuant to 28 U.S.C. Section 1332, plaintiffs bring an action for: 1) Injunctive Relief; 2) Breach of Contract; 3) Breach of Fiduciary Duty; 4) Inducement of Breach of Fiduciary Duty; 5) Tortious Interference with Contractual Business Relations; 6) Misappropriation of Trade Secrets (765 ILCS 1065/1 et seq.); 7) Conversion; 8) Civil Conspiracy; 9) Consumer Fraud and Deceptive Business Practices (815 ILCS 505/1 et seq. and 815 ILCS 510/1 et seq.); 10) Misrepresentation and 11) Fraud**

VII. Requested in Complaint
              Class Action:**No**
              Dollar Demand:**TRO**
              Jury Demand:**No**

x  3/23/04       x

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**DOCKETED**

MAR 2 4 2004

In the Matter of

SIGNATOR INSURANCE AGENCY, INC., SIGNATOR INVESTORS, INC., individually and as wholly-owned subsidiaries of JOHN HANCOCK FINANCIAL SERVICES, INC.

V.

ROBERT LYMAN, MARK BERNHAGEN, KEITH MOONEY & THOMAS KOCHAN

Case Number **04C 2149**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

SIGNATOR INSURANCE AGENCY, INC., SIGNATOR INVESTORS, INC., individually and as wholly-owned subsidiaries of JOHN HANCOCK FINANCIAL SERVICES, INC.

| (A) | (B) |
|---|---|
| SIGNATURE *Michael J. Sheehan* ( BSL ) | SIGNATURE *Brian* |
| NAME Michael J. Sheehan | NAME Brian Spang |
| FIRM Connelly Sheehan Moran | FIRM Connelly Sheehan Moran |
| STREET ADDRESS 150 S. Wacker Dr., Ste. 1600 | STREET ADDRESS 150 S. Wacker Dr., Ste. 1600 |
| CITY/STATE/ZIP Chicago, IL 60606 | CITY/STATE/ZIP Chicago, IL 60606 |
| TELEPHONE NUMBER 312-372-1969   FAX NUMBER 312-372-1968 | TELEPHONE NUMBER 312-372-1969   FAX NUMBER 312-372-1968 |
| E-MAIL ADDRESS msheehan@csm-law.com | E-MAIL ADDRESS bspang@csm-law.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06195189 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06243937 |
| MEMBER OF TRIAL BAR?   YES X   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO X |
| TRIAL ATTORNEY?   YES X   NO ☐ | TRIAL ATTORNEY?   YES X   NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO X |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER   FAX NUMBER | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |